IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **SECOND CHANCE, INC.** | * | |
| 1700 Ridgely Street | | |
| Baltimore, MD 21230 | * | |
| | | |
| and | * | |
| | | |
| **MARK S. FOSTER** | * | |
| 600 E. Seminary Avenue | | |
| Towson, MD 21286 | * | |
| | | |
| Plaintiffs, | * | Case No.: |
| | | |
| v. | * | |
| | | |
| **UNITED STATES OF AMERICA** | * | |
| c/o Internal Revenue Service | | |
| 1111 Constitution Avenue, NW | * | |
| Washington, DC 20224 | | |
| | * | |
| SERVE: | | |
| Kelly O. Hayes, Esq. | * | |
| United States Attorney for the District of Maryland | | |
| United States Attorney's Office | * | |
| 36 S. Charles Street | | |
| Baltimore, MD 21201 | * | |
| | | |
| Defendant. | * | |
| | | |
| | * | |

* * * * * * * * * * * * *

# **COMPLAINT**

Plaintiffs, Second Chance, Inc. ("Second Chance") and Mark S. Foster ("Foster") (together, "Plaintiffs"), by their undersigned attorneys, and pursuant to 26 U.S.C. ("I.R.C.") §§ 6703(c)(2) and 7422, hereby submit this Complaint and Demand for Jury Trial against the Defendant, United States of America c/o Internal Revenue Service ("IRS" or "Defendant"), and state as follows:

## NATURE OF THE CASE

1. Plaintiffs bring this action pursuant to I.R.C. §§ 6703(c)(2) and 7422 for a determination that Plaintiffs are not liable for civil penalties or interest assessed against them by the Defendant pursuant to I.R.C. § 6701 and for the recovery of certain payments that Plaintiffs made toward those penalties, which the IRS erroneously and illegally assessed and collected from Plaintiffs.

## PARTIES

2. Second Chance, Inc. is an I.R.C. 501(c)(3) nonprofit, charitable corporation with its principal place of business located at 1700 Ridgely Street, Baltimore, Maryland 21230.

3. Mark S. Foster is a resident of the State of Maryland who resides at 600 East Seminary Avenue, Towson, Maryland 21286. Foster is the founder, President, and CEO of Second Chance.

4. The Internal Revenue Service is an agency of the United States of America with its principal place of business located at 1111 Constitution Avenue, N.W., Washington, District of Columbia 20224.

## JURISDICTION AND VENUE

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1346(a)(1) and I.R.C. §§ 6703(c) and 7422.

6. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1402(a)(1).

## FACTS COMMON TO ALL COUNTS

### Second Chance's Charitable Missions

7. Second Chance's IRS-approved charitable mission is twofold. First, through a process known as "deconstruction," Second Chance carefully salvages and repurposes existing building materials from structures that would otherwise be destroyed. Deconstruction allows Second Chance's donors—individuals and corporations that are typically planning to demolish and/or renovate improvements to real property—to instead divert valuable and even historically significant building materials back into the stream of commerce rather than the landfill.

8. Second, Second Chance operates a workforce and skill development program for underemployed individuals. Through this program, Second Chance has successfully given hundreds of individuals a literal second chance at participating in society, often presenting these individuals an opportunity for stable employment, workforce experience (learning a trade and simple life skills such as time management and communicating in a workplace environment), and ultimately reducing recidivism. Over more than two decades, Second Chance's programs and operations have received awards and accolades too numerous to list here, but which include at least nine consecutive years on GreatNonprofits' Top-Rated list, various local and community accolades, and press recognition (*e.g.*, "Best Of …" lists).

9. In essence, Second Chance utilizes multiple elements of the organization to conduct workforce development and job training, waste stream diversion, recycling, and reuse – a deconstruction operation, a donations operation, a transportation and logistics operation, and a massive retail/warehouse operation.

101898\000048\4926-3726-2652.v4

10. Since its founding, thousands of donors up and down the Eastern Seaboard have successfully donated valuable building materials to Second Chance that would otherwise have been destroyed, directed to a landfill, or sold for commercial gain.

11. Deconstruction of donated materials is a laborious and time-intensive process. It can take Second Chance many days—sometimes weeks—to complete a project at a residential structure. Some large residential or commercial projects take even more time. But the societal benefits and reward is significant; Second Chance salvages millions of dollars' worth of materials—everything from lumber to windows, water heaters to vanities, doors to copper wire and plumbing—every single year, much of which is sold to contractors and the general public alike in its stunning 250,000 foot warehouse retail operation located in the heart of Baltimore City. Salvaged materials that do not return to the warehouse are often repurposed in other ways, such as by "re-donation" to other regional charitable operations, or diversion to recycling operations.

**The Donation Process**

12. Donors are incentivized to make donations of valuable building materials by the United States Internal Revenue Code, which provides tax benefits for non-cash donations provided taxpayers satisfy certain statutory criteria, including an appraisal from an independent, third-party appraiser for non-cash donations in excess of $5,000. It is the IRS's misapplication and/or misinterpretation of those criteria that are at issue in this case.

13. Relevant here, the criteria each taxpayer must meet to claim a charitable deduction include:

    a. Donations must be made to an eligible organization that is recognized as tax-exempt under I.R.C. § 501(c)(3).
    b. Donors must obtain and maintain proper documentation for non-cash contributions, which generally means a receipt or written acknowledgement

          from the charitable organization including a detailed description of the donated property.

    c. For all non-cash donations valued in excess of $5,000, donors must obtain an appraisal from a qualified appraiser.

    d. Donors must also complete a Form 8283, which includes specific details about the contributed property, including description, date acquired, cost or other bases, and fair market value.

14. With respect to the requirement for a qualified appraisal, donors retain third-party, qualified appraisers to conduct and prepare a qualified appraisal of the donated materials in compliance with the IRC and IRS regulations. More specifically, qualified appraisers employ IRS-approved valuation methodologies in light of the facts and circumstances of each appraisal, choosing whichever method or combination of valuation methods is most likely to produce the most accurate fair market value of donated materials.

15. Contemporaneously, and as required, Second Chance provides written acknowledgements to donors confirming receipt of donated materials. These acknowledgements include executed IRS Forms 8283, which set forth specific details about the contributed property, including description, date acquired, cost or other bases, and fair market value.

16. Second Chance's signature on the Forms 8283 does not represent its concurrence with the appraised value of the contributed property. Rather, Second Chance's signature (whether by Foster or other authorized employee) on the Forms 8283 serves as Second Chance's confirmation that it *received* the donated property.

17. Whether or not donors ultimately elect to claim deductions on their income tax returns is within donors' sole discretion. Indeed, at all stages in the process, Second Chance and Foster expressly disclaim the giving of any tax advice, and confirm that the donors are relying on the donors' own tax professionals, accountants, and legal counsel for all tax matters, including whether or not they ultimately decide to claim deductions.

**The IRS Investigation**

18. At all relevant times, Second Chance has worked tirelessly and in good faith to ensure it and its programs remain in full compliance with all applicable laws, standards, and regulations.

19. Despite Second Chance's laudable IRS-approved missions and goals, and continued efforts at compliance, the IRS has at various times over the past 15 years or so unfairly targeted Second Chance and/or its donors. Moreover, the IRS has failed to issue guidance or rules pertaining to deconstruction donations generally, and instead has asserted positions that are both internally inconsistent and/or incorrect as a matter of law. Pertaining to Second Chance, IRS agents have gone so far as to make hyperbolic and unprofessional threats, such as a stated desire to "put a stake through the heart" of the organization. While the IRS's motives for such statements and actions are often inscrutable, its animus appears consistently triggered by the fact that donors may claim deductions of material value, in the tens or even the hundreds of thousands of dollars.

20. Against this backdrop, and despite the proliferation of deconstruction donations around the country over the past two decades, the IRS has consistently failed to provide any meaningful clarity or guidance regarding the "rules of the road" applicable to the appraisals and valuation of donated building materials. The uncertainty surrounding the IRS rules and regulations applicable to donations of deconstructed building materials has created a moving target.

21. Donors, charities, tax professionals, and appraisers nationwide would benefit from clarity regarding the appropriate methodologies and criteria that donors must satisfy in order to claim a valid donation. But until that happens, the donating public and various related

constituencies remain at the mercy of the whims of whichever particular IRS enforcement section or individuals they may encounter.

22. In early 2021, the IRS initiated the latest iteration of its crusade: an investigation of Second Chance into purported tax avoidance transactions. It found nothing of the sort. Instead of closing its fruitless investigation, however, the IRS apparently used the information it had gathered during the investigation to single out a set of twenty-two (22) Second Chance donors from tax year 2020 for audit (hereinafter the "Audits," and those donors subject to the Audits, the "Audited Donors"). Upon information and belief, the outcome of the Audits as to materials donations to Second Chance was all but predetermined. Indeed, the IRS coordinated and presented a handful of maximalist arguments against the Audited Donors in which their deductions (and underlying appraisals—all from the same appraiser relying on a similar methodology) were rejected in full.

23. Upon information and belief, the IRS supported its rejection of most if not all of the charitable donation deductions claimed by the Audited Donors with a "Technical Review" written by a purported appraisal expert. Upon information and belief, the IRS's appraiser conducted a "desk review" of each of the third-party appraisals submitted by the 22 Audited Donors in conjunction with the filing of their 2020 tax returns. In each case the IRS's appraiser's desk review concluded that the appraisals failed to provide a fair market value. The desk reviews that Plaintiffs have seen are short (4 pages or so), and yet still contain errors and incorrect assumptions contradicted by the underlying facts and data. Unfortunately, but perhaps unsurprisingly under the circumstances, rather than provide a competing fair market analysis, the IRS's appraiser instead consistently determined that the value of each donation of materials was,

somehow, "zero." Worse yet, the IRS levied significant interest and penalties against most if not all of the Audited Donors.

24.     The IRS did not stop there. The IRS kept its investigation of Second Chance "open" while it spent years quietly conducting the Audits. In July 2024, however, the IRS finally unveiled its endgame, culminating its investigation by, for each of the Audits, assessing "tax return preparation" penalties pursuant to I.R.C. § 6701 directly against both Second Chance and Foster for purportedly "aiding and abetting the understatement of another person's tax liability."

25.     Specifically, on or about July 8, 2024, Second Chance received a letter from the IRS advising, in part, that "the penalty under Section 6701, *Penalties for Aiding and Abetting Understatement of Tax Liability* [was] applicable" to Second Chance for the 2020 tax year (the "Second Chance Determination Letter").  *See* July 8, 2024 Second Chance Determination Letter, attached hereto as **Exhibit A**.  Enclosed with the Second Chance Determination Letter were Forms 886-A, *Explanation of Items*, and *Computation of Penalty*, which purported to "explain the reasons for [the IRS's] determination and the computation of the penalty amounts" (the "Second Chance Form 886-A").  *Id.*  According to the Second Chance Form 886-A, penalties were to be assessed in relation to twenty-two (22) of Second Chance's "clients" (*i.e.*, donors). *Id.* The Second Chance Form 886-A further stated that penalties assessed pursuant to Section 6701 are $1,000 per return, which made the contemplated total penalty $22,000. *Id.*

26.     On or about July 8, 2024, Foster received a substantially similar letter from the IRS advising, in part, that the penalty under Section 6701 was applicable to Foster (the "Foster Determination Letter").  *See* July 8, 2024 Foster Determination Letter, attached hereto as **Exhibit B**.  The Foster Determination Letter also enclosed a Form 886-A (the "Foster Form 886-A"), which referenced a total penalty in the amount of $22,000. *Id.*

27. On or about August 12, 2024, Second Chance and Foster, through counsel, responded to the Second Chance and Foster Determination Letters (together, the "Determination Letters") by letter to the IRS disputing the IRS's position that Second Chance and Foster were liable for any penalty assessed under Section 6701 (the "Rebuttal Letters"). *See* August 12, 2024 Rebuttal Letters, attached hereto as **Exhibits C and D**.

28. On or about August 15, 2024, Second Chance and Foster, through counsel, supplemented the Rebuttal Letters by email in response to a request from the IRS for additional information. *See* August 15, 2024 email correspondence, attached hereto as **Exhibit E**.

29. On or about September 23, 2024, Foster received a notice stating, "[y]ou have been charged a penalty under Section 6701 of the Internal Revenue Code for penalty [sic] for aiding and abetting the understatement of another person's tax liability" (the "Foster Notice of Penalty Charge"). *See* September 23, 2024 Foster Chance Notice of Penalty Charge, attached hereto as **Exhibit F**. The penalty assessed against Foster was in the amount of $22,000. *Id.* The Foster Notice of Penalty Charge indicated that payment was due by October 14, 2024. *Id.* The Foster Notice of Penalty Charge further indicated, "[i]f you want to contest the penalty assessment, you must follow on of the two procedures below… Pay at least 15% of the penalty. You must then file Form 6118, Claim for Refund of Tax Return Preparer and Promoter Penalties, within 30 days of the date of this notice." *Id.*

30. On or about September 30, 2024, Second Chance received its own notice stating, "[w]e charged you a civil penalty for 2020, under Internal Revenue Code Section 6701 for Penalty for Aiding and Abetting the Understatement of Another Person's Tax Liability" (the "Second Chance Notice of Penalty Charge"). *See* September 30, 2024 Second Chance Notice of Penalty Charge, attached hereto as **Exhibit G**. The penalty assessed against Second Chance was

9

in the amount of $22,000. *Id.* The Second Chance Notice of Penalty Charge indicated that payment was due by October 21, 2024. *Id.* The Second Chance Notice of Penalty Charge further indicated, "[i]f you want to contest the penalty assessment, you must follow on of the two procedures below… Pay at least 15% of the penalty. You must then file Form 6118, Claim for Refund of Tax Return Preparer and Promoter Penalties, within 30 days of the date of this notice." *Id.*

31. On or about October 11, 2024, Foster paid 15% of the total assessed penalty and, on or about October 20, 2024, filed Forms 6118 (the "Foster Forms 6118") for each of the individual taxpayers identified in the Foster Form 886-A. *See* October 20, 2024 Foster Forms 6118, attached hereto as **Exhibit H**. Upon information and belief, the IRS received the Foster Forms 6118 on October 24, 2024.

32. On or about October 18, 2024, Second Chance paid 15% of the total assessed penalty and, on or about October 20, 2024, filed Forms 6118 (the "Second Chance Forms 6118") for each of the individual taxpayers identified in the Second Chance Form 886-A. *See* October 20, 2024 Second Chance Forms 6118, attached hereto as **Exhibit I**. Upon information and belief, the IRS received the Second Forms 6118 on October 25, 2024.

33. On or about May 15, 2025, in response to a request by the IRS seeking certain additional information it claimed was not included in the Forms 6118, Foster supplemented his Forms 6118 with regard to the reasons he is entitled to a refund (the "Foster Forms 6118 Supplement"). *See* May 14, 2025 Foster Forms 6118 Supplement, attached hereto as **Exhibit J**.

34. On or about May 16, 2025, Second Chance supplemented its Forms 6118 with regard to the reasons it is entitled to a refund (the "Second Chance Forms 6118 Supplement"). *See* May 16, 2025 Second Chance Forms 6118 Supplement, attached hereto as **Exhibit K**.

35. More than six (6) months have passed since Second Chance and Foster filed their claims for refund on their respective Forms 6118. Therefore, all conditions precedent necessary to maintain this lawsuit have been met.

**The Audited Donors did not Understate their Tax Liability**

36. Notwithstanding the Audited Donors' compliance with the applicable IRS requirements, the IRS incorrectly asserts that these donors understated their respective tax liability. The IRS has further assessed penalties against Second Chance and Foster alleging that Second Chance and Foster have "aided and abetted" their donor's understatement of tax liability.

37. Upon information and belief, following an examination audit of the Audited Donors' returns, the IRS advanced substantially similar and legally flawed arguments to arbitrarily disallow deductions, even when these donors substantially complied with all applicable guidelines and regulations.

38. For context, upon information and belief, the Audited Donors and their tax professionals (accountants, agents, and/or lawyers), provided the IRS with reams of requested materials, including appraisal reports, documented photographs of the donated materials, letters/certifications acknowledging receipt of donated materials from Second Chance, contracts, communications, and more.

39. Upon information and belief, the Audits uncovered no material evidence suggesting that the Audited Donors retained an interest in the donated materials or that the materials for which donations were claimed were not, in fact, deconstructed, salvaged, and removed from the donors' real property by Second Chance. In other words, the Audit outcomes were primarily premised on the IRS's contentions disputing the claimed valuation dollars and

methodology—by a third party appraiser—not on evidence that the donors or Second Chance failed to do what they should have done.

40.     Still, despite the documentary record, the IRS proposed to disallow each audited contribution in their *entirety*, and, despite the fact that most donors received and relied on professional advice, and did nothing different than taxpayers around the country who take similar deductions, the IRS wrongfully sought civil penalties against the Audited Donors.

41.     The IRS's determinations in the Audits rest on a veritable kitchen sink of false and meritless legal and factual contentions and arguments, including, but *not* limited to, the following five claims.

42.     First, the IRS alleged that some if not all Audited Donors had claimed not just certain materials that were in fact deconstructed and removed from the premises (which is permitted by applicable law), but the "entire house." Upon information and belief, this is false; the Audited Donors obtained appraisals of—and claimed deductions for—*only* discrete items of personal property that were physically removed from the premises by Second Chance and for Second Chance specifically acknowledged receipt.

43.     Second, the IRS contends that some if not all of the Audited Donor's appraisals were not "qualified" because they did not employ the comparable-sales approach and because they relied on R.S. Means cost data to value the donated property. The regulations and caselaw, however, explicitly recognize the replacement-cost-less-depreciation approach used by the subject qualified appraiser in its appraisals. Moreover, R.S. Means software is the very cost database the IRS itself designates as a preferred vendor in its published guidance. The IRS nonetheless maintained its unreasonable position without conducting or commissioning any

competing valuation; its appraiser instead unreasonably asserted that the only supportable value was "zero." Accordingly, the IRS's position is meritless.

44.     <u>Third</u>, the IRS asserts that the appraisals failed to state the physical condition of the donated property. But in reality, the narrative portion of each appraisal described the donated property as being in "good condition," and the appraisal specifically included numerous photographs to provide visual corroboration of those statements. Still, undeterred, the IRS declined to review and/or accept the photographic evidence of the contribution. Again, the IRS's position in this regard is meritless.

45.     <u>Fourth</u>, the IRS alleges that the conveyance of building components required recordation in state land records. However, fixtures subject to a written agreement of severance become personal property at the moment of contract, rendering recordation unnecessary. While the IRS has never identified any statutory or regulatory text imposing a recordation mandate on donated personalty (*e.g.*, doors, appliances), it has continued to rely on this improper ground to uphold the disallowances.

46.     <u>Fifth</u>, the IRS claimed that the contemporaneous written acknowledgements included with the donations were deficient. But, upon information and belief, most if not all of the Audited Donors were able to produce *four* separate acknowledgements—(i) a same-day letter from Second Chance confirming receipt of the materials, (ii) a signed pledge agreement, (iii) a donation receipt itemizing donated materials, signed by Foster individually, and attached to each final copy off the appraisal, and (iv) a year-end "thank you" letter referencing the donation date. Each document contained the information required by regulations, a description of the property, and a statement that no goods or services were received in exchange.

47. Upon information and belief, at least several of the Audited Donors were able to obtain some relief (for example, waiver of penalties) at the IRS Office of Appeals, or otherwise convince the appeals officers that one or more of the above positions was meritless. But, unfortunately, it is costly, risky, and time-consuming for an individual donor to battle against the IRS's coordinated, targeted, and predetermined outcome.

48. Considering the above, it is clear that Plaintiffs did not, and could not, have "aided or abetted" an understatement for any Audited Donor. The underlying contributions were all fully documented, accurately valued, and entirely permissible under the regulations. The IRS's insistence on various far-fetched theories—such as mandatory recordation, wholesale condemnation of the replacement-cost method, and a fabricated requirement for line-by-line condition ratings—portrays a fundamental misapplication of the law and indeed renders the assessments unlawful.

49. As explained above, because the premise upon which the IRS has assessed penalties against Second Chance and Foster (*i.e.*, that they purportedly assisted donors in understating their respective tax liability) is incorrect, Second Chance and Foster are not liable for the assessed penalties.

**Penalties Assessed Pursuant to I.R.C. § 6701**

50. The IRS's imposition of penalties pursuant to I.R.C. § 6701 against Second Chance and Foster is erroneous and lacks any justification in fact or law.

51. At all relevant times, I.R.C. § 6701(a) stated, in pertinent part, as follows:

> (410) **Imposition of penalty**
>
> Any person –
> **(1)** who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document.

14

> **(2)** who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and
>
> **(3)** who knows that such portion (if so used) would result in an understatement of the liability for tax of another person,
>
> shall pay a penalty with respect to each such document in the amount determined under subsection (b).

52. As stated, the elements required under I.R.C. § 6701 are not satisfied and, therefore, the penalties are improper as a matter of law.

53. First, neither Foster nor Second Chance have ever aided or assisted donors in the preparation of their federal tax returns. Second Chance is a charity, not a tax preparer. Foster works for that charity. Form 8283 documents signed by Foster merely confirm Second Chance's receipt of donated materials, which Second Chance is required to do under I.R.C. rules related to non-cash donations. As such, the IRS has not satisfied the first element required for imposition of a penalty under I.R.C. § 6701.

54. Second, while Second Chance and Foster acknowledge that tax benefits are typically available to their donors, neither Second Chance nor Foster have actual knowledge as to whether a given donor does, in fact, seek to claim a deduction for a given donation, much less have reason to believe that any such filing, if made, implicates any "material matter." As such, the IRS has not satisfied the second element required for imposition of a penalty under I.R.C. § 6701.

55. Finally, as it relates to the third element required for imposition of a penalty under I.R.C. § 6701, the IRS asserts that Foster and Second Chance somehow knew that the third-party appraisals would lead to an "understatement of another person's tax liability." This erroneous conclusion purports to make charities and their employees the arbiters of valuation methodologies employed by qualified third-party property appraisers. This position is not

15

supported by any authority, much less common sense. Moreover, notwithstanding any dispute about the "best" or most "accurate" valuation methodology, the IRS cannot show that the subject appraisal methodology was somehow unqualified, or that a charity whose donors rely on a qualified third-party appraiser to support their non-cash donations can be penalized. As such, the IRS has not satisfied the third element required for imposition of a penalty under I.R.C. § 6701.

56. Having failed to satisfy each of the required elements required for imposition of penalties pursuant to I.R.C. § 6701, the penalties assessed against Second Chance and Foster thereunder are invalid, unlawful, and erroneous.

## COUNT I – CLAIM FOR REFUND
**(Second Chance, Inc.)**

57. The previous paragraphs are incorporated by reference as if fully restated herein.

58. In order to impose penalties under I.R.C. § 6701, the IRS is required satisfy each of the elements set forth therein.

59. The IRS has failed to satisfy the elements required for imposition of penalties under I.R.C. § 6701.

60. Therefore, the assessment of penalties against Second Chance pursuant to I.R.C § 6701 for the tax year 2020 is invalid, unlawful, and erroneous.

WHEREFORE, Plaintiff, Second Chance, Inc., respectfully requests that this Court render judgment in its favor and against Defendant, United States of America c/o Internal Revenue Service, on Count I as follows:

    a. Enter an Order determining that Second Chance did not aid and abet the understatement of tax liability in violation of I.R.C. § 6701 and is not liable for the penalty assessed by the Internal Revenue Service for the tax year 2020;

    b. Enter an Order for the refund of 15% of the penalty assessed for the tax year 2020 pursuant to I.R.C. § 6701 paid by Second Chance to the IRS;

    c. Enter an Order requiring the Defendant to abate any efforts to collect the remaining 85% of the asserted I.R.C. § 6701 penalty;

    d. Award Second Chance its reasonable litigation costs, including attorneys' fees, pursuant to I.R.C. § 7430; and

    e. Such other relief that this Court deems just and proper.

### COUNT II – CLAIM FOR REFUND
### (Mark S. Foster)

61. The previous paragraphs are incorporated by reference as if fully restated herein.

62. In order to impose penalties under I.R.C. § 6701, the IRS is required satisfy each of the elements set forth therein.

63. The IRS has failed to satisfy the elements required for imposition of penalties under I.R.C. § 6701.

64. Therefore, the assessment of penalties against Foster pursuant to I.R.C § 6701 for the tax year 2020 is invalid, unlawful, and erroneous.

WHEREFORE, Plaintiff, Mark S. Foster, respectfully requests that this Court render judgment in his favor and against Defendant, United States of America c/o Internal Revenue Service, on Count II as follows:

    f. Enter an Order determining that Foster did not aid and abet the understatement of tax liability in violation of I.R.C. § 6701 and is not liable for the penalty assessed by the Internal Revenue Service for the tax year 2020;

    g. Enter an Order for the refund of 15% of the penalty assessed for the tax year 2020 pursuant to I.R.C. § 6701 paid by Foster to the Internal Revenue Service;

  h. Enter an Order requiring the Defendant to abate any efforts to collect the remaining 85% of the asserted I.R.C. § 6701 penalty;

  i. Award Foster his reasonable litigation costs, including attorneys' fees, pursuant to I.R.C. § 7430; and

  j. Such other relief that this Court deems just and proper.

            Respectfully submitted,

            /s/ *Joshua J. Gayfield*
            Joshua J. Gayfield, Fed. Bar No. 29189
            Patrick F. Toohey, Fed. Bar No. 20723
            Miles & Stockbridge P.C.
            100 Light Street
            Baltimore, Maryland 21202
            (410) 727-6464
            (410) 385-3700 (fax)
            jgayfield@milesstockbridge.com
            pftoohey@milesstockbridge.com

            *Counsel for Plaintiffs,*
            *Second Chance, Inc. and Mark S. Foster*

## **DEMAND FOR JURY TRIAL**

 Plaintiffs, Second Chance, Inc. and Mark S. Foster hereby demand a jury trial on all issues so triable pursuant to F.R.C.P 38 and 28 U.S.C. § 2402.

            /s/ *Joshua J. Gayfield*
            Joshua J. Gayfield, Fed. Bar No. 29189

101898\000048\4926-3726-2652.v4