# EXHIBIT A



| | |
|---|---|
| **Department of the Treasury**<br>**Internal Revenue Service**<br>**Small Business/Self-Employed Division**<br><br>2670 Industrial Highway<br>York, PA  17402 | **Date:**<br>07/08/2024<br>**Taxpayer ID number (last 4 digits):**<br>■■■■<br>**Taxpayer name:**<br>Second Chance, Inc.<br>**Form number:**<br>Civil penalties<br>**Years:**<br>202012<br>**Person to contact:**<br>Donna Lamonna<br>**Employee ID number:**<br>1000831807<br>**Contact telephone number:**<br>223-259-5340<br>**Contact fax number:**<br>888-850-0320 |
| Miles & Stockbridge P.C.<br>Attn:  Joshua Gayfield<br>100 Light Street<br>Baltimore, MD  21202 | |

Dear Joshua Gayfield:

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

            Sincerely,

            *Timothy Bauer*   Digitally signed by Timothy Bauer
                       Date: 2024.07.08 06:29:11 -07'00'

            Timothy Bauer
            Supervisory Revenue Agent

Enclosures:
☒ Letters
☒ Reports
☐ Copy of Determination Letter
☐ Other

**Letter 937 (Rev. 3-2017)**
Catalog Number 30760X

 **Department of the Treasury
Internal Revenue Service
Small Business / Self-Employed Division**
2670 Industrial Highway
York, PA  17402

**Date:**
07/08/2024

**Taxpayer ID number: (last 4 digits):**
■

**Person to contact:**
Donna Lamonna

**Contact telephone number:**
223-259-5340

**Contact fax number:**
888-850-0320

**Employee ID number:**
1000831807

Second Chance, Inc.
c/o Mark Foster
1700 Ridgely Street
Baltimore, MD  21230

Dear Second Chance, Inc.:

We determined the penalty under Section *6701, Penalties for Aiding and Abetting Understatement of Tax Liability* is applicable. The enclosed Forms 886-A, *Explanation of Items*, and *Computation of Penalty*, explain the reasons for our determination and the computation of the penalty amounts.

If you want to submit a written rebuttal to the enclosed report, you must do so by July 23, 2024.
If your written rebuttal isn't received by then, the investigation will be closed based on the information available.

The penalty under IRC Section 6701 is subject to special administrative provisions of IRC Section 6703, Rules. If you want to contest the penalty after we assess it, one option is to file a claim for refund.

After we close the investigation, we'll send you a CP15 or CP215 penalty assessment notice which will explain your options in greater detail. To take advantage of the IRC Section 6703 special procedures for claiming a refund, you must respond to the assessment notice within 30 days from the date of the notice by filing the required form, either Form 6118, *Claim for Refund of Tax Return Preparer and Promoter Penalties,* or Form 843, *Claim for Refund and Request for Abatement,* and paying 15% of the amount assessed. You can also choose to contest the penalty assessment by following the general refund procedures in IRC Section 7422, *Refund Suits.* You can get more information about IRC Sections 6703 and 7422 by visiting our website at www.irs.gov.

If you have questions, you can contact me at the telephone number listed above.

Thank you for your cooperation.

Sincerely,

*Timothy Bauer*
Digitally signed by
Timothy Bauer
Date: 2024.07.07
14:28:59 -07'00'

Timothy Bauer
Supervisory Internal Revenue Agent

Enclosures:
Forms 886-A
Computation of Penalty

Letter 5390 (Rev. 11-2016)
Catalog Number 66286U

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | **Year/Period Ended**<br>202012 |

**PENALTIES:**

<u>**2020**</u>

    **Per IRC §6701**    **$22,000**

**ISSUE:** Internal Revenue Code (IRC) §6701 Penalty

Whether Second Chance, Inc. is subject to penalties under IRC §6701 for aiding or assisting in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the Internal Revenue laws and knowing that if it is so used, it will result in an understatement of another person's tax liability.

**FACTS:**

Second Chance, Inc. is a 501(c)(3) nonprofit organization. Mark Foster is the founder and CEO. Second Chance, Inc. is involved in the deconstruction of houses and buildings. Deconstruction is taking a house apart in the reverse order that it was constructed with the hopes of salvaging materials that can be repurposed. Per its website, "The Second Chance mission has always been (1) to retrain and create employment for displaced and unemployed workers; (2) to reclaim building material to reduce environmental harm and demolition debris in burgeoning landfills; (3) to renew both people and products to useful, purposeful life. As a result, Second Chance provides jobs and a green collar workforce, protects the natural environment, and preserves people and our rich architectural heritage." Any items salvaged from these projects are taken back to the Second Chance warehouse in Baltimore, MD where they are sold to the public.

The individuals involved in the deconstruction of houses receive hands on training on the correct way to deconstruct a property. In the Mann v. United States case, Second Chance, Inc. was the deconstruction company. As is stated in this case, "it is undisputed that some parts of a structure are necessarily destroyed as part of the deconstruction process and that some of Second Chance's training includes deliberately destroying parts of a structure for the purpose of training, such as destroying a window to show what happens if you wedge this too hard". As a result, not all components of a house are salvageable.

There are many documents involved in the deconstruction process. The client signs an Agreement for Charitable Contribution and Pledge Agreement. After the deconstruction process is over, Second Chance, Inc. provides the client with a signed letter thanking them for the donation of the property and after the pledge is paid, they send another signed letter thanking them for the cash donation. Mark Foster signs these thank you letters as Chief Executive Officer of Second Chance, Inc. On occasion, the letter acknowledging the donation of the property may be signed by a member of the Deconstruction Sales Team. Mark Foster is the author of these

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | **Year/Period Ended**<br>202012 |

agreements and letters. Most of the communication throughout the deconstruction process is done via email and Mark Foster is cc'd on all communications.

The deconstruction process begins with the client meeting with a member of the Deconstruction Sales Team. To not overwhelm the client at the first meeting, the deconstruction process is explained in general terms. Once the client decides to go through with deconstruction, the process is explained in more detail. During these discussions, the Deconstruction Sales Team member will provide the client with a Deconstruction Information Guide that explains the steps of the deconstruction process. The client is also given a Tax Strategy Planning Worksheet that provides an example of the estimated tax savings of the donation using $200,000 as the fair market value until the range of value is determined by the appraiser. When the range of value is determined, it is given to the client and emailed to Second Chance who prepares a new Tax Strategy Planning Worksheet that is tailored to that client using the figure that falls in the middle of this range of value.

The Deconstruction Sales Team member tells the client that a qualified appraisal of the property is required to claim the noncash charitable contribution deduction. An email is sent to the client by Second Chance, Inc. summarizing the details of the deconstruction process. The email states, "Once we have answered all of your questions, the first step is to contact an appraiser. One appraiser who specializes in building materials appraisals is Green Donation Consultants. Their contact information is as follows." The email and phone number of Green Donation Consultants (owned by Patrick Smith) is then provided. If the client requests a list of appraisers, then a list of qualified appraisers is given to the client however Patrick Smith of Green Donation Consultants is usually at the top of the list, and he is the appraiser that is recommended. Patrick Smith has completed appraisals for approximately 95%-98% of Second Chance clients.

Prior to engaging the appraiser, Patrick Smith will provide the client with a free estimate of the value of the house as it sits on the land. No appraisal is given to the client at this point, just a range of value. It's not until the client engages the appraiser by signing a contract and paying for the appraisal is the final appraisal given to the client. In order to provide an estimate or range of value of the property at this point, either Patrick Smith or an employee of Green Donation Consultants will visit the property, take pictures and measurements. Patrick Smith inputs this information into the R.S. Means software. R.S. Means is a software used by the construction industry to determine what it would cost to build a house today. Patrick Smith uses this software to determine the cost of building a new home and reaches a valuation determination by subtracting overhead costs and a depreciation percentage from the cost. This method does not reflect the resale value of the items actually removed by Second Chance, Inc., but instead shows what it would cost today to reconstruct the entire home and its contents as if it were a newly built house.

Patrick Smith then gives the client a value range of what it would cost to build this house currently. The value range does not consider what components would successfully be deconstructed or the condition of the components in their deconstructed state. This range of

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

value is given to the Deconstruction Sales Team member who uses the Tax Strategy Planning Worksheet to determine the estimated tax savings of the donation. The estimated tax savings is determined prior to knowing what items would be salvaged and their condition. The Tax Strategy Planning Worksheet is then given to the client who can decide if it is cost effective to go through with the deconstruction. The value used in the final appraisal always falls within the estimated value range provided by the appraiser prior to deconstruction and reported on the Tax Strategy Planning Worksheet.

Once the decision is made to move forward with the project, the client is asked to sign an Agreement for Charitable Contribution. This agreement states, "Owner desires to contribute to Second Chance the existing improvements, buildings, and fixtures upon such Premises (collectively the "improvements"), which such Improvements shall be treated as personalty (personal property) severed from the Premises, for the express purpose of Second Chance using the Improvements in its charitable operations." This agreement also includes the charitable pledge amount that was decided upon between Second Chance, Inc. and the client. The client is told the date they sign the agreement is considered the donation date when in fact the donation date is when the house was actually deconstructed, and Second Chance, Inc. took possession of the components. Title of the property was never transferred to Second Chance, Inc., therefore Second Chance, Inc. didn't own anything until the deconstruction.

In addition to the donation of the salvaged materials of the house, the client signs an agreement executing a binding charitable pledge whereby owner agrees to honor its pledge of an amount that is agreed upon. The initial pledge amount is determined by the Deconstruction Sales Manager. Mark Foster stated in his interview, "the purpose of the pledge is to offset deconstruction costs and provide support for the broad mission of Second Chance. The profits from the sale of the salvaged items don't even cover the cost of labor to deconstruct. Because of this the pledges are high, but they must be fair and equitable for both parties". The first step to determine the pledge amount is to look at the appraiser's field survey to determine the cost of the project, size of the project and the scope of the work. The highest expense for deconstruction is the payroll cost. The client has the option of paying the pledge amount in one lump sum or pay it over multiple years.

Once the Agreement for Charitable Contribution and Pledge Agreement are signed, the client engages the appraiser. The Director of Deconstruction then schedules the dates for deconstruction. Present at the deconstruction are the crew members and the foreman. The crew leader is told to complete the list of salvaged items (also known as manifests) as they are being loaded onto the truck. Mark Foster stated in his interview that complete lists of salvaged items with the condition of the items are not maintained, and the incomplete lists that are maintained are not given to the appraiser or the client. Although Second Chance, Inc. does not determine the value of the salvaged components, it is their responsibility to maintain complete lists of salvaged items including the condition of the items in their deconstructed state and provide the lists to the appraiser. The appraiser is typically not present during deconstruction or when the salvaged items are taken away therefore the appraiser does not see what items are salvaged or the

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | **Year/Period Ended**<br>202012 |

condition. Second Chance, Inc. does not take pictures of the items salvaged. The only pictures that are taken would be of personal property such as furniture and appliances. Most of the salvaged items are taken back to the Second Chance, Inc. warehouse in Baltimore, MD where they are listed for sale. In the interview of Mark Foster, he stated the profits from the sale of the salvaged items don't even cover the cost of labor to deconstruct a house.

During the deconstruction, items not salvaged are thrown into dumpsters or into the basement for removal by the demolition company. After the deconstruction is completed, the client is responsible for paying to have the remaining portion of the house demolished. As was previously stated, upon initial inspection of the property as it sits on the land, Patrick Smith enters the measurements and components of the house into R.S. Means software. This software prints out a list of all the components and their current value. It is not a list of salvaged items and their value in their deconstructed state. The range of value given to the client prior to deconstruction is the result of the measurements and components entered into the R.S. Means software. The value per the final appraisal always falls within this range of value which confirms that the list given to Second Chance represents the components prior to deconstruction and the final appraisal value is not revised to reflect salvaged items and their "as-deconstructed" condition. Patrick Smith provides Second Chance with this list he created from R.S. Means which represents the entire house prior to deconstruction, less drywall, masonry, tile and mirror. If before deconstruction the client says they want to keep some of the items, the R.S. Means list is not adjusted. The list from R.S. Means is copied word for word and Mark Foster signs it as "All Materials Received". The R.S. Means list is attached to the appraisal as Addendum A and the list signed by Mark Foster is usually attached as Addendum AA. The appraiser sends the appraisal to the client and a copy is kept in the client file maintained by Second Chance, Inc. The appraiser signs Form 8283, forwards it to Second Chance and Mark Foster signs the Form 8283 as President of Second Chance, Inc. and gives it to the client.

Mark Foster stated that in 2010 or 2011, he met with Internal Revenue Service agents in Annapolis, MD and discussed the proper way to value the houses that were being deconstructed. He felt the entire house should be valued since it was donated to be used in Second Chance, Inc.'s mission to retrain and create employment for displaced and unemployed workers. He learned during this discussion that the proper way to value the donation was to determine the value of the salvaged items in their deconstructed state that cross the threshold of Second Chance, Inc.'s warehouse. Mark Foster stated in his interview that starting in 2012, no longer could the entire house be deducted but only the salvaged items.

The Mann v. United States case was filed in the court 1/31/2019. Second Chance, Inc. was the deconstruction company and Patrick Smith was the appraiser, therefore Second Chance, Inc. was aware of the outcome of the case. The courts decided the appraisal was invalid because it calculated the value of the house at its highest and best use. The second appraisal prepared by Patrick Smith and provided by the clients specifically stated that it seeks to "determine the fair market value of the donated structure's used building components when sold on the 2nd hand market" by taking the value of new versions of the building materials comprising the house and

| Form **886-A**(Rev.4-68) | Department of the Treasury - Internal Revenue Service |
|---|---|
| | **Page: -4-** |

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

depreciating those materials based on the age of the house. Second Chance, Inc. stated to the Manns, and the court agreed, the proper way to calculate a tax deduction from this donation is based on the resale value of the specific building materials and contents that "we actually take away from the site" and that "cross the threshold" of Second Chance's warehouse.

## LAW:

IRC §6701(a) penalizes any person who aids or assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the internal revenue laws and knowing that if it is so used it will result in an understatement of another person's tax liability.

Under IRC §6701(b) the amount of the penalty shall be $1,000 however if the return, affidavit, claim, or other document relates to the tax liability of a corporation, the amount of the penalty shall be $10,000.

Per IRC §6701(c)(1), the term "procures" includes "ordering (or otherwise causing) a subordinate to do an act", as well as "knowing of, and not attempting to prevent, participation by a subordinate in an act".


## GOVERNMENT'S POSITION:

It is the government's position that the penalty per IRC §6701 is applicable for the reasons stated below.

**Element #1**: Aids, assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document.

When a client is deciding whether to move forward with the deconstruction, the appraiser, Patrick Smith, or one of his employees will visit the property to take pictures and measurements of the interior and exterior. To give the client an estimated value range of the contribution, the appraiser relied upon the construction estimating software package R.S. Means to determine the cost of building a new home on the property and made adjustments purporting to account for physical depreciation and functional obsolescence. This list of building materials from R.S. Means prior to deconstruction was included in the appraisal as Addendum A. The R.S. Means list was provided to Second Chance, Inc. who then copied this list to a new document and Mark Foster signed the document as "All Materials Received". This list is also included in the appraisal as Addendum AA. This list cannot be an accurate list of the items salvaged for the following reasons. (1) The list is a breakdown of the components of the house as it stood on the land prior to deconstruction; (2) Individual items on the R.S. Means list are not listed and the

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

items listed on the incomplete list of salvaged items are labeled differently than what is on the R.S. Means list. For example, the R.S. Means list provides one value for the entire bathroom, rather than valuing the components of the bathroom. The list of salvaged items will list toilet, sink, etc. separately. It is very possible that all the components of the bathroom were not salvaged; The R.S. Means list reflects approximately 5-7 line items for "framing systems" however the list of salvaged items lists "lumber" with no total amount of lumber or else lumber isn't listed at all; (3) The list of salvaged items prepared by Second Chance, Inc. reflects less items than is listed on the R.S. Means list that Mark Foster signed; (4) Mark Foster admitted the lists of salvaged items are not given to the appraiser and the appraiser does not see the items after they are deconstructed therefore how can he appraise them; (5) The list signed by Mark Foster indicating "All Materials Received" is dated prior to deconstruction. As a result, Second Chance, Inc. is providing the client with a false contemporaneous written acknowledgement of the donation of building materials and personal property because the list Mark Foster is signing does not represent the items salvaged. Also, the donation date Second Chance, Inc. provides is prior to the date the items were salvaged. Clients are led to believe the R.S.Means list included in the appraisal and the materials list signed by Mark Foster and attached to the appraisal are the items salvaged from the deconstruction.

Although Second Chance, Inc. claims the list of salvaged items is compared to the R.S.Means list and the appraiser removes any items that were not salvaged, this is not true. There were items the clients decided to keep, i.e. washer, dryer, and storm door which are listed on the R.S.Means list, and are listed on the contemporaneous written acknowledgement signed by Mark Foster, therefore Mark Foster did not compare the lists and did not have the appraiser adjust the appraisal however he still signed the R.S. Means list as "All Materials Received", even though they weren't all received.

Second Chance, Inc. provides the clients with a contemporaneous written acknowledgement for the cash and noncash charitable contributions. They are either signed by Mark Foster, Chief Executive Officer, Spence Jeffries or Ryan Mariman of the Deconstruction Sales Team.

Mark Foster signed the Forms 8283 Part V as President of Second Chance, Inc. stating, "This charitable organization acknowledges that it is a qualified organization under section 170 (c) and that it received the donated property as described in Section B, Part I, above on the following date…." The FMV in Part I would agree to the value in the qualified appraisal which is provided to Second Chance and maintained in the client file. This value is from R.S. Means and not the value of items actually salvaged which Second Chance, Inc. knew because lists of salvaged items were never maintained and given to the appraiser.

The Agreement for Charitable Contribution includes language regarding the cash and noncash charitable contributions. This agreement is signed by the Deconstruction Sales Manager and Mark Foster at times, signs as the witness. Letters are provided to the clients recognizing the cash and noncash charitable donations to Second Chance, Inc. and they are either signed by

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

Mark Foster as Chief Executive Officer, Spence Jeffries or Ryan Mariman of the Deconstruction Sales Team.

All the information included in the Tax Strategy Worksheet, Deconstruction Agreement (also known as the Charitable Contribution Agreement), Pledge Agreement and Recognition of Donation Letter was written by Second Chance, Inc. and over the years accountants and attorneys provided suggestions. Mark Foster also spoke to persons at the Internal Revenue Service to make sure the wording was correct in the Recognition of Donation Letter.

Second Chance, Inc. aided, assisted in, procured, or advised with respect to the preparation or presentation of a federal tax return, refund claim, or other document. Forms 8283, contemporaneous written acknowledgements, and Charitable Contribution Agreements were signed by Mark Foster. Letters acknowledging the donation of the property were sometimes signed by the Deconstruction Sales Team members. Second Chance Inc. and in particular, Mark Foster was the author of these documents. Mark Foster also signed the list from R.S. Means stating "All Materials Received".

**Element #2:** Who knows (or has a reason to know) that such portion will be used in connection with any material matter arising under the internal revenue laws.

Second Chance, Inc. knew or had reason to know that the documents mentioned in Element #1 and the statements regarding tax benefits would be used in connection with a material matter arising under the internal revenue laws. A matter is material if it would have a substantial impact on the decision-making process for entering into the transaction.

During discussions with potential clients, they were told and/or provided literature regarding the deconstruction process and the tax benefits. This literature was prepared by Second Chance, Inc. Clients were told that any noncash charitable contribution exceeding $5,000 required an appraisal by an independent appraiser. Clients were informed in the Deconstruction Information Guide that both a qualified appraisal and Form 8283 signed by the appraiser and Second Chance, Inc. are needed to claim the noncash contribution deduction on their tax return.

Clients were given a "Tax Strategy Planning Worksheet" that explained the estimated tax savings of donating their house and the net benefit to the donor after also pledging money to Second Chance. The original Tax Strategy Planning Worksheet that was used was in generic format using $200,000 for all the clients as the value of the house. Once the range of value of the house was provided by the appraiser, then a different Tax Strategy Planning Worksheet was prepared tailored to each clients' situation. The clients relied on the Tax Strategy Planning Worksheet to determine if it was beneficial for them to deconstruct. This range of value was determined as the house was situated on the land prior to deconstruction. In emails from Second Chance, Inc. explaining the deconstruction process they state, "We ask that the donor shares a portion of the tax benefit with us in the form of a cash donation made at the time that is in

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | **Year/Period Ended**<br>202012 |

keeping with their tax strategy. In the vast majority of cases, the homeowner retains the lion's share of the benefit, and all parties walk away having financially benefited for making an environmentally and socially responsible choice".

The Agreement for Charitable Contribution signed by a member of the Deconstruction Sales Team and sometimes witnessed by Mark Foster states, "Second Chance shall cooperate with Owner and Green Donation Consultants in coordinating the documentation to evidence the charitable contribution to Second Chance and for the Owner's federal and state income tax returns, including coordinating with Owner and Green Donation Consultants in connection with the preparation of an IRS compliant documentation packet required to take full advantage of the available tax benefits for the improvement and the charitable pledge".

In the "Thank you for your donation" letter, Second Chance, Inc. states, "You should retain this letter in your records for tax purposes. As you may be aware, the IRS no longer will accept a canceled check as substantiation of a charitable contribution of $250 or more. This letter serves to verify that you did not receive anything of value in exchange for your contribution. Therefore, the entire value of your donation is tax-deductible". This letter is signed by Mark Foster, Chief Executive Officer.

Clients were told they would be provided with a signed Form 8283 which they needed to claim the noncash charitable contribution deduction. Also provided was a contemporaneous written acknowledgement of the donation. Attached to the appraisals as Addendum AA is a list of purported items salvaged and donated to Second Chance, Inc., signed by Mark Foster indicating "All Materials Received". The contemporaneous written acknowledgement, donation receipt and the Form 8283 signed by Mark Foster effect the understatement of liability which is a material matter.

Statements regarding tax benefits are also a material matter and were given to clients either through documents provided to them or in email communications. The emails were usually sent by the Deconstruction Sales Team, and Mark Foster was cc'd on every email.

Other statements regarding tax benefits that were given to clients are as follows:

- "In summary, your house creates a tax deduction, which creates a tax savings or an actual refund of money to you. You will keep the larger portion of your tax savings/refund and provide funding for our training program which will be learning on your site, by pledging a portion of your savings/refund to Second Chance, Inc."

- Once Second Chance is involved in the deconstruction, a tax-deductible benefit comes relevant because you are supporting our workforce development training program."
- "I will create potential tax benefit scenarios and pledge options that assume a final appraised value that lands in the middle of the range provided by the appraiser."

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

- "If you would like to take advantage of the significant tax benefits associated with deconstructing a building, instead of demolishing it, call me to discuss our Funded Deconstruction Program."

- "Clients come to us with an interest in keeping items from the landfill and an interest in the significant tax benefits."

- An appraiser who specializes in materials appraisals will determine the value of the materials in your house. The appraisal value will determine your tax savings/deduction.

- The Deconstruction Sales Manager explained to the client that his charitable contribution deduction is limited to 50% of his adjusted gross income but he has 5 years to capture it in its entirety. He also stated, "The 'tax event' occurs as of the date indicated on the conveyance document you would sign. You should have no problem taking the deduction for the material in 2020". (Note: The deconstruction did not take place until 2021).

Second Chance, Inc. aides and assists in the deconstruction process of homes for clients used in connection with a material matter arising under the internal revenue laws. Mark Foster signs the Form 8283 as President of Second Chance, Inc. and gives it the clients so it can be attached to their federal income tax return. Second Chance, Inc. acknowledges the donation will result in a tax deduction in the thank you letters to the clients and the clients are provided with their "Tax Savings or Refund" amounts per the Tax Strategy Planning Worksheet. It is also mentioned on the Second Chance, Inc. website, "Deconstruction generates generous tax savings from home and material donations to Second Chance. That translates into cash in your pocket!"

**Element #3:** Who knows that such portion (if so used) would result in an understatement of the liability for tax of another person.

Mark Foster met with IRS employees in Annapolis, MD in either 2010 or 2011 to discuss how much of the house donation could be deducted as a noncash charitable contribution. He felt the value of the entire structure could be deducted because it was used in the Second Chance, Inc.'s training program. During these discussions he became aware that only the value of the salvaged items was deductible. He said this reduced the charitable deduction by about 40%. Mark Foster stated in his interview that whatever gets to the nonprofit organization is what is tax deductible and since 2012, only salvaged items were valued.

The MANN v. United States court case was decided on 1/31/2019 and Second Chance, Inc. performed the deconstruction services for Lawrence and Linda Mann. The court stated, "Rather, as Second Chance's communications to the Manns reveal, the proper way to calculate a tax deduction from this donation is based on the resale value of the specific building materials and contents that 'we actually take away from the site' and that 'cross the threshold' of Second

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>**Second Chance, Inc.** | | **Year/Period Ended**<br>202012 |

Chance's warehouse."

On behalf of Second Chance, Inc., Mark Foster signed Addendum AA of the appraisals as "All Materials Received" even though he knew it did not represent the salvaged items. He signed the Addendum as Founder & President of Second Chance, Inc. Second Chance, Inc. knew this overvaluation would result in an understatement of tax liability. Mark Foster admitted the resale value of the salvaged items doesn't even cover the payroll costs for deconstruction. He was aware that the appraiser used the R.S. Means software to determine the current value of all the components of the house less drywall, masonry, tile, mirror, prior to deconstruction. Based on the Mann v. United States case and his discussions with the Internal Revenue Agents in Annapolis, MD, Mark Foster admitted that the appraisals should have reflected the resale value of the specific building materials and contents that crossed the threshold of the Second Chance, Inc. warehouse. The list using the R. S. Means software was given to Second Chance, Inc. who in turn recopied the list and signed it indicating that Second Chance, Inc. received everything that was on the list. Second Chance, Inc. was aware that some rooms were valued as a whole instead of each separate component since that is how they are reflected on the R.S. Means list and copied over to the list signed by Mark Foster. Second Chance, Inc. also knew that the lists of salvaged items that were kept were substantially incomplete. All the salvaged items were not listed and the items that were listed were not adequately described as to what was salvaged and the condition of the deconstructed items was not noted. No steps were taken by Second Chance, Inc. to make sure complete lists of salvaged items were maintained listing the condition of the items in their deconstructed state. Mark Foster admitted that these incomplete lists were not given to the appraiser and the appraiser never saw the items in their deconstructed state.

The decision in the MANN case confirmed that there would be an understatement of tax liability unless a deduction was claimed for only salvaged items. Second Chance, Inc. knew that claiming a noncash charitable contribution deduction by the clients would result in an understatement of tax liability. After the decision in the MANN case, no processes were put in place by Second Chance, Inc. to track the condition of the items salvaged and ensure that only salvaged items were valued. (Gard v. United States, 1992 WL 113456 (N.D.Ga. 1992). The deduction for salvaged and not salvaged items was still occurring for the clients Second Chance, Inc. was helping to facilitate in tax year 2020.

Although Second Chance, Inc. did not determine the value of the donation, they were aware the donation was overvalued which in turn would understate the client's tax liability. Second Chance, Inc. did not provide an actual list of each deconstructed item and its "as-deconstructed" condition to anyone. Mark Foster admitted the appraiser performed the appraisals for 95% to 98% of the Second Chance, Inc.'s clients. He knew the appraiser used the R.S. Means software which determines the fair market value of the property as it sits on the land prior to deconstruction. The lists of salvaged items maintained by Second Chance, Inc. did not list all the items salvaged, did not list the condition of the items in the deconstructed state and they were not given to the appraiser or the client therefore Second Chance, Inc. knew the appraiser was not valuing salvaged items. The appraiser did not see the items in their

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

deconstructed state. It is Second Chance, Inc.'s responsibility to maintain correct lists of salvaged items and their condition, and provide this list to the appraiser so the correct components could be valued in their deconstructed state. This list from the R.S. Means software was given to Second Chance, Inc. by the appraiser. After copying all the items word for word from the R.S.Means list to a separate document, Mark Foster signed it as "All Materials Received". The date on this document that he signed indicated the materials were received prior to deconstruction. Second Chance, Inc. knew there was an overvaluation issue in these transactions which resulted in an understatement of tax liability. The R.S. Means list and the identical list signed by Mark Foster as Founder and President of Second Chance, Inc. were attached to the appraisal as Addendum A and Addendum AA. Since the clients were told that only salvageable items are valued, and the list attached to the appraisal was signed by Mark Foster as "all materials received", the clients were lead to believe the lists identified only the salvaged items.

There were instances where the client decided to keep some of the items, rather than donating them. These items were listed on the R.S. Means list given to Second Chance, Inc. and also on the list signed by Mark Foster which shows the value given to the client is the value determined prior to deconstruction. For example, prior to deconstruction a client decided to keep their washer and dryer and sent an email to both Second Chance, Inc. and Green Donation Consultants to inform them of this decision. The R.S. Means list prepared prior to deconstruction listed both the washer and dryer. The purported list of salvaged items signed by Mark Foster as "All Materials Received", also listed the washer and dryer.

In another instance, a client's house had two storm doors and a neighbor wanted to have one of them. The R.S. Means list prepared prior to deconstruction reflected two storm doors. The client told Second Chance, Inc. that only one of the storm doors was being donated and said the appraisal needed to be adjusted. The purported list of salvaged items signed by Mark Foster as "All Materials Received", listed both storm doors.

Second Chance, Inc. was aware that the R.S, Means software values some rooms as a whole instead of their individual parts. For instance, rather than valuing the toilet, sink and shower, the bathroom is valued as a whole despite which components are actually salvaged. During one of the deconstructions, Second Chance, Inc. found a box(es) of brand new faucets and asked Patrick Smith to include them in the appraisal. The response provided by a Green Donation Consultant employee was "The bathroom fixtures cannot possibly be added. As we have stated before, the two sets of lines (4 total in this instance), already attributed to the bathrooms in the R.S.Means more than cover all of the bathroom items. The bathroom values are $22,000 + $6,575 + $3,100 + $15,741 (the latter two specifically for fixtures) for a total of $47,416. Although I kind of understand questioning the box of faucets, I cannot possibly add any more value for anything bathroom related without drawing red flags." This confirms that Second Chance, Inc. knew Patrick Smith was not valuing the components properly and the noncash charitable contribution deduction would cause an understatement of tax liability. Second Chance, Inc. was aware of everything that was discussed between clients and Second Chance because Mark Foster was cc'd

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | **Year/Period Ended**<br>202012 |

on all emails whether they were sent to clients, Patrick Smith, or Green Donation Consultants. As a result of the MANN case, Second Chance, Inc. was alerted and informed of problems with not identifying a detailed list of salvaged items or any party making a valid attempt at providing a condition for each of the donated items. This makes Second Chance, Inc. liable for the penalty per IRC §6701. No action was taken to rectify the lack of specifically identifying the salvaged items for the appraisals or identifying the condition of the salvaged items. Although the appraisals stated that unless otherwise noted, all the items were in good condition, these can't be relied upon because Second Chance, Inc. never maintained adequate lists of salvaged items and their condition and it knew the appraiser never saw the items in their deconstructed state. (Mattingly v. United States, 924 F.2d 785 (8th Cir. 1991))

Second Chance, Inc. was made known from the conclusion in the MANN case that a list of salvaged items and their condition was required to be maintained so that only salvaged items would be valued. Even though Mark Foster admitted that lists and conditions of salvaged items were not maintained by Second Chance, Inc. and given to the appraiser, Second Chance, Inc. assured customers that the purported tax benefits are available despite consistent rejection that the appraisals needed to identify a specific list of the salvaged items including the condition of these items in their deconstructed state. (United States v. Fisher, 2004 WL 489822 (N.D. Tex. 2004)

By providing the clients with a value not representative of the salvaged items, the clients claimed noncash charitable contribution deductions which understated their tax liability.

**TAXPAYER'S POSITION:**

Not known at this time

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

**CONCLUSION:**

The following clients are included in the calculation of the IRC §6701 penalty. The penalty amount per IRC §6701(b) is $1,000 per tax return.

22 clients x $1,000 = $22,000

| Name | Estimated Value Prior to Deconstruction | Final Appraisal Value | Did Appraised Value Incorporate the Condition & Detailed List of Salvaged Items? | Exhibit |
|---|---|---|---|---|
| ▓▓▓ | 160,000 to 190,000 | 176,000 | No | 27 |
| ▓▓▓r | 220,000 to 250,000 | 236,000 | No | 28 |
| ▓▓▓ | 115,000 | 117,500 | No | 29 |
| ▓▓▓ | 140,000 to 160,000 | 153,000 | No | 30 |
| ▓▓▓ | 135,000 to 165,000 | 148,500 | No | 31 |
| ▓▓▓ | 145,000 to 165,000 | 161,000 | No | 32 |
| ▓▓▓ | 165,000 to 195,000 | 183,000 | No | 33 |
| ▓▓▓ | 280,000 to 300,000 | 298,000 | No | 34 |
| ▓▓▓ | 145,000 to 175,000 | 157,000 | No | 35 |
| ▓▓▓ | 285,000 | 291,000 | No | 36 |
| ▓▓▓ | Unknown | 170,500 | No | 37 |
| ▓▓▓ | 255,000 | 240,500 | No | 38 |
| ▓▓▓ | 190,000 | 193,000 | No | 39 |

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

| Name | Estimated Value Prior to Deconstruction | Final Appraisal Value | Did Appraised Value Incorporate the Condition & Detailed List of Salvaged Items? | Exhibit |
|---|---|---|---|---|
| ▮ | 190,000 to 220,000 | 203,000 | No | 40 |
| ▮ | 125,000 | 139,000 | No | 41 |
| ▮ | Unknown | 139,000 | No | 42 |
| ▮ | 145,000 to 175,000 | 168,000 | No | 43 |
| ▮ | Unknown | 155,000 | No | 44 |
| ▮ | 380,000 | 381,000 | No | 45 |
| ▮ | 245,000 | 250,000 | No | 46 |
| ▮ | 180,000 to 210,000 | 189,000 | No | 47 |
| ▮ | 270,000 to 300,000 | 284,000 | No | 48 |

Second Chance, Inc. aided, assisted in, procured, or advised with respect to the preparation or presentation of a federal tax return, refund claim, or other document. During the deconstruction process, the clients are provided with Tax Strategy Planning Worksheets and Deconstruction Information Guide. They are required to sign an agreement executing a binding charitable pledge and an agreement to donate the components of the house that are salvaged. These documents were written by Second Chance, Inc., in particular, Mark Foster. These agreements are signed by either Mark Foster or a member of the Deconstruction Sales Team. The letters sent to the clients acknowledging the cash and noncash charitable contributions were written by Second Chance, Inc. and Mark Foster signed them as President and CEO of Second Chance, Inc. Second Chance, Inc. instructed the clients that in order to claim a charitable contribution deduction on their tax return, a qualified appraisal was needed. Clients were also told a Form 8283 needed to be attached to their tax return when claiming the charitable contribution deduction. The Form 8283 was signed by Mark Foster as President of Second Chance, Inc.

| Form **886-A**(Rev.4-68) | Department of the Treasury - Internal Revenue Service |
|---|---|
| | **Page: -14-** |

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Second Chance, Inc. | | Year/Period Ended<br>202012 |

A matter is material if it would have a substantial impact on the decision-making process for entering into a transaction. Second Chance, Inc. knew statements regarding tax benefits would be used in connection with a material matter arising under the internal revenue laws. The information provided, the agreements signed, and the emails sent to clients during the deconstruction process all contained numerous statements regarding tax benefits. A Tax Strategy Planning Worksheet created by Mark Foster was also tailored to each client using the initial range of value provided by the appraiser prior to deconstruction so the client could decide if it was in their best interest to follow through with the deconstruction process. In the emails to clients there were numerous statements regarding tax benefits. For example, "In summary, your house creates a tax deduction, which creates a tax savings or an actual refund of money to you". "If you would like to take advantage of the significant tax benefits associated with deconstructing a building, instead of demolishing it, call me to discuss our Funded Deconstruction Program". Second Chance, Inc. was aware of these tax benefit statements in the emails to clients because Mark Foster was cc'd on all emails. This information was critical in the client's decision to move forward with the deconstruction process.

Second Chance, Inc. was aware that claiming the noncash charitable contribution deduction would understate the tax liability of the client. Second Chance, Inc. created the Tax Strategy Planning Worksheet that showed the client how much money they would save in taxes by deconstructing their house and claiming a noncash charitable contribution deduction. Second Chance, Inc. was aware that the value provided to the client by the appraiser was overvalued. Mark Foster admitted that Second Chance, Inc. did not keep lists of the salvaged items, no list or condition of items was ever provided to the appraiser, and the appraiser never saw the deconstructed items. As a result, the value given to the client was based on the value determined as the house was situated on the land prior to deconstruction. This final value always fell within the initial range of value given to the client prior to deconstruction.

The MANN v. United States court case was decided on 1/31/2019 and Second Chance, Inc. was the deconstruction company. Lawrence and Linda Mann had their residence deconstructed by Second Chance, Inc. and claimed a noncash charitable contribution deduction. The deduction understated their tax liability, the court ruled in favor of the Internal Revenue Service, and the deduction was denied. The noncash charitable contribution deduction was disallowed because the taxpayers failed to prepare or secure descriptions of the specific property salvaged and donated to Second Chance and failed to provide a valuation of the deconstructed items at the time of donation. The deduction for salvaged and not salvaged items was still occurring for the clients Second Chance was helping to facilitate in tax year 2020.

The three elements of IRC §6701 have been met therefore Second Chance is liable for the penalty.