# EXHIBIT J



**Joshua J. Gayfield**
(410) 385-3734
jgayfield@milesstockbridge.com

May 14, 2025

**VIA FEDEX**
Charles R. Matthews, Department Manager, AM Op 1, Dept 4
Department of the Treasury
Internal Revenue Service
2525 Capitol Street
Fresno, CA 93721

Re:    **April 24, 2025 Letter to Mark Foster (Last 4 of ID: ███)**
       **Reference No.: 0844217673**

Dear Mr. Matthews:

Please accept this correspondence as Mr. Foster's written response to the IRS's April 24, 2025 letter (LTR 96C) regarding the twenty-two (22) Forms 6118 Mr. Foster submitted on October 25, 2024. A copy of the IRS's April 24, 2025 letter is enclosed herewith as **Exhibit A**.

I have enclosed Forms 2848, powers of attorney, authorizing me and my colleague, Patrick F. Toohey, to represent Mr. Foster and his employer, Second Chance, Inc. ("Second Chance") (EIN: ████████) in connection with this matter. The Forms 2848 are enclosed herewith as **Exhibit B**.

The primary purposes of this response are (i) to seek clarification of certain statements contained in the IRS's April 24, 2025 letter and (ii) to supplement the subject Forms 6118 with respect to the reasons Mr. Foster is entitled to a refund of the penalties assessed against him.

<u>**The April 25, 2025 Letter**</u>

Your April 25, 2025 letter states that the IRS is "unable to process for a civil penalty removal at this time" and requests that Mr. Foster "provide the individual Taxpayers social security numbers as required." Although not stated, we assume your letter is referring to column (e) of the Identification of Penalties section of each Form 6118, which seeks the "Taxpayer's identification number." In column (e) for each of the forms, Mr. Foster entered "Unknown" because neither he nor Second Chance are in possession of, have access to, or are entitled to have access to various Taxpayer identification numbers.

As background, the IRS has assessed penalties against Mr. Foster and Second Chance pursuant to I.R.C. § 6701 for aiding and abetting the understatement of another person's (*i.e.*, Second Chance's donors) tax liability. As described below, Mr. Foster and Second Chance vehemently dispute their liability for these penalties. Accordingly, upon receipt of the IRS's September 23,

100 Light Street  |  Baltimore, MD 21202  |  410.727.6464  |  milesstockbridge.com

EASTON, MD  ·  FREDERICK, MD  ·  RICHMOND, VA  ·  ROCKVILLE, MD  ·  TYSONS CORNER, VA  ·  WASHINGTON, D.C.

101898\000048

Charles R. Matthews
May 14, 2025
Page 2



2024 Notice of Penalty Charge (CP15), Mr. Foster and Second Chance timely paid 15% of their respective penalties and submitted Forms 6118 for each of the taxpayers identified in the report (Form 886A) enclosed with the IRS's July 8, 2024 Determination Letter (the "Determination Letter"). A copy of the July 8, 2024 Determination Letter is enclosed herewith as **Exhibit C**. Mr. Foster and Second Chance intend to take advantage of the procedures outlined in I.R.C. §§ 6703 and 7422. However, your April 24, 2025 letter suggests the IRS is refusing to process the forms without further information. As explained below, this information is in the possession of the IRS, not Mr. Foster or Second Chance.

Second Chance is a 501(c)(3) nonprofit organization that accepts noncash donations in the form of deconstructed building materials. Donors to Second Chance may seek to deduct the appraised value of donated building materials from their taxes, and, in connection with the same, donors obtain signed 8283 forms from Second Chance (which are typically signed by Second Chance's CEO, Mr. Foster) acknowledging receipt of the donated noncash materials. In accepting these noncash donations, neither Second Chance nor Mr. Foster obtain (and have never intentionally obtained) personally identifiable information (i.e. social security numbers) from Second Chance donors. Accordingly, Mr. Foster is unable to provide the "individual Taxpayer's social security numbers" as requested by your April 24, 2025 letter.

Because Mr. Foster cannot be required to provide information that he does not have (and has no lawful mechanism of obtaining) in his Forms 6118, the IRS must process the forms without this information. Alternatively, if the IRS continues to insist upon reviewing this information in order to process the Forms 6118, we suggest you obtain the individual taxpayers' social security numbers from Agent Timothy Bauer (copied on this letter), who authored the Determination Letter and assessed the subject penalties related to each donation; presumably Agent Bauer has access to each taxpayer's SSN in his investigative file.

Accordingly, Mr. Foster asks that the IRS timely process the Forms 6118 submitted on October 25, 2024, as supplemented below.

## Supplement to Forms 6118 Submitted October 25, 2024

In order to ensure that the IRS does not identify any further reasons for delaying a decision on the Forms 6118, Mr. Foster submits the following supplement to the reasons for claiming a refund as explained in the Forms 6118 submitted on October 25, 2024:

As noted, Mr. Foster is not liable for penalties assessed under I.R.C. § 6701. Imposition of a penalty pursuant to I.R.C. § 6701 requires satisfaction of three (3) elements. The IRS, however, has not established the required elements. The first element requires that a person aid, assist, procure, or advise with respect to the preparation or presentation of a federal tax return, refund claim, or other document. The IRS appears to take the position that Mr. Foster's signature on the Forms 8283, contemporaneous written acknowledgements, and Charitable Contribution Agreements satisfies this element. Not so. Neither Mr. Foster nor Second Chance have ever aided or assisted donors in the preparation of their federal tax returns. Second Chance is a *charity*, not a *tax preparer*. Mr. Foster works for that *charity*, not for a *tax preparation service*.

Charles R. Matthews
May 14, 2025
Page 3



Indeed, Form 8283 documents signed by Mr. Foster merely confirm Second Chance's receipt of donated materials, which Second Chance is *required to do* under I.R.C. rules related to noncash donations.

The second element requires that a person knows or has reason to know that such portion (of the documents/materials referenced in element one) will be used in connection with any material matter arising under the internal revenue laws. The IRS again contends that Mr. Foster's signature on donors' Forms 8283, together with Mr. Foster and Second Chance's generalized acknowledgment of the tax benefits associated with I.R.C. complaint, noncash donations, satisfies element two. While Mr. Foster and Second Chance acknowledge that tax benefits are available to their donors, neither Mr. Foster nor Second Chance know whether their donors will, in fact, take advantage of these benefits. Moreover, a charity's mere acknowledgment of receipt signature on the Form 8283 does not endorse valuation or any other portion of a tax return.

Finally, the third element requires a person to know that such portion (again referring to the documents/materials referenced in element one), if used, would result in the understatement of the tax liability for another person. The IRS's contentions with regard to the third element are particularly problematic. Specifically, the IRS appears to take issue with the valuation methodology by a third-party materials appraiser utilized by some of Second Chance's donors. Problematically, it stretches disagreements about valuation methodologies into a conclusion that Mr. Foster and Second Chance somehow *knew* that the third-party appraisals would lead to an "understatement of another person's tax liability." Not only does this erroneous conclusion propose to make *charities* and their personnel the arbiters of valuation methodologies employed by qualified third-party property appraisers, but it does also so without a single reference to statutory or other authority demonstrating that somehow the appraisal methodology employed was unlawful or that a charity whose donors rely on such methodology can be penalized for the same. For these reasons, among others, Mr. Foster respectfully denies that he is liable for any penalty under I.R.C. § 6701 and requests that a refund be issued for the portion of the penalty he has paid.

Although Mr. Foster was only recently assessed penalties pursuant to I.R.C § 6701, the IRS's scrutiny of Mr. Foster and Second Chance has been in motion for well over a decade. For reasons explained by Thomas O'Rourke in his February 15, 2021 correspondence to Agent Donna Lamonna, a copy of which is enclosed herewith as **Exhibit D**, there is no legitimate basis for this newest examination as neither Mr. Foster nor Second Chance are involved in promoting improper tax avoidance transactions. Mr. Foster and Second Chance have been fully compliant with all previously-issued and available IRS guidance, to the extent there is any at all. Over the years, despite the extraordinary burden and expense of the IRS's various investigations, Second Chance and Mr. Foster have at all times cooperated with the IRS and have provided all information that has been requested. *None* of the information provided to the IRS in this newest examination has demonstrated anything contrary to our initial position.

We thank you for your consideration, and look forward to hearing from you shortly regarding the requested clarification of the April 25, 2024 letter. Please also confirm your acceptance of this correspondence as Mr. Foster's formal supplement to the Forms 6118 filed on October 25, 2024.

Charles R. Matthews
May 14, 2025
Page 4



If I can provide any further information, or if you would like to discuss in further detail, please do not hesitate to contact me.

Very truly yours,

Joshua J. Gayfield

cc:    Timothy Bauer, Supervisory Internal Revenue Agent (via fax: 888-850-0320)

# EXHIBIT A

IRS Department of the Treasury
Internal Revenue Service

IRS
FRESNO   CA   93888-0025

In reply refer to:  0844217673
Apr. 24, 2025      LTR 96C    0
                   202012 30        R
                       00000143
                   BODC: SB



MARK S  FOSTER
600 E SEMINARY AVE
TOWSON  MD  21286

000752

Social Security number or individual
taxpayer identification number:
          Tax periods: Dec. 31, 2020

Dear Taxpayer:

Thank you for your correspondence which we received on Oct. 25, 2024.

We are unable to process for a civil penalty removal at this time.  We
need more information to process the forms 6118 that were sent in.
Please provide the individual Taxpayers social security numbers as
required.

If you have questions, you can call 800-829-0922.

If you prefer, you can write to the address at the top of the first
page of this letter.

Find tax forms or publications by visiting IRS.gov/forms or calling
800-TAX-FORM (800-829-3676).

When you write, include a copy of this letter, and write your
telephone number and the hours we can reach you.

Keep a copy of this letter for your records.

Thank you for your cooperation.

```
                                                    0844217673
                          Apr. 24, 2025    LTR 96C    0
                          ███████████       202012 30         R
                                                      00000144
```

MARK S   FOSTER
600 E SEMINARY AVE
TOWSON   MD   21286


Sincerely yours,

*Charles R. Matthews*

Charles R. Matthews
Department Manager, AM Op 1, Dept 4

**IRS** Department of the Treasury
Internal Revenue Service

IRS
FRESNO   CA   93888-0025

000752.666562.454561.26205 1 MB 0.622 532

MARK S FOSTER
600 E SEMINARY AVE
TOWSON  MD  21286

000752

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

---

The IRS address must appear in the window.        Use for payments
                                    0844217673        Letter Number: LTR0096C
      BODCD-                                          Letter Date  : 2025-04-24
                                                      Tax Period   : 202012

INTERNAL REVENUE SERVICE                      MARK S  FOSTER
                                              600 E SEMINARY AVE
Kansas City MO 64999-0206                     TOWSON   MD  21286

216521358 0S F0ST 30 0 202012 670 00000000000

# EXHIBIT B

Form **2848**
(Rev. January 2021)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**  **Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1**  **Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) | |
|---|---|---|
| Mark S. Foster | ▮▮▮▮▮▮ | |
| | Daytime telephone number | Plan number (if applicable) |
| 600 E. Seminary Ave., Towson, MD 21286 | | |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2**  **Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | | |
|---|---|---|
| Joshua J. Gayfield, Esq. | CAF No. _____ | |
| | PTIN _____ | |
| | Telephone No. 410-385-3734 | |
| Miles & Stockbridge P.C., 100 Light St., Baltimore, MD 21202 | Fax No. 410-773-9096 | |
| **Check if to be sent copies of notices and communications** ☑ | Check if new: Address ☐  Telephone No. ☐  Fax No. ☑ | |

| Name and address | | |
|---|---|---|
| Patrick F. Toohey, Esq. | CAF No. _____ | |
| | PTIN _____ | |
| | Telephone No. 301-517-4803 | |
| Miles & Stockbridge P.C., 11 N. Washington St., Suite 700, Rockville, MD 20850 | Fax No. 301-762-0363 | |
| **Check if to be sent copies of notices and communications** ☑ | Check if new: Address ☑  Telephone No. ☑  Fax No. ☑ | |

| Name and address | | |
|---|---|---|
| | CAF No. _____ | |
| | PTIN _____ | |
| | Telephone No. _____ | |
| | Fax No. _____ | |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |

| Name and address | | |
|---|---|---|
| | CAF No. _____ | |
| | PTIN _____ | |
| | Telephone No. _____ | |
| | Fax No. _____ | |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ | |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3**  **Acts authorized (you are required to complete line 3).** Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Civil Penalty | 6118 | 2020 |
| | | |
| | | |

**4**  **Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions . . . . . . . . . . . . . . . . ▶ ☐

**5a**  **Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☐ Substitute or add representative(s);   ☐ Sign a return; _____
_____
_____
☐ Other acts authorized: _____
_____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.   Cat. No. 11980J   Form **2848** (Rev. 1-2021)

Form 2848 (Rev. 1-2021)                                                                Page **2**

**b**   **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ..................................................
.......................................................................................................................................................................................

**6**   **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**   **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.
▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| _(signature)_ | APRIL 30, 2025 | |
| Signature | Date | Title (if applicable) |

Mark S. Foster
.............................................        .............................................................................
Print name                                     Print name of taxpayer from line 1 if other than individual

### Part II   Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

  **a** Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  **b** Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
  **c** Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
  **d** Officer—a bona fide officer of the taxpayer organization.
  **e** Full-Time Employee—a full-time employee of the taxpayer.
  **f** Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
  **g** Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
  **h** Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). **See Special Rules and Requirements for Unenrolled Return Preparers in the instructions for additional information.**
  **k** Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
  **r** Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**
Note: For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a-r). | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | MD | 0912150281 | _(signature)_ | 5/1/25 |
| a | MD | 1612140297 | _(signature)_ | 4.30.25 |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2021)

| Form **2848**<br>(Rev. January 2021)<br>Department of the Treasury<br>Internal Revenue Service | **Power of Attorney**<br>**and Declaration of Representative**<br>▶ Go to *www.irs.gov/Form2848* for instructions and the latest information. | OMB No. 1545-0150 |
|---|---|---|

<table>
<tr><td colspan="2"></td><td>For IRS Use Only</td></tr>
<tr><td colspan="2"></td><td>Received by:</td></tr>
<tr><td colspan="2"></td><td>Name</td></tr>
<tr><td colspan="2"></td><td>Telephone</td></tr>
<tr><td colspan="2"></td><td>Function</td></tr>
<tr><td colspan="2"></td><td>Date    /   /</td></tr>
</table>

**Part I      Power of Attorney**

**Caution: A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.**

**1      Taxpayer information. Taxpayer must sign and date this form on page 2, line 7.**

| Taxpayer name and address | Taxpayer identification number(s) | |
|---|---|---|
| Second Chance, Inc.<br><br>1700 Ridgley St., Baltimore MD 21230 | Daytime telephone number | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2      Representative(s) must sign and date this form on page 2, Part II.**

| Name and address | |
|---|---|
| Joshua J. Gayfield, Esq.<br><br>Miles & Stockbridge P.C., 100 Light St., Baltimore, MD 21202 | CAF No. _____<br>PTIN _____<br>Telephone No. _____ 410-385-3734<br>Fax No. _____ 410-773-9096 |
| **Check if to be sent copies of notices and communications** ☑ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☑ |

| Name and address | |
|---|---|
| Patrick F. Toohey, Esq.<br><br>Miles & Stockbridge P.C., 11 N. Washington St., Suite 700, Rockville MD 20850 | CAF No. _____<br>PTIN _____<br>Telephone No. _____ 301-517-4803<br>Fax No. _____ 301-762-0363 |
| **Check if to be sent copies of notices and communications** ☑ | Check if new: Address ☑   Telephone No. ☑   Fax No. ☑ |

| Name and address | |
|---|---|
| | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. _____<br>PTIN _____<br>Telephone No. _____<br>Fax No. _____ |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3      Acts authorized (you are required to complete line 3).** Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Civil Penalty | 6118 | 2020 |
| | | |
| | | |

**4      Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   ▶ ☐

**5a      Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☐ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;      ☐ Substitute or add representative(s);      ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.          Cat. No. 11980J          Form **2848** (Rev. 1-2021)

Form 2848 (Rev. 1-2021)                                                                                                    Page **2**

**b** **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.

List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): _____

_____

**6** **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you **do not** want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7** **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.

▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| *(signature)* | APRIL 30, 2025 | President & CEO |
| Signature | Date | Title (if applicable) |

Mark S. Foster                                      Second Chance, Inc.

Print name                                      Print name of taxpayer from line 1 if other than individual

## Part II    Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

* I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
* I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
* I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
* I am one of the following:

    a  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
    b  Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
    c  Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
    d  Officer—a bona fide officer of the taxpayer organization.
    e  Full-Time Employee—a full-time employee of the taxpayer.
    f  Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
    g  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
    h  Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). **See Special Rules and Requirements for Unenrolled Return Preparers** *in the instructions for additional information.*
    k  Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
    r  Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r) | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | MD | 0912150281 | *(signature)* | 5/1/25 |
| a | MD | 1612140297 | *(signature)* | 4.30.25 |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2021)

# EXHIBIT C



**Department of the Treasury**
**Internal Revenue Service**
**Small Business/Self-Employed Division**

2670 Industrial Highway
York, PA  17402

Miles & Stockbridge P.C.
Attn:  Joshua Gayfield
100 Light Street
Baltimore, MD  21202

**Date:**
07/08/2024
**Taxpayer ID number (last 4 digits):**
▮▮▮
**Taxpayer name:**
Mark Foster
**Form number:**
Civil penalties
**Years:**
202012
**Person to contact:**
Donna Lamonna
**Employee ID number:**
1000831807
**Contact telephone number:**
223-259-5340
**Contact fax number:**
888-850-0320

Dear Joshua Gayfield:

We are sending the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

*Timothy Bauer*
Digitally signed by Timothy Bauer
Date: 2024.07.08 06:29:45 -07'00'

Timothy Bauer
Supervisory Revenue Agent

Enclosures:
☒ Letters
☒ Reports
☐ Copy of Determination Letter
☐ Other

**Letter 937 (Rev. 3-2017)**
Catalog Number 30760X



**Department of the Treasury**
**Internal Revenue Service**
**Small Business / Self-Employed Division**
2670 Industrial Highway
York, PA  17402

Date:
07/08/2024
Taxpayer ID number: (last 4 digits):
███

Person to contact:
Donna Lamonna
Contact telephone number:
223-259-5340
Contact fax number:
888-850-0320
Employee ID number:
100831807

Mark Foster
600 East Seminary Avenue
Towson, MD   21286

Dear Mark Foster:

We determined the penalty under Section *6701, Penalties for Aiding and Abetting Understatement of Tax Liability* is applicable. The enclosed Forms 886-A, *Explanation of Items*, and *Computation of Penalty*, explain the reasons for our determination and the computation of the penalty amounts.

If you want to submit a written rebuttal to the enclosed report, you must do so by July 23, 2024.
If your written rebuttal isn't received by then, the investigation will be closed based on the information available.

The penalty under IRC Section 6701 is subject to special administrative provisions of IRC Section 6703, Rules. If you want to contest the penalty after we assess it, one option is to file a claim for refund.

After we close the investigation, we'll send you a CP15 or CP215 penalty assessment notice which will explain your options in greater detail. To take advantage of the IRC Section 6703 special procedures for claiming a refund, you must respond to the assessment notice within 30 days from the date of the notice by filing the required form, either Form 6118, *Claim for Refund of Tax Return Preparer and Promoter Penalties,* or Form 843, *Claim for Refund and Request for Abatement,* and paying 15% of the amount assessed. You can also choose to contest the penalty assessment by following the general refund procedures in IRC Section 7422, *Refund Suits.* You can get more information about IRC Sections 6703 and 7422 by visiting our website at www.irs.gov.

If you have questions, you can contact me at the telephone number listed above.

Thank you for your cooperation.

Sincerely,

Digitally signed by
Timothy Bauer
Date: 2024.07.07 14:25:33
-07'00'

Timothy Bauer
Supervisory Internal Revenue Agent

Enclosures:
Forms 886-A
Computation of Penalty

**Letter 5390 (Rev. 11-2016)**
Catalog Number 66286U

| Form 886A | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

## PENALTIES:

### <u>2020</u>

**Per IRC §6701**    **$22,000**

**ISSUE:**  Internal Revenue Code (IRC) §6701 Penalty

Whether Mark Foster is subject to penalties under IRC §6701 for aiding or assisting in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the Internal Revenue laws and knowing that if it is so used, it will result in an understatement of another person's tax liability.

**FACTS:**

Mark Foster is the founder and CEO of Second Chance, Inc. which is a 501(c)(3) nonprofit organization.  Second Chance, Inc. is involved in the deconstruction of houses and buildings. Deconstruction is taking a house apart in the reverse order that it was constructed with the hopes of salvaging materials that can be repurposed. Per its website, "the Second Chance mission has always been (1) to retrain and create employment for displaced and unemployed workers; (2) to reclaim building material to reduce environmental harm and demolition debris in burgeoning landfills; (3) to renew both people and products to useful, purposeful life.  As a result, Second Chance provides jobs and a green collar workforce, protects the natural environment, and preserves people and our rich architectural heritage."  Any items salvaged from these projects are taken back to the Second Chance warehouse in Baltimore, MD where they are sold to the public.

The individuals involved in the deconstruction of houses receive hands on training on the correct way to deconstruct a property.  In the Mann v. United States case, Second Chance was the deconstruction company.  As is stated in this case, "it is undisputed that some parts of a structure are necessarily destroyed as part of the deconstruction process and that some of Second Chance's training includes deliberately destroying parts of a structure for the purpose of training, such as destroying a window to show what happens if you wedge this too hard".  As a result, not all components of a house are salvageable.

There are many documents involved in the deconstruction process.  The client signs an Agreement for Charitable Contribution and Pledge Agreement.  After the deconstruction process is over, Mark Foster provides the client with a signed letter thanking them for the donation of the property and after the pledge is paid, he sends another signed letter thanking them for the cash donation. He signs these thank you letters as Chief Executive Office of Second Chance, Inc.  On occasion, the letter acknowledging the donation of the property may be signed by a member of the Deconstruction Sales Team whom Mark Foster supervises.  Mark Foster is the author of

---

Form **886-A**(Rev.4-68)                                          Department of the Treasury - Internal Revenue Service

**Page: -1-**

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

these agreements and letters. Most of the communication throughout the deconstruction process is done via email and Mark Foster is cc'd on all communications.

The deconstruction process begins with the client meeting with a member of the Deconstruction Sales Team. To not overwhelm the client at the first meeting, the deconstruction process is explained in general terms. Once the client decides to go through with deconstruction, the process is explained in more detail. During these discussions, the Deconstruction Sales Team member will provide the client with a Deconstruction Information Guide that explains the steps of the deconstruction process. The client is also given a Tax Strategy Planning Worksheet that provides an example of the estimated tax savings of the donation using $200,000 as the fair market value until the range of value is determined by the appraiser. When the range of value is determined, it is given to the client and emailed to Second Chance, Inc. who prepares a new Tax Strategy Planning Worksheet that is tailored to that client using the figure that falls in the middle of this range of value.

The Deconstruction Sales Team member tells the client that a qualified appraisal of the property is required to claim the noncash charitable contribution deduction. An email is sent to the client by Second Chance, Inc. summarizing the details of the deconstruction process. The email states, "Once we have answered all of your questions, the first step is to contact an appraiser. One appraiser who specializes in building materials appraisals is Green Donation Consultants. Their contact information is as follows." The email and phone number of Green Donation Consultants (owned by Patrick Smith) is then provided. If the client requests a list of appraisers, then a list of qualified appraisers is given to the client however Patrick Smith of Green Donation Consultants is usually at the top of the list, and he is the appraiser that is recommended. Patrick Smith has completed appraisals for approximately 95%-98% of Second Chance clients.

Prior to engaging the appraiser, Patrick Smith will provide the client with a free estimate of the value of the house as it sits on the land. No appraisal is given to the client at this point, just a range of value. It's not until the client engages the appraiser by signing a contract and paying for the appraisal is the final appraisal given to the client. In order to provide an estimate or range of value of the property at this point, either Patrick Smith or an employee of Green Donation Consultants will visit the property, take pictures and measurements. Patrick Smith inputs this information into the R.S. Means software. R.S. Means is a software used by the construction industry to determine what it would cost to build a house today. Patrick Smith uses this software to determine the cost of building a new home and reaches a valuation determination by subtracting overhead costs and a depreciation percentage from the cost. This method does not reflect the resale value of the items actually removed by Second Chance, Inc. but instead shows what it would cost today to reconstruct the entire home and its contents as if it were a newly built house.

Patrick Smith then gives the client a value range of what it would cost to build this house currently. The value range does not consider what components would successfully be deconstructed or the condition of the components in their deconstructed state. This range of

| Form **886A** | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  **Mark Foster** | | Year/Period Ended  202012 |

value is given to the Deconstruction Sales Team member who uses the Tax Strategy Planning Worksheet to determine the estimated tax savings of the donation. The estimated tax savings is determined prior to knowing what items would be salvaged and their condition. The Tax Strategy Planning Worksheet is then given to the client who can decide if it is cost effective to go through with the deconstruction. The value used in the final appraisal always falls within the estimated value range provided by the appraiser prior to deconstruction and reported on the Tax Strategy Planning Worksheet.

Once the decision is made to move forward with the project, the client is asked to sign an Agreement for Charitable Contribution. This agreement states, "Owner desires to contribute to Second Chance the existing improvements, buildings, and fixtures upon such Premises (collectively the "improvements"), which such Improvements shall be treated as personalty (personal property) severed from the Premises, for the express purpose of Second Chance using the Improvements in its charitable operations." This agreement also includes the charitable pledge amount that was decided upon between Second Chance, Inc. and the client. The client is told the date they sign the agreement is considered the donation date when in fact the donation date is when the house was actually deconstructed, and Second Chance, Inc. took possession of the components. Title of the property was never transferred to Second Chance, Inc. therefore Second Chance, Inc. didn't own anything until the deconstruction.

In addition to the donation of the salvaged materials of the house, the client signs an agreement executing a binding charitable pledge whereby owner agrees to honor its pledge of an amount that is agreed upon. The initial pledge amount is determined by the Deconstruction Sales Manager. Mark Foster stated in his interview, "the purpose of the pledge is to offset deconstruction costs and provide support for the broad mission of Second Chance. The profits from the sale of the salvaged items don't even cover the cost of labor to deconstruct. Because of this the pledges are high, but they must be fair and equitable for both parties". The first step to determine the pledge amount is to look at the appraiser's field survey to determine the cost of the project, size of the project and the scope of the work. The highest expense for deconstruction is the payroll cost. The client has the option of paying the pledge amount in one lump sum or pay it over multiple years.

Once the Agreement for Charitable Contribution and Pledge Agreement are signed, the client engages the appraiser. The Director of Deconstruction then schedules the dates for deconstruction. Present at the deconstruction are the crew members and the foreman. The crew leader is told to complete the list of salvaged items (also known as manifests) as they are being loaded onto the truck. Mark Foster stated in his interview that complete lists of salvaged items with the condition of the items are not maintained, and the incomplete lists that are maintained are not given to the appraiser or the client. Although Mark Foster does not determine the value of the salvaged components, it is his responsibility to maintain complete lists of salvaged items including the condition of the items in their deconstructed state and provide the lists to the appraiser. The appraiser is typically not present during deconstruction or when the salvaged items are taken away therefore the appraiser does not see what items are salvaged or the

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

condition. Second Chance does not take pictures of the items salvaged. The only pictures that are taken would be of personal property such as furniture and appliances. Most of the salvaged items are taken back to the Second Chance warehouse in Baltimore, MD where they are listed for sale. In the interview of Mark Foster, he stated the profits from the sale of the salvaged items don't even cover the cost of labor to deconstruct a house.

During the deconstruction, items not salvaged are thrown into dumpsters or into the basement for removal by the demolition company. After the deconstruction is completed, the client is responsible for paying to have the remaining portion of the house demolished. As was previously stated, upon initial inspection of the property as it sits on the land, Patrick Smith enters the measurements and components of the house into R.S. Means software. This software prints out a list of all the components and their current value. It is not a list of salvaged items and their value in their deconstructed state. The range of value given to the client prior to deconstruction is the result of the measurements and components entered into the R.S. Means software. The value per the final appraisal always falls within this range of value which confirms that the list given to Mark Foster represents the components prior to deconstruction and the final appraisal value is not revised to reflect salvaged items and their "as-deconstructed" condition. Patrick Smith provides Mark Foster with this list he created from R.S. Means which represents the entire house prior to deconstruction, less drywall, masonry, tile and mirror. If before deconstruction the client says they want to keep some of the items, the R.S. Means list is not adjusted. Mark Foster copies the list from R.S. Means, word for word and signs it as "All Materials Received". The R.S. Means list is attached to the appraisal as Addendum A and the list signed by Mark Foster is attached as Addendum AA. The appraiser sends the appraisal to the client and a copy is kept in the client file maintained by Second Chance, Inc. The appraiser signs Form 8283 and forwards it to Mark Foster which he signs as President of Second Chance, Inc. and gives it to the client.

Mark Foster stated that in 2010 or 2011, he met with Internal Revenue Service agents in Annapolis, MD and discussed the proper way to value the houses that were being deconstructed. He felt the entire house should be valued since it was donated to be used in Second Chance, Inc.'s mission to retrain and create employment for displaced and unemployed workers. He learned during this discussion that the proper way to value the donation was to determine the value of the salvaged items in their deconstructed state that cross the threshold of Second Chance, Inc.'s warehouse. Mark Foster stated in his interview that starting in 2012, no longer could the entire house be deducted but only the salvaged items.

In 2014, Mark Foster hired Second Chance, Inc. to deconstruct his personal residence, engaged Patrick Smith to prepare the appraisal and claimed a noncash charitable contribution deduction. The examination/engineer's report provided to Mark Foster during the audit of his 2014 personal tax return detailed why the donation was not deductible.

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

1) A contribution of the use of property is specifically identified in IRC §170(f)(3) and Treasury Regulation §1.170A-7 as constituting less than a taxpayer's entire interest in the property.
2) The appraisal was not a qualified appraisal because it did not include a description of the property in sufficient detail to ascertain that the property appraised was the property donated and did not include the "as-deconstructed" physical condition of the donated tangible personal property.
3) Mark Foster failed to meet the burden of proof in substantiating fair market value of the donation, as shown on Form 8283, based on the appraisal that was prepared. The appraisal included items of significance that were not donated. The appraisal purports to value tangible personal property (value of house as if severed from the home site) by basing valuation solely on depreciated cost new, calculated by economic age-life method, which reflects value of the house for use and occupancy as a residence (real estate), not for deconstruction.

The Mann v. United States case was filed in the court 1/31/2019. Second Chance, Inc. was the deconstruction company and Patrick Smith was the appraiser, therefore Mark Foster was aware of the outcome of the case. The courts decided the appraisal was invalid because it calculated the value of the house at its highest and best use. The second appraisal prepared by Patrick Smith and provided by the clients specifically stated that it seeks to "determine the fair market value of the donated structure's used building components when sold on the 2nd hand market" by taking the value of new versions of the building materials comprising the house and depreciating those materials based on the age of the house. Second Chance stated to the Manns, and the court agreed, the proper way to calculate a tax deduction from this donation is based on the resale value of the specific building materials and contents that "we actually take away from the site" and that "cross the threshold" of Second Chance's warehouse.


## LAW:

IRC §6701(a) penalizes any person who aids or assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the internal revenue laws and knowing that if it is so used it will result in an understatement of another person's tax liability.

Under IRC §6701(b) the amount of the penalty shall be $1,000 however if the return, affidavit, claim, or other document relates to the tax liability of a corporation, the amount of the penalty shall be $10,000.

Per IRC §6701(c)(1), the term "procures" includes "ordering (or otherwise causing) a subordinate to do an act", as well as "knowing of, and not attempting to prevent, participation by a subordinate in an act".

Form **886-A**(Rev.4-68)                    Department of the Treasury - Internal Revenue Service

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

**GOVERNMENT'S POSITION:**

It is the government's position that the penalty per IRC §6701 is applicable for the reasons stated below.

**Element #1**:  Aids, assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document.

When a client is deciding whether to move forward with the deconstruction, the appraiser, Patrick Smith, or one of his employees will visit the property to take pictures and measurements of the interior and exterior.  To give the client an estimated value range of the contribution, the appraiser relied upon the construction estimating software package R.S. Means to determine the cost of building a new home on the property and made adjustments purporting to account for physical depreciation and functional obsolescence.  This list of building materials from R.S. Means prior to deconstruction was included in the appraisal as Addendum A. The R.S. Means list was provided to Second Chance, Inc. who then copied this list to a new document and Mark Foster signed the document as "All Materials Received".  This list is also included in the appraisal as Addendum AA. This list cannot be an accurate list of the items salvaged for the following reasons. (1) The list is a breakdown of the components of the house as it stood on the land prior to deconstruction; (2) Individual items on the R.S. Means list are not listed and the items listed on the incomplete list of salvaged items are labeled differently than what is on the R.S. Means list.  For example, the R.S. Means list provides one value for the entire bathroom, rather than valuing the components of the bathroom.  The list of salvaged items will list toilet, sink, etc. separately.  It is very possible that all the components of the bathroom were not salvaged; The R.S. Means list reflects approximately 5-7 line items for "framing systems" however the list of salvaged items lists "lumber" with no total amount of lumber or else lumber isn't listed at all; (3) The list of salvaged items prepared by Second Chance, Inc. reflects less items than is listed on the R.S. Means list that Mark Foster signed; (4) Mark Foster admitted the lists of salvaged items are not given to the appraiser and the appraiser does not see the items after they are deconstructed therefore how can he appraise them; (5) The list signed by Mark Foster indicating "All Materials Received" is dated prior to deconstruction.  As a result, Mark Foster is providing the client with a false contemporaneous written acknowledgement of the donation of building materials and personal property because the list he is signing does not represent the items salvaged.  Also, the donation date he provides is prior to the date the items were salvaged. Clients are led to believe the R.S.Means list included in the appraisal and the materials list signed by Mark Foster and attached to the appraisal are the items salvaged from the deconstruction.

Although Mark Foster claims that he compares the list of salvaged items to the R.S.Means list and has the appraiser remove any items that were not salvaged, this is not true.  There were items the clients decided to keep, i.e. washer, dryer, and storm door which are listed on the R.S.Means list, and are listed on the contemporaneous written acknowledgement signed by Mark Foster, therefore Mark Foster did not compare the lists and did not have the appraiser adjust the

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>**Mark Foster** | | **Year/Period Ended**<br>202012 |

appraisal however he still signed the R.S. Means list as "All Materials Received", even though they weren't all received.

Mark Foster provides the clients with a contemporaneous written acknowledgement for the cash and noncash charitable contributions. They are either signed by Mark Foster, Chief Executive Officer, Spence Jeffries or Ryan Mariman of the Deconstruction Sales Team, who Mark Foster supervises.

Mark Foster signed the Forms 8283 Part V as President of Second Chance, Inc. stating, "This charitable organization acknowledges that it is a qualified organization under section 170 (c) and that it received the donated property as described in Section B, Part I, above on the following date…." The FMV in Part I would agree to the value in the qualified appraisal which is provided to Second Chance and maintained in the client file. This value is from R.S. Means and not the value of items actually salvaged which Mark Foster knew because lists of salvaged items were never maintained or given to the appraiser.

The Agreement for Charitable Contribution includes language regarding the cash and noncash charitable contributions. This agreement is signed by the Deconstruction Sales Manager whom Mark Foster supervises and Mark Foster at times, signs as the witness. Letters are provided to the clients recognizing the cash and noncash charitable donations to Second Chance, Inc. and they are either signed by Mark Foster as Chief Executive Officer, Spence Jeffries or Ryan Mariman of the Deconstruction Sales Team.

All the information included in the Tax Strategy Worksheet, Deconstruction Agreement (also known as the Charitable Contribution Agreement), Pledge Agreement and Recognition of Donation Letter was written by Mark Foster and over the years accountants and attorneys provided suggestions. He also spoke to persons at the Internal Revenue Service to make sure the wording was correct in the Recognition of Donation Letter.

Mark Foster aided, assisted in, procured, or advised with respect to the preparation or presentation of a federal tax return, refund claim, or other document. He signed Forms 8283, contemporaneous written acknowledgements, and Charitable Contribution Agreements and he was the author of these documents. He also signed the list from R.S. Means stating "All Materials Received".

**Element #2:** Who knows (or has a reason to know) that such portion will be used in connection with any material matter arising under the internal revenue laws.

Mark Foster knew or had reason to know that the documents mentioned in Element #1 and the statements regarding tax benefits would be used in connection with a material matter arising under the internal revenue laws. A matter is material if it would have a substantial impact on the decision-making process for entering into the transaction.

---

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

During discussions with potential clients, they were told and/or provided literature regarding the deconstruction process and the tax benefits. This literature was prepared by Mark Foster. Clients were told that any noncash charitable contribution exceeding $5,000 required an appraisal by an independent appraiser. Clients were informed in the Deconstruction Information Guide that both a qualified appraisal and Form 8283 signed by the appraiser and Second Chance, Inc. are needed to claim the noncash contribution deduction on their tax return.

Clients were given a "Tax Strategy Planning Worksheet" that explained the estimated tax savings of donating their house and the net benefit to the donor after also pledging money to Second Chance, Inc. The original Tax Strategy Planning Worksheet that was used was in generic format using $200,000 for all the clients as the value of the house. Once the range of value of the house was provided by the appraiser, then a different Tax Strategy Planning Worksheet was prepared tailored to each clients' situation. This range of value was determined as the house was situated on the land prior to deconstruction. In emails from Second Chance, Inc. explaining the deconstruction process they state, "We ask that the donor shares a portion of the tax benefit with us in the form of a cash donation made at the time that is in keeping with their tax strategy. In the vast majority of cases, the homeowner retains the lion's share of the benefit, and all parties walk away having financially benefited for making an environmentally and socially responsible choice".

The Agreement for Charitable Contribution signed by a member of the Deconstruction Sales Team and sometimes witnessed by Mark Foster states, "Second Chance shall cooperate with Owner and Green Donation Consultants in coordinating the documentation to evidence the charitable contribution to Second Chance and for the Owner's federal and state income tax returns, including coordinating with Owner and Green Donation Consultants in connection with the preparation of an IRS compliant documentation packet required to take full advantage of the available tax benefits for the improvement and the charitable pledge".

In the "Thank you for your donation" letter, Mark Foster states, "You should retain this letter in your records for tax purposes. As you may be aware, the IRS no longer will accept a canceled check as substantiation of a charitable contribution of $250 or more. This letter serves to verify that you did not receive anything of value in exchange for your contribution. Therefore, the entire value of your donation is tax-deductible". This letter is signed by Mark Foster, Chief Executive Officer.

Clients were told they would be provided with a signed Form 8283 which they needed to claim the noncash charitable deduction. Also provided was a contemporaneous written acknowledgement of the donation. Attached to the appraisals as Addendum AA is a list of purported items salvaged and donated to Second Chance, signed by Mark Foster indicating "All Materials Received". The contemporaneous written acknowledgement, donation receipt and the Form 8283 signed by Mark Foster effect the understatement of liability which is a material matter.

| Form 886A | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Mark Foster | | Year/Period Ended<br>202012 |

Statements regarding tax benefits are also a material matter and were given to clients either through documents provided to them or in email communications. The emails were usually sent by the Deconstruction Sales Team, who Mark Foster supervises, and Mark Foster was cc'd on every email.

Other statements regarding tax benefits that were given to clients are as follows:

- "In summary, your house creates a tax deduction, which creates a tax savings or an actual refund of money to you. You will keep the larger portion of your tax savings/refund and provide funding for our training program which will be learning on your site, by pledging a portion of your savings/refund to Second Chance, Inc."

- "Once Second Chance is involved in the deconstruction, a tax-deductible benefit comes relevant because you are supporting our workforce development training program."

- "I will create potential tax benefit scenarios and pledge options that assume a final appraised value that lands in the middle of the range provided by the appraiser."

- "If you would like to take advantage of the significant tax benefits associated with deconstructing a building, instead of demolishing it, call me to discuss our Funded Deconstruction Program."

- "Clients come to us with an interest in keeping items from the landfill and an interest in the significant tax benefits."

- An appraiser who specializes in materials appraisals will determine the value of the materials in your house. The appraisal value will determine your tax savings/deduction.

- The deconstruction sales manager explained to the client that his charitable contribution deduction is limited to 50% of his adjusted gross income but he has 5 years to capture it in its entirety. He also stated, "The 'tax event' occurs as of the date indicated on the conveyance document you would sign. You should have no problem taking the deduction for the material in 2020". (Note: The deconstruction did not take place until 2021).

Foster aides and assists in the deconstruction process of homes for clients used in connection with a material matter arising under the internal revenue laws. He signs the Form 8283 to attach to his clients' federal income tax return, he acknowledges the donation will result in a tax deduction in his thank you letters to his clients and provides the clients with their "Tax Savings or Refund" amounts per the Tax Strategy Planning Worksheet. He also mentions on the Second

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>Mark Foster | | Year/Period Ended<br>202012 |

Chance, Inc. website, "Deconstruction generates generous tax savings from home and material donations to Second Chance. That translates into cash in your pocket!"

**Element #3:** Who knows that such portion (if so used) would result in an understatement of the liability for tax of another person.

Mark Foster met with IRS employees in Annapolis, MD in either 2010 or 2011 to discuss how much of the house donation could be deducted as a noncash charitable contribution. He felt the value of the entire structure could be deducted because it was used in the Second Chance, Inc's training program. During these discussions he became aware that only the value of the salvaged items was deductible. He said this reduced the charitable deduction by about 40%. Mark Foster stated in his interview that whatever gets to the nonprofit organization is what is tax deductible and since 2012, only salvaged items were valued.

Despite the discussions he had with the agents in Annapolis, MD, in tax year 2014 Mark Foster had his personal residence deconstructed by Second Chance, Inc. and claimed a noncash charitable contribution deduction for the value of the entire house and not the salvaged items which reduced his tax liability. His 2014 tax return was audited, and the noncash contribution deduction was disallowed by the Examination Division of the Internal Revenue Service and the decision was upheld by the Appeals Division. The examination/engineer's report detailed the reason for the disallowance and the fact that all items appraised per R.S. Means, were not salvaged.

The MANN v. United States court case was decided on 1/31/2019 and Second Chance, Inc. performed the deconstruction services for Lawrence and Linda Mann. The court stated, "Rather, as Second Chance's communications to the Manns reveal, the proper way to calculate a tax deduction from this donation is based on the resale value of the specific building materials and contents that 'we actually take away from the site' and that 'cross the threshold' of Second Chance's warehouse."

Mark Foster signed Addendum AA of the appraisals as "All Materials Received" even though he knew it did not represent the salvaged items. He signed the Addendum as Founder & President of Second Chance, Inc. He knew this overvaluation would result in an understatement of tax liability. Mark Foster admitted the resale value of the salvaged items doesn't even cover the payroll costs for deconstruction. He was aware that the appraiser used the R.S. Means software to determine the current value of all the components of the house less drywall, masonry, tile, mirror, prior to deconstruction. Based on the Mann v. United States case and his discussions with the Internal Revenue Agents in Annapolis, MD, Mark Foster admitted that the appraisals should have reflected the resale value of the specific building materials and contents that crossed the threshold of the Second Chance, Inc. warehouse. The list using the R. S. Means software was given to Mark Foster who in turn recopied the list and signed it indicating that Second Chance, Inc. received everything that was on the list. He was aware that some rooms were

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

valued as a whole instead of each separate component since that is how they are reflected on the R.S. Means list which he copied over to the list that he signed. He also knew that the lists of salvaged items that were kept by Second Chance, Inc. were substantially incomplete. All the salvaged items were not listed and the items that were listed were not adequately described as to what was salvaged and the condition of the deconstructed items was not noted. No steps were taken by Mark Foster to make sure complete lists of salvaged items were maintained listing the condition of the items in their deconstructed state. Mark Foster admitted that these lists were not given to the appraiser and the appraiser never saw the items in their deconstructed state.

The noncash contribution deduction claimed on Mark Foster's 2014 personal tax return was disallowed and the decision in the MANN case confirmed that there would be an understatement of tax liability unless a deduction was claimed for only salvaged items. Mark Foster knew that claiming a noncash charitable contribution deduction by the clients would result in an understatement of tax liability. After his personal audit and the decision in the MANN case, no processes were put in place to track the condition of the items salvaged and ensure that only salvaged items were valued. (Gard v. United States, 1992 WL 113456 (N.D.Ga. 1992), The deduction for salvaged and not salvaged items was still occurring for the clients Mark Foster was helping to facilitate in tax year 2020.

Although Mark Foster did not determine the value of the donation, he was aware the donation was overvalued which in turn would understate the client's tax liability. He did not provide an actual list of each deconstructed item and its "as-deconstructed" condition to anyone. Mark Foster admitted the appraiser performed the appraisals for 95% to 98% of Second Chance, Inc. clients. He knew the appraiser used the R.S. Means software which determines the fair market value of the property as it sits on the land prior to deconstruction. The lists of salvaged items maintained by Second Chance, Inc. did not list all the items salvaged, did not list the condition of the items in the deconstructed state and they were not given to the appraiser or the client, therefore Mark Foster knew the appraiser was not valuing salvaged items. The appraiser did not see the items in their deconstructed state. It is Mark Foster's responsibility to maintain correct lists of salvaged items and their condition, and provide this list to the appraiser so the correct components could be valued in their deconstructed state. This list from the R.S. Means software was given to Mark Foster by the appraiser. After copying all the items word for word from the R.S.Means list to a separate document, he signed it as "All Materials Received". The date on this document that he signed indicated the materials were received prior to deconstruction. Mark Foster knew there was an overvaluation issue in these transactions which resulted in an understatement of tax liability.

The R.S. Means list and the identical list signed by Mark Foster were attached to the appraisal as Addendum A and Addendum AA. Since the clients were told that only salvageable items are valued, and the list attached to the appraisal was signed by Mark Foster as "all materials received", the clients were lead to believe the lists identified only the salvaged items.

There were instances where the client decided to keep some of the items, rather than

---

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

donating them.  These items were listed on the R.S. Means list given to Mark Foster and also on the list signed by Mark Foster which shows the value given to the client is the value determined prior to deconstruction.  For example, prior to deconstruction a client decided to keep their washer and dryer and sent an email to both Second Chance, Inc. and Green Donation Consultants to inform them of this decision.  The R.S. Means list prepared prior to deconstruction listed both the washer and dryer.  The purported list of salvaged items signed by Mark Foster as "All Materials Received", also listed the washer and dryer.

In another instance, a client's house had two storm doors and a neighbor wanted to have one of them.  The R.S. Means list prepared prior to deconstruction reflected two storm doors.  The client told Second Chance that only one of the storm doors was being donated and said the appraisal needed to be adjusted.  The purported list of salvaged items signed by Mark Foster as "All Materials Received", listed both storm doors.

Mark Foster was aware that the R.S, Means software values some rooms as a whole instead of their individual parts.  For instance, rather than valuing the toilet, sink and shower, the bathroom is valued as a whole despite which components are actually salvaged.  During one of the deconstructions, Second Chance, Inc found a box(es) of brand new faucets and asked Patrick Smith to include them in the appraisal.  The response provided by a Green Donation Consultant employee was "The bathroom fixtures cannot possible be added.  As we have stated before, the two sets of lines (4 total in this instance), already attributed to the bathrooms in the R.S.Means more than cover all of the bathroom items.  The bathroom values are $22,000 + $6,575 + $3,100 + $15,741 (the latter two specifically for fixtures) for a total of $47,416.  Although I kind of understand questioning the box of faucets, I cannot possibly add anymore value for anything bathroom related without drawing red flags."  This confirms that Mark Foster knew Patrick Smith was not valuing the components properly and the noncash charitable contribution deduction would cause an understatement of tax liability.  Mark Foster was aware of everything that was discussed between clients and Second Chance because he was cc'd on all emails whether they were sent to clients, Patrick Smith, or Green Donation Consultants.

As a result of the examination of Mark Foster's personal tax return and the MANN case, he was alerted and informed of problems with not identifying a detailed list of salvaged items or any party making a valid attempt at providing a condition for each of the donated items and this makes Mark Foster liable for the penalty per IRC §6701.  He took no action to rectify the lack of specifically identifying the salvaged items for the appraisals or identifying the condition of the salvaged items.  Although the appraisals stated that unless otherwise noted, all the items were in good condition, these can't be relied upon because Mark Foster never maintained adequate lists of salvaged items and their condition and he knew the appraiser never saw the items in their deconstructed state.  (Mattingly v. United States, 924 F.2d 785 (8th Cir. 1991))

Mark Foster was made known during the audit of his personal tax return and the conclusion in the MANN case that a list of salvaged items and their condition was required to be maintained so that only salvaged items would be valued.  Even though Mark Foster admitted that lists and

| Form 886A | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  Mark Foster | | Year/Period Ended 202012 |

conditions of salvaged items were not maintained and given to the appraiser, he assured customers that the purported tax benefits are available despite consistent rejection that the appraisals needed to identify a specific list of the salvaged items including the condition of these items in their deconstructed state.  (United States v. Fisher, 2004 WL 489822 (N.D. Tex. 2004)

By providing the clients with a value not representative of the salvaged items, the clients claimed noncash charitable contribution deductions which understated their tax liability.

**TAXPAYER'S POSITION:**

Not known at this time

**CONCLUSION:**

The following clients are included in the calculation of the IRC §6701 penalty.  The penalty amount per IRC §6701(b) is $1,000 per tax return.

22 clients x $1,000 = $22,000

| Name | Estimated Value Prior to Deconstruction | Final Appraisal Value | Did Appraised Value Incorporate the Condition & Detailed List of Salvaged Items? | Exhibit |
|---|---|---|---|---|
| ████████ | 160,000 to 190,000 | 176,000 | No | 29 |
| ████████ | 220,000 to 250,000 | 236,000 | No | 30 |
| ████████ | 115,000 | 117,500 | No | 31 |
| ████████ | 140,000 to 160,000 | 153,000 | No | 32 |
| ████████ | 135,000 to 165,000 | 148,500 | No | 33 |
| ████████ | 145,000 to 165,000 | 161,000 | No | 34 |
|  |  |  |  |  |

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>Mark Foster | | **Year/Period Ended**<br>202012 |

| Name | Estimated Value Prior to Deconstruction | Final Appraisal Value | Did Appraised Value Incorporate the Condition & Detailed List of Salvaged Items? | Exhibit |
|---|---|---|---|---|
| ▮▮▮▮▮▮ | 165,000 to 195,000 | 183,000 | No | 35 |
| ▮▮▮▮▮▮▮▮ | 280,000 to 300,000 | 298,000 | No | 36 |
| ▮▮▮▮▮▮▮ | 145,000 to 175,000 | 157,000 | No | 37 |
| ▮▮▮▮▮ | 285,000 | 291,000 | No | 38 |
| ▮▮▮▮▮ | Unknown | 170,500 | No | 39 |
| ▮▮▮▮▮▮ | 255,000 | 240,500 | No | 40 |
| ▮▮▮▮ | 190,000 | 193,000 | No | 41 |
| ▮▮▮▮▮▮ | 190,000 to 220,000 | 203,000 | No | 42 |
| ▮▮▮▮ | 125,000 | 139,000 | No | 43 |
| ▮▮▮▮▮ | Unknown | 139,000 | No | 44 |
| ▮▮▮▮▮▮ | 145,000 to 175,000 | 168,000 | No | 45 |
| ▮▮▮▮▮ | Unknown | 155,000 | No | 46 |
| ▮▮▮▮▮ | 380,000 | 381,000 | No | 47 |
| ▮▮▮▮▮ | 245,000 | 250,000 | No | 48 |
| ▮▮▮▮▮▮ | 180,000 to 210,000 | 189,000 | No | 49 |
| ▮▮▮▮▮ | 270,000 to 300,000 | 284,000 | No | 50 |

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit |
|---|---|---|
| **Name of Taxpayer**<br><br>**Mark Foster** | | **Year/Period Ended**<br>202012 |

Mark Foster aided, assisted in, procured, or advised with respect to the preparation or presentation of a federal tax return, refund claim, or other document. During the deconstruction process, the clients are provided with Tax Strategy Planning Worksheets and Deconstruction Information Guide. They are required to sign an agreement executing a binding charitable pledge and an agreement to donate the components of the house that are salvaged. These documents were written by Mark Foster. These agreements are signed by either Mark Foster or a member of the Deconstruction Sales Team who Mark Foster supervises. The letters sent to the clients acknowledging the cash and noncash charitable contributions were written by Mark Foster and he signed them as President and CEO of Second Chance. Mark Foster instructed the clients that in order to claim a charitable contribution deduction on their tax return, a qualified appraisal was needed. Clients were also told a Form 8283 needed to be attached to their tax return when claiming the charitable contribution deduction. The Form 8283 was signed by Mark Foster as President of Second Chance.

A matter is material if it would have a substantial impact on the decision-making process for entering into a transaction. Mark Foster knew statements regarding tax benefits would be used in connection with a material matter arising under the internal revenue laws. The information provided, the agreements signed, and the emails sent to clients during the deconstruction process all contained numerous statements regarding tax benefits. A Tax Strategy Planning Worksheet created by Mark Foster was also tailored to each client using the initial range of value provided by the appraiser prior to deconstruction so the client could decide if it was in their best interest to follow through with the deconstruction process. In the emails to clients there were numerous statements regarding tax benefits. For example, "In summary, your house creates a tax deduction, which creates a tax savings or an actual refund of money to you". "If you would like to take advantage of the significant tax benefits associated with deconstructing a building, instead of demolishing it, call me to discuss our Funded Deconstruction Program". Mark Foster was aware of these tax benefit statements in the emails to clients because he was cc'd on all emails. This information was critical in the client's decision to move forward with the deconstruction process.

Mark Foster was aware that claiming the noncash charitable contribution deduction would understate the tax liability of the client. He created the Tax Strategy Planning Worksheet that showed the client how much money they would save in taxes by deconstructing their house and claiming a noncash charitable contribution deduction. Mark Foster was aware that the value provided to the client by the appraiser was overvalued. He admitted that Second Chance, Inc. did not keep lists of the salvaged items, no list or condition of items was ever provided to the appraiser, and the appraiser never saw the deconstructed items. As a result, the value given to the client was based on the value determined as the house was situated on the land prior to deconstruction. This final value always fell within the initial range of value given to the client prior to deconstruction.

Mark Foster hired Second Chance, Inc. to deconstruct his personal residence in 2014 and he claimed a noncash charitable contribution deduction that was disallowed during the examination

| Form **886A** | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>**Mark Foster** | | Year/Period Ended<br>202012 |

of his tax return.  The case was forwarded to Appeals Division who upheld the decision by the Internal Revenue Service.  The MANN v. United States court case was decided on 1/31/2019 and Second Chance was the deconstruction company.  Lawrence and Linda Mann had their residence deconstructed by Second Chance and claimed a noncash charitable contribution deduction.  The deduction understated their tax liability, the court ruled in favor of the Internal Revenue Service and the deduction was denied.

The noncash charitable contribution deduction in both the examination of Mark Foster's personal tax return and the MANN case were disallowed because the taxpayers failed to prepare or secure descriptions of the specific property salvaged and donated to Second Chance and failed to provide a valuation of the deconstructed items at the time of donation.  The deduction for salvaged and not salvaged items was still occurring for the clients Mark Foster was helping to facilitate in tax year 2020.

The three elements of IRC §6701 have been met therefore Mark Foster is liable for the penalty.

# EXHIBIT D



**MILES &
STOCKBRIDGE** P.C.

Thomas J. O'Rourke
301-517-4821
torourke@milesstockbridge.com

February 15, 2021

Ms. Donna Lamonna
IRS
228 Walnut Street          Sent via fax to 888-850-0320
P.O. Box 866
Harrisburg, PA 17108

Re:    Mark Foster/Second Chance, Inc.

Dear Ms. Lamonna:

This letter is in response to your letter dated January 29, 2021 to my client, Mark Foster.

I have enclosed Forms 2848, powers of attorney, authorizing me to represent both Mr. Foster and
his employer, Second Chance, Inc. As your letter requests, we suggest that we arrange a meeting
to discuss the issues addressed in your letter. Please call me at your convenience to discuss such
a meeting.

We ask the IRS to reconsider its decision to initiate this examination for the reasons set forth in
this letter. Two similar examinations related to this issue have been resolved on the basis that
Second Chance is a charitable organization described in Code § 501(c)(3)[1] and that it is not
involved in promoting improper tax avoidance transactions. Moreover, a recent decision in
*Mann v. United States*, 364 F, Supp. 553 (D. MD 2020) aff'd at 127 AFTR 2021-477 (4th Cir.
2021), the Court specifically found that a contribution to Second Chance was a permissible
deduction to a Section 501(c)(3) organization. These matters are discussed in succeeding
sections of this letter.

Your letter is to Mr. Foster in his individual capacity. You may or may not be aware that he is
the President and Chief Executive Officer of Second Chance. The only matters addressed in the
information documents request (IDR) attached to your letter that he has personal knowledge of
are items 1-5, to the extent they exist. Second Chance does have records for many of the
remaining items listed, but these records are not in the personal possession of Mr. Foster.

---

[1]        All references to Code refer to the Internal Revenue Code, 26 U.S.C.

11 N. WASHINGTON STREET, SUITE 700 | ROCKVILLE, MD 20850-4276 | 301.762.1600 | milesstockbridge.com

BALTIMORE, MD · EASTON, MD · FREDERICK, MD · RICHMOND, VA · TYSONS CORNER, VA · WASHINGTON, D.C.

MILES &
STOCKBRIDGE P.C.

Page 2

**IRS Examination 2012-2017**

The IRS initiated an examination of Second Chance in 2012 that encompassed income and employment tax issues, and an investigation of whether Second Chance's exemption under Code Section 501(c) (3) should be revoked. The initial investigation took more than two years and during this time, the examining agent was provided with virtually all of the information requested in your IDR, but for earlier tax years.[2]

The examining agent (Mr. Walker) proposed numerous adjustments. All of the proposed adjustments have been resolved as a result of appeals to IRS Appeals Division and to the US Tax Court.

This examination also resulted in an erroneous determination that Second Chance's exemption under Section 501(c) (3) should be revoked. The examining agent characterized Second Chance of being in the business of generating false deductions, running *a quid pro quo* program, and promoting a scam.

The taxpayer appealed this determination and submitted the response attached as Exhibit 1 to this letter. After considering the taxpayer's position, Appeals rejected the examining agent's determination and found as follows: "We have determined that the organization's exemption from tax as an organization described in Internal Revenue Code ("Code") section indicated above (Section 501(c)(3)) remains in effect. A copy of the Appeals determination dated March 23, 2017 is enclosed as Exhibit 2 to this letter.

**IRS Examination 2015-2016**

While the appeal of the examination initiated in 2012 was being considered, IRS initiated another examination involving the identical issues mentioned in your letter. We have attached a copy of the examination notification and the IDR issued as part of that investigation as Exhibit 3. The undersigned met with the examining agent (Mr. Volpe) and IRS Counsel (Ms. Henn) in March 2015 and provided the attached letter dated March 5, 2015 outlining Second Chance's position. After the initial meeting, the undersigned communicated with Mr. Volpe on a periodic basis and submitted information requested in the IDR. The last communication with him was in a letter dated March 31, 2016 in which I sent him certain information he had requested. After this March 31, 2016 letter, Second Chance heard nothing further from the IRS.

---

[2]       The only material difference is that the current examination seeks information about later years. While different donors were involved in the earlier examination, the underlying program's operation has been the substantially the same with minor changes to keep pace with the evolving legal landscape.

MILES &
STOCKBRIDGE P.C.

Page 3

**Court Cases Involving Second Chance Donors**

There have also been two recent court cases involving Second Chance donors, *Loube v. Commissioner*, TC Memo 2020-3(2020)[3] and *Mann v. United States*, 364 F, Supp. 553 (D. MD 2020) aff'd at 127 FTR 2021-477 (4th Cir. 2021).

The *Mann* case is relevant to the issues in your examination. Specifically, in *Mann*, the IRS argued that certain cash contributions were not deductible because these contributions were a *quid pro quo* made to pay for deconstruction services. The Court specifically rejected this argument and held that, "Because the record establishes no benefit to the Mann's from Second Chance's deconstruction services..., **the Court concludes that the cash donations were not a quid pro quo but were instead properly deductible.**"[4]

**Summary and Conclusion**

Based on the above discussion, we respectfully request that you discontinue your proposed examination. The identical issues identified in your letter were examined by IRS in the 2012-2017 and the 2015- 2016 examinations. In the earlier examination, the IRS concluded that Second Chance was properly classified as a Section 501(c) (3) organization. Moreover, after the taxpayer produced the virtually identical information (at considerable expense) you are now requesting, the IRS decided not to pursue the 2015-2016 examination. Finally and perhaps most significantly, the court that will have jurisdiction over any determination you may make has expressly found that cash contributions to Second Chance are properly deductible charitable contributions.

We welcome the opportunity to discuss these matters with you. We do wish to note that much of the information you are requesting in your IDR is identical to the information provided in prior examinations. We respectfully request that you retrieve this information from records in the possession of the IRS.

We intend to cooperate in this matter and will provide any information in the taxpayer's possession that has not previously been provided if you decide to proceed with this investigation. It may take some time because of the work restrictions that have been imposed because of the covid-19 pandemic. We will not be able to provide this information by the March 1, 2021 deadline mentioned in the IDR.

---

[3]     The Court in *Loube* disallowed the taxpayer's deduction because he failed to satisfy the substantiation requirements of Code §170. There was no discussion of Second Chance's activities and this case has no relevance to your present inquiry.

[4]     A contribution is only properly deductible if made to a Section 501(c)(3) organization



Page 4

I look forward to discussing this matter with you at your convenience.


Sincerely,

Thomas J. O'Rourke

Enclosures

cc:    Mark Foster

| Form **2848** | **Power of Attorney** | OMB No. 1545-0150 |
|---|---|---|
| (Rev. January 2021) | **and Declaration of Representative** | For IRS Use Only |
| Department of the Treasury<br>Internal Revenue Service | ▶ Go to *www.irs.gov/Form2848* for instructions and the latest information. | Received by: |

| | | Name |
|---|---|---|
| | | Telephone |

**Part I**   **Power of Attorney**

    **Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

| Function |
|---|
| Date    /   / |

**1   Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| Second Chance, Inc.<br>1700 Ridgely Street<br>Baltimore, MD 21230 | ▆▆▆▆▆▆ |

| Daytime telephone number | Plan number (if applicable) |
|---|---|
| | |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | | |
|---|---|---|
| Thomas J. O'Rourke<br>11 N.Washington Street; Suite 700<br>Rockville, MD 20850 | CAF No.   2605-40113<br>PTIN<br>Telephone No.   301-517-4821<br>Fax No.   301-841-7992 | |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ | |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| Check if to be sent copies of notices and communications ☐ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3   Acts authorized** (you are required to complete line 3). Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Civil Penalties | N.A. | 2016,2017,2018,2019,2020 |
| | | |
| | | |

**4   Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions . . . . . . . . . . . . . . . ▶ ☐

**5a   Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☑ Access my IRS records via an Intermediate Service Provider;

☐ Authorize disclosure to third parties;    ☑ Substitute or add representative(s);    ☐ Sign a return;

    ☐ Other acts authorized:

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.      Cat. No. 11980J      Form **2848** (Rev. 1-2021)

Form 2848 (Rev. 1-2021)    Page **2**

**b**  **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): ------------------
--------------------------------------------------------------------------

**6**  **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you do not want to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**7**  **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.
▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| | | |
|---|---|---|
| *Mark ~ Foster* | President 2/12/2021 | President/CEO |
| Signature | Date | Title (if applicable) |
| Mark S. Foster | Second Chance, INC | |
| *MARK S FOSTER* | | |
| Print name | Print name of taxpayer from line 1 if other than individual | |

## Part II    Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

  **a**  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  **b**  Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
  **c**  Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
  **d**  Officer—a bona fide officer of the taxpayer organization.
  **e**  Full-Time Employee—a full-time employee of the taxpayer.
  **f**  Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
  **g**  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
  **h**  Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). See Special Rules and Requirements for Unenrolled Return Preparers *in the instructions for additional information.*
  **k**  Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
  **r**  Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

**Note:** For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | DC, MD | 385888 | *M. J. O'Rourke* | 2/15/21 |
| | | | | |
| | | | | |

Form **2848** (Rev. 1-2021)

Form **2848**
(Rev. January 2021)
Department of the Treasury
Internal Revenue Service

# Power of Attorney
## and Declaration of Representative

▶ Go to *www.irs.gov/Form2848* for instructions and the latest information.

OMB No. 1545-0150

| For IRS Use Only |
|---|
| Received by: |
| Name |
| Telephone |
| Function |
| Date    /    / |

**Part I**    **Power of Attorney**

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1**   **Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| Mark Foster<br><br>600 East Seminary Avenue<br>Towson, MD 21286 | ▮▮▮▮▮▮▮ |
| | Daytime telephone number     Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2**   **Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Thomas J. O'Rourke<br>11 N.Washington Street; Suite 700<br>Rockville, MD 20850 | CAF No.   2605-40113<br>PTIN<br>Telephone No.   301-517-4821<br>Fax No.   301-841-7992 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| Check if to be sent copies of notices and communications ☐ | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No.<br>PTIN<br>Telephone No.<br>Fax No. |
| (Note: IRS sends notices and communications to only two representatives.) | Check if new: Address ☐   Telephone No. ☐   Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3**   **Acts authorized (you are required to complete line 3).** Except for the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Civil Penalties | N.A. | 2016,2017,2018,2019,2020 |
| | | |
| | | |
| | | |

**4**   **Specific use not recorded on the Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See *Line 4. Specific Use Not Recorded on CAF* in the instructions   . . . . . . . . . . . . . . . ▶ ☐

**5a**   **Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information): ☑ Access my IRS records via an Intermediate Service Provider;
☐ Authorize disclosure to third parties;   ☑ Substitute or add representative(s);   ☐ Sign a return; _____

☐ Other acts authorized: _____

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.     Cat. No. 11980J     Form **2848** (Rev. 1-2021)

Form 2848 (Rev. 1-2021)                                                                                                    Page **2**

b  **Specific acts not authorized.** My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
List any other specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b): _____

6  **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this form. If you do not want to revoke a prior power of attorney, check here  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

7  **Taxpayer declaration and signature.** If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, partnership representative (or designated individual, if applicable), executor, receiver, administrator, trustee, or individual other than the taxpayer, I certify I have the legal authority to execute this form on behalf of the taxpayer.
▶ **IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.**

| _Signature_ | _2/12/2021_ | |
|---|---|---|
| Signature | Date | Title (if applicable) |

Mark S. Foster

| MARK S FOSTER | |
|---|---|
| Print name | Print name of taxpayer from line 1 if other than individual |

**Part II    Declaration of Representative**

Under penalties of perjury, by my signature below I declare that:

• I am not currently suspended or disbarred from practice, or ineligible for practice, before the Internal Revenue Service;
• I am subject to regulations in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
• I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
• I am one of the following:

a  Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
b  Certified Public Accountant—a holder of an active license to practice as a certified public accountant in the jurisdiction shown below.
c  Enrolled Agent—enrolled as an agent by the IRS per the requirements of Circular 230.
d  Officer—a bona fide officer of the taxpayer organization.
e  Full-Time Employee—a full-time employee of the taxpayer.
f  Family Member—a member of the taxpayer's immediate family (spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
g  Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the IRS is limited by section 10.3(d) of Circular 230).
h  Unenrolled Return Preparer—Authority to practice before the IRS is limited. An unenrolled return preparer may represent, provided the preparer (1) prepared and signed the return or claim for refund (or prepared if there is no signature space on the form); (2) was eligible to sign the return or claim for refund; (3) has a valid PTIN; and (4) possesses the required Annual Filing Season Program Record of Completion(s). See Special Rules and Requirements for Unenrolled Return Preparers *in the instructions for additional information.*
k  Qualifying Student or Law Graduate—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student, or law graduate working in a LITC or STCP. See instructions for Part II for additional information and requirements.
r  Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2.**

Note: For designations d–f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column.

| Designation— Insert above letter (a–r). | Licensing jurisdiction (State) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable) | Signature | Date |
|---|---|---|---|---|
| a | DC, MD | 385888 | _signature_ | 2/15/21 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Form **2848** (Rev. 1-2021)

*Exhibit #1*

Thomas J. O'Rourke
301-517-4821
torourke@milesstockbridge.com

July 6, 2016

Ms. Kim Thoa Nguyen
IRS San Jose Appeals, MS -7100
55South Market Street; Suite 440
San Jose, CA 95113

Re:     Second Chance, Inc.

Dear Ms. Nguyen:

This letter is written in follow-up to the Appeals conference we had with you on May 26, 2016 regarding Second Chance, Inc. ("Second Chance"). The sole purpose of this letter is to address the examining agent's position that the exemption granted to Second Chance pursuant to Code §501(c)(3)[1] should be revoked. The remaining issues and the additional information you requested regarding other issues raised in the examination report will be provided in a subsequent submission.

**The Examining Agent's Position**

The examining agent concluded that the exemption granted to Second Chance in 2001 by the IRS should be revoked. The discussion of this matter in the examination report involves three separate matters: a summary of interviews with not for profit executives in the Baltimore area; an edited version of comments made supposedly made by persons formerly affiliated with Second Chance; and the tax benefits claimed by Second Chance donors. There is no discussion of Second Chance's exempt purpose or of any failure to act in furtherance of this exempt purpose.

The agent's reference to comments made by executives from other tax exempt entities in the Baltimore area is quite puzzling. Whatever these executives may or may not do in their organizations has absolutely no relevance to Second Chance and its exempt status. Moreover, there is not even a suggestion that any of the executives mentioned had any knowledge of Second Chance or how it was operated. This discussion is simply a waste of time and offers no insight into the resolution of the underlying issue.

The heavily edited comments of persons who may at one time have been affiliated with Second Chance are of questionable relevance. These comments do not address Second Chance's exempt

---

[1]     All references to Code refer to the Internal Revenue Code of 1986, as amended, 26, U.S C.

Page 2

purpose or what efforts were undertaken in furtherance of this exempt purpose. Rather, they relate solely to what Second Chance did or did not do to determine the tax benefits available to donors. Perhaps most significant, however, is the fact that comments attributed to some of these individuals are factually incorrect. Some of the individuals quoted simply deny the accuracy of the agent's characterization of their remarks.

The agent does spend a considerable amount of time discussing the tax benefits claimed by Second Chance donors. His position seems to be that it is more beneficial for society to pay for an individual's incarceration than to allow a tax benefit for donation to an organization that provides gainful employment to the individual. The ability to obtain tax deductible contributions is one of the primary incentives for seeking 501(c)(3) status. Congress has specifically provided tax benefits for contributions to an organization that engages in socially desirable activities. It is impossible to determine whether Second Chance has failed to act in accordance with its exempt purpose without discussing what this exempt purpose is and whether its actions have been in furtherance of its exempt purpose.

The examining agent characterizes Second Chance of being in the business of generating "false deductions", running a "quid pro program" and promoting a "scam". Ironically, Second Chance and its donors have been closely scrutinized by the IRS since its initial establishment. **Other IRS personnel in the Examination and Appeals Divisions have consistently concluded that the activities characterized by the examining agent as "false deductions", a "quid pro program" and a "scam" are perfectly permissible activities under the Code.** A summary discussion of the conclusions reached by other IRS personal may be found at pp. 4-7, infra.

### An Overview of Second Chance and its Activities

The threshold issue in the present case is whether the exemption granted to Second Chance should be revoked. Resolution of this issue requires a consideration of what its exempt purpose is and whether it has been acting in furtherance of this exempt purpose. As noted above, it is impossible to determine whether Second Chance has failed to act in accordance with its exempt purpose without discussing what it has done and whether its actions have been in furtherance of its exempt purpose. This complete failure to even mention Second Chance's exempt activities suggests the agent made no effort to objectively evaluate the organization

Second Chance was organized in 2001 as a nonprofit organization that provides people, materials, and the environment with a "second chance." We have attached a description of how it carries out its exempt purposes taken from the organization's web site as **Exhibit A**. The Second Chance mission is to retrain and create employment for displaced and unemployed workers in deconstruction methods; reclaim building material to reduce demolition debris overloading landfills; and renew materials to preserve the region's rich architectural heritage. Second Chance provides jobs and a green collar workforce, protects the natural environment, and preserves our architectural heritage.

Page 3

We have attached materials from the websites from the US Environmental Protection Agency (**Exhibit B**) and from the US Department of Housing and Urban Development (**Exhibit C**) that encourage the use of programs such as those adapted by Second Chance. We have also attached materials from a variety of organizations and publications that use methods similar to those employed by Second Chance or that describe the benefits the benefits of deconstruction programs (**Exhibit D**).

Second Chance was founded in 2001 and developed an employment and training program in 2003 to address the pressing needs of Baltimore City residents facing multiple challenges in finding employment.

As a testament to the effectiveness of the Second Chance mission, the organization has been the subject of numerous press reports and has received awards and recognition on multiple levels. These include, among others: the "*Baltimore Regional Workforce Innovations Award*" awarded by the Baltimore Workforce Investment Board and the Baltimore County Workforce Development Council; the "*Enoch Pratt Community Award*" presented by The First Unitarian Church of Baltimore; the "*City of Baltimore Certificate of Recognition*" in recognition of Second Chance's outstanding service to the Operation Safe Kids Program and Baltimore City youth; an "*Official Citation*" from Senator Verna L. Jones of the 44th Legislative District, Baltimore City, and from Delegate Salima Siler Marriott, Chair of the Baltimore City Delegation, in recognition of enhancing the region's economic and workforce development; a "*Mayor's Letter of Appreciation*" from Mayor Martin O'Malley; and the "*Mayor's Business Recognition Award*" from the Greater Baltimore Committee and the Baltimore Development Corporation.

Most recently, Senator Benjamin Cardin has recognized the effectiveness of the Second Chance program. Specifically he stated:

> "It never ceases to amaze me what people can do when given even the smallest glimmer of hope, and I saw the transformative power on display at Second Chance. If you want to see people from some incredibly challenging backgrounds turning their lives around, visit them in South Baltimore. Second Chance isn't only equipping people with the skills needed for their 'green collar' jobs, it is helping communities renew themselves"
>
> ...
>
> "If we want to reduce recidivism and truly allow people to re-establish their lives after a criminal conviction, we must allow Americans who have served their time to re-integrate fully by seeking gainful employment in our communities. That's what Second Chance does for Baltimore, providing job training and real world opportunities for its staff. Along the way they learn a number of fundamental life skills and develop professional references, a first for many. The importance of these things to someone trying to re-enter society is difficult to overestimate."

A copy of Senator Cardin's statement is attached as **Exhibit E** and a video of these remarks may also be viewed on the Second Chance website (www.secondchanceinc.org.). In addition the

Page 4

website includes a description of the many public serve awards made to Second Chance for its activities in support of its exempt purpose.

Second Chance is able to carry out its mission because of the support of its donors who have contributed buildings, materials, and money to support its exempt purposes. Because the IRS has granted an exemption to Second Chance under section 501(c) (3) of the Code, donors are entitled to claim a tax deduction for the value of any property contributed to Second Chance.

### IRS Examination of Second Chance Donors

For the periods prior to 2011 a number of Second Chance donors were examined by the IRS and the valuation of the property contributed by these donors to Second Chance was questioned. A number of cases resulted in the taxpayers' receipt of a "no change" letter, indicating that the IRS accepted the donation to Second Chance as perfectly permissible under the tax code. While Second Chance has not been a party to any of these actions, it has been advised that all IRS examinations initiated prior to 2013 were resolved amicably between the donors and the IRS.

An issue in any IRS examination of a Second Chance donor typically involves the valuation of any materials or structure that has been donated. Most individuals who donated buildings prior to 2012 valued their donations by determining the value of the property before and after the donation and claiming the diminution in value of the property as the charitable contribution, or utilized a qualified real estate appraiser to determine the contributory value of the structure being donated. See the attached **Exhibit F** [2].

In the middle of 2012, Second Chance was advised that the IRS changed the standard it would apply to Second Chance donations. On July 17, 2012, Mark Foster (the President of Second Chance) was summoned to appear for a meeting with IRS personnel in which Second Chance was directed to inform its potential donors that IRS was now prescribing and setting the standard on what it called a "deconstructed appraisal" to support any charitable contribution. A copy of an affidavit from Mr. Foster is attached as **Exhibit G.**

To the best of the taxpayer's knowledge, the IRS has not issued any written guidance describing the revised method of valuing buildings donated to charitable organizations. Rather, the only guidance provided to Second Chance was the oral guidance provided to Mr. Foster in July of 2012 by the IRS managers who expressed that authority.

---

[2]      Exhibit F describes this methodology. It is also important to note that in this letter written more than 6 years ago, the undersigned requested the IRS to issue guidance as to how "deconstructed" property should be properly valued. Such formal guidance has not been forthcoming. The case at issue in the May, 2010 letter was ultimately settled with the Washington, DC IRS Appeals Division. The Appeals Division agreed that the Second Chance program was perfectly permissible under the Code and the parties ultimately agreed to accept a valuation of the Maryland Department of Assessments and Taxation as the proper basis for valuing the property donated to Second Chance.

Page 5

It is of utmost importance that it is understood that Second Chance has never provided tax advice to any donor. That is repeated verbally and in almost every document presented to any potential donor. Notwithstanding that, it is incumbent on Second Chance to share with potential donors and their advisers any pertinent information that it is aware of to consider in determining whether to make a donation to Second Chance, and if so, how to properly value the donation. Ultimately the amount of any deduction claimed, the type of appraisal utilized, and the selection of any appraiser are all decision made by the donor, independent of Second Chance.

**The IRS Examination of Donations to Second Chance in 2011**

The investigation in the present case was initiated in August, 2012 by Revenue Agent Charles Walker. Mr. Walker issued a number of information documents requests in which he asked Second Chance to supply voluminous records. Second Chance supplied all of the information that it had that was responsive to Mr. Walker's request. Second Chance produced records showing the names or persons who had made donations.

With this information, IRS initiated a project to examine the tax returns of approximately 30 to 45 Second Chance donors for the 2011 tax year. It should be noted that donors from 2011 would not have had the benefit of the guidance provided by IRS Managers to Mr. Foster in July of 2012 and it was clearly too late for a contemporaneous appraisal as the donated structure was gone.

The facts seem to indicate that there was a pre-determined outcome for each examination as evidenced by the following:

1. In at least one case the audit was completed, and the taxpayer was advised that there would be no change to his return. After several weeks, the agent contacted the taxpayer and advised him that the agent's group manager had advised him that the no change report would have to be revised because it involved a donation to Second Chance.

2. A most cursory audit that had a predetermined outcome that both surprised and angered the taxpayers and their representatives. There was typically one meeting with the taxpayer and/or his/her representative. An examination report was issued almost immediately. In one case, the taxpayer was given the examination report at the initial meeting. This suggests there is no consideration of the facts of any given case.

3. All monetary and property donations to Second Chance were immediately and summarily disallowed and penalties were asserted.

4. The legal basis for disallowing the deductions was always one or a combination of the following:
   A. There was a "quid pro quo." The taxpayers received demolition services in exchange for their donation to Second Chance. The decisions in *Rolfs v. Commissioner*, 135 TIC. 471, aff'd at 668 F. 3d 888(7th Cir. 2012) and *Patel v. Commissioner*, 138 T.C. 395(2012) were routinely cited as support the

Page 6

examining agent's position. These cases had very different fact sets that concerned donations to fire departments. In every case the donors provided information that they had to pay an independent third party for demolition services after Second Chance had completed its deconstruction. Making a cash contribution to Second Chance did not reduce their demolition costs at all. The conclusion to the contrary is simply wrong.

B. The taxpayer did not contribute his/her entire interest in the donated property.

C. Any appraisal that the taxpayer may have submitted was not a "qualified appraisal" prepared by a "qualified appraiser" without specifying any defects in either the appraisal or the appraiser's qualifications. In many of the examinations, the valuation methodology was not mentioned as a basis for the disallowance.

5. A perfunctory meeting with the agent and a group manager in which the taxpayer's representative was advised that all deductions will be disallowed.

Many donors appealed the examination determinations to the IRS Appeals Division. All Second Chance cases were handled by the IRS Appeals Division on a coordinated basis. All cases were assigned to the same Appeals Officer, a senior Appeals Officer in Washington, DC. Detailed legal arguments were submitted in support of the position that the examination reports in virtually every case were based on both an erroneous factual premise (that the taxpayers received demolition services in exchange for their donation) and an improper application of applicable law. Thus, Appeals agreed that the conclusions reached in the examination reports were wrong, but there was still a difference of opinion on the proper valuation of any property contributed to Second Chance.

The taxpayers requested that Appeals Officer provide copies of any guidance that had been issued that addressed how donations such as those made to Second Chance should be valued. The Appeals Officer indicated that to the best of her knowledge no such guidance had ever been issued.

After a series of meetings, the parties reached a basis of settlement in May, 2014. They agreed that all affected taxpayers were entitled to deduct the full amount of their cash contributions to Second Chance, 50% of the value of the contributed property, and that no penalties would be asserted. This was intended to be a global settlement to resolve all Second Chance cases. This settlement was reviewed and approved by the Appeals officer and by at least one senior reviewer in the Appeals Division.

**It is most important to emphasize the following:**

- **The activities which served as the basis for the agent's conclusions were the very same actions considered by Appeals. The actions characterized as a scam by the examining agent have been determined by IRS Appeals to be perfectly permissible under the Code.**

Page 7

- The examining agent's conclusion that any cash contribution is a "quid pro quo" for demolition services has been rejected by the Appeals Division because this position is contrary to all available evidence.
- The issue of the proper method for valuing donations such as those made to Second Chance has been settled on a "hazards of litigation" basis. This has been done because the Service has never been issued any guidance regarding the proper valuation method. In other words, it is not proper for the Service to disallow deductions when it has never told taxpayers how they should value their donations.

The settlement was offered and accepted by approximately 20-35 individual taxpayers who were audited for their 2011 tax year. The IRS immediately provided written agreements to some of the taxpayers, all of them signed the agreements and paid any additional tax due under the settlement. (Note IRS should have precise number of persons accepting the global settlement.) Other donors (approximately 10-15 individuals) were treated differently with some receiving written settlement agreements which they signed and returned before the deadline, and others who verbally accepted the offer but did not receive a written offer.

In September/October, 2014 these remaining donors were told that a hold had been placed on all Second Chance cases. None of the persons that we have dealt with in the IRS will provide any information about why the processing of Second Chance cases was placed on hold. We believe, but cannot confirm, that the hold resulted from ex parte communications between representatives of the IRS Examination and Appeals Divisions. Such ex parte communications are expressly prohibited by the Internal Revenue Service Restructuring and Reform Act of 1998, Rev. Proc. 2012-18, §2.03, and by the manuals of both the IRS and Appeals and Examinations. Internal Revenue Manual Part 4.2.7(Examination Division) and Part 8.1.10 (Appeals).

In late November, 2014 the remaining donors were advised that the IRS was revoking the "global settlement" offer and that it would provide a new offer. Under the revised offer, a taxpayer could settle by accepting a 50% disallowance of any cash contributed to Second Chance and $10,000 for the value of any property that had been contributed. No penalties would be asserted. The legal position to support the logic of this offer has not been provided to any of the taxpayers.

When donors or their representatives contacted the Appeals Officer assigned to coordinate the Second Chance project, they were told that she would be happy to meet with them to discuss their cases, but that she had no authority to deviate from the settlement offer. The matter had been taken out of her hands. When asked if she could arrange a meeting with higher level officials who had made the decisions, she said that she did not think that this was possible. When she was requested to provide a written explanation of the IRS position which led to modification of the prior position, she said there was no written explanation, or if there was it had never been provided to her. When asked if it did not seem fundamentally unfair of the IRS to treat similarly situated taxpayers differently, she said she had no authority to comment on this.

Page 8

The individual taxpayers who were given the revised settlement offers have either signed Forms 870 and intend to file a suit for refund in federal district court after all procedural requirements have been satisfied, or have asked for notice of deficiency so they may challenge the IRS position in U.S. Tax Court. We have not been involved in pursuing any case after having negotiated the global settlement.

**Conclusion**

We believe that since its inception Second Chance has operated in a manner that is entirely consistent with the tax code. It has acted in a manner that has been praised both by the EPA and by HUD. It has been the recipient of many awards at the federal, state, and local levels. Its activities have been entirely consistent with the purpose for which it was initially granted exemption under Section 501(c)(3). The agent's report offers no discussion of what Second Chance's exempt purpose is and whether it has acted in accordance with this exempt purpose. His conclusion that its exemption should be revoked is simply not supported by any relevant, credible evidence.

The IRS has consistently determined that Second Chance conducts its activities in a manner acceptable to the IRS. While the Service has taken issue with the proper valuation of donations to Second Chance, it has never published definitive guidance with respect to how it believes these donations should be valued.

Second Chance represents what can be accomplished in service to the community when donors are generous enough to provide materials and training opportunities rather than send those materials to the landfill. The role of government is to encourage good and responsible behavior and one way that is done is by providing tax incentives. This is precisely what both EPA and HUD are suggesting in the materials attached to this letter.

The outcomes that are the result of the operation of Second Chance are recognized by the community as well as by City and State Government by the many awards and recognitions that have been bestowed and jobs that are being created.

Page 9

Second Chance has acted in a manner consistent with its exempt purpose and its activities have been and will continue to be deserving of praise. There is no basis in anything the agent has written that serves as a basis for revocation of its exempt status.

We look forward to discussing this matter with you.

Sincerely,


Thomas J. O'Rourke

Enclosures

cc:    Mark Foster

*Exh. b. T#2*

Internal Revenue Service
Appeals Office
San Jose Appeals, MS-7100
55 S. Market St., Suite 440
San Jose, CA 95113

**Department of the Treasury**

**Employer Identification Number:**
█████████

Date: **MAR 2 3 2017**

SECOND CHANCE, INC.
%MARK S FOSTER
1700 RIDGELY STREET
BALTIMORE, MD 21230

**Internal Revenue Code Section:**
501(c)(3)

**Person to Contact:**
Kim Nguyen
Employee ID Number: 1000203260
Tel: 408-283-1492
Fax: 855-238-8648
Contact Hours: 7:30AM-4:00 PM PT

**Date of Proposed Adverse Letter:**
April 15, 2015

Dear Taxpayer:

This letter revokes the proposed adverse letter issued to you by the Director, Exempt Organizations, Examinations, on the above date and reflects our consideration of your appeal. As a result of our review, we have determined that the organization's tax exemption from Federal income tax as an organization described in Internal Revenue Code (the "Code") section indicated above remains in effect. In addition, we have also determined that the organization's foundation status under Code section 509(a)(1) and 170(b)(1)(A)(vi) remains in effect.

For tax periods beginning January 1, 2010, tax-exempt organizations with gross receipts of $50,000 or more must file either Form 990-EZ or Form 990 depending on their gross receipts and total assets. Small tax-exempt organizations with gross receipts normally less than $50,000 a year may file an annual electronic notice, Form 990-N, Electronic Notice (e-Postcard) for Tax-Exempt Organizations Not Required to File Form 990 or 990-EZ instead of a full return. If a return or notice is required, it must be filed by the 15th day of the fifth month after the end of your annual accounting period. The law imposes a penalty on the organization of $20 a day, up to a maximum of $10,000, when a return/form is filed late, unless there is reasonable cause for the delay. This penalty may also be charged if a return/form is not complete. Organizations that do not file a return or a notice for three consecutive years will lose their tax-exempt status. You may visit www.irs.gov for further details, exceptions to filing, and instructions on how to file.

You are not required to file Federal income tax returns unless you are subject to the tax on unrelated business income under Code section 511. If you are subject to this tax, you must file an income tax return on Form 990-T. In this letter we are not determining whether any of your present or proposed activities are unrelated trade or business as defined in Code section §513.

Unless specifically excepted, you are liable for taxes under the Federal Insurance Contributions Act (social security taxes) for each employee to whom you pay $100 or more during a calendar year. And, unless excepted, you are also liable for tax under the Federal Unemployment Tax Act for each employee to whom you pay $50 or more during a calendar quarter if, during the current or preceding calendar year, you had one or more employees at any time in each of 20 calendar weeks or you paid wages of $1,500 or more in any calendar quarter. If you have any questions about excise, employment, or other Federal taxes, please address them to the Director, Exempt Organizations, Rulings and Agreements.

You are also subject to certain excise taxes under Chapter 42 of the Code where applicable. Please see Publication 557, *Tax-Exempt Status for Your Organization*, for more details.

Please show your employer identification number on all returns you file and in all correspondence with the Internal Revenue Service.

Because this letter could help resolve any questions about your exempt status, you should keep it in your permanent records.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Sincerely Yours,

*J. Kevin Phegley*

J. Kevin Phegley
Appeals Team Manager

cc: Christopher A. Davis & Thomas J. O'Rourke

Internal Revenue Service

Department of the Treasury

Appeals Office
San Jose Appeals, MS-7100
55 S. Market St., Suite 440
San Jose, CA 95113

**Person to Contact:**
Kim Nguyen
Employee ID Number: 1000203260
Tel: 408-283-1492
Fax: 855-238-8648
Contact Hours: 7:30AM - 4:00PM PT

Date: MAR 2 3 2017

**Refer Reply to:**
AP:TS:SJO:KTN

**In Re:**
Second Chance, Inc.

THOMAS J. O'ROURKE
MILES & STOCKBRIDGE PC
11 N WASHINGTON STREET, STE 700
ROCKRILLE, MARYLAND 20850

**SSN/EIN Number:**
███████

**Tax Period(s) Ended:**
12/2009 12/2010 12/2011

Dear Mr. O'Rourke:

We are sending you the enclosed material under the provisions of your power of attorney or other authorization we have on file. For your convenience, we have listed the name of the taxpayer to whom this material relates in the heading above.

If you have any questions, please call me at the above phone number.

Thank you for your cooperation.

Sincerely,

Kim Nguyen
Appeals Officer

**RECEIVED**

MAR 2 7 2017

MILES & STOCKBRIDGE P.C.

02/19/2015  07:50   4103850435          SECOND_CHANCE                          PAGE  01

*Exh. b, T#3*

**Internal Revenue Service**                    **Department of the Treasury**
**Tax Exempt & Government Entities**
450 Golden Gate Ave
MS 7401                                         Examiner:
San Francisco, CA 94102
                                                   Marco Volpe

Date: February 10, 2015                         Examiner's Employee Identification Number:
                                                   94-11780
                                                Contact Telephone Number:
Mark Foster                                        415-837-6673
5 Upland Rd                                      Fax Number:
Baltimore, MD 21210                                855-770-7067


Dear Mr. Foster:

We have reviewed materials regarding your participation in tax avoidance transactions.  We are considering
penalties and injunctions under Internal Revenue Code sections 6694, 6695, 6700, 6701, 7402, 7407 and 7408
for promoting and/or preparing documents relating to these transactions.  In addition, we will consider issuing
"pre-filing notification" letters to persons participating in these transactions.

This letter is to schedule a meeting to give you an opportunity to present any facts or legal arguments that you
feel would conclude the penalties and/or injunction are not appropriate.

**Appointment Information:**

Location: **31 Hopkins Plaza**                   Date:  March 5, 2015
          Room 1320 - 13th floor
          Baltimore, MD 21201                    Time:  10:00 am


Generally, no extension of time will be granted for this meeting; however, if you would like to reschedule, an
earlier date will be considered. The information you provide at this meeting will be used to determine what
possible action(s) the Internal Revenue Service may take.

Please contact me at the telephone number shown above if you have any questions you would like to discuss.

Thank you for your cooperation.

                                                Sincerely yours,

                                                Marco Volpe
                                                Marco Volpe
                                                Revenue Agent


Enclosure(s):
Notice 609
IDR

                                                *Letter 3828 (4-2004)*
                                                Catalog Number 37925K

02/19/2015  07:50    4103850435              SECOND_CHANCE              PAGE  02

| Form 4564 | Department of the Treasury<br>Internal Revenue Service<br>Department Information Document Request | Request Number<br>01 |
|---|---|---|

| To:  (Name of Taxpayer and Company, Division or Branch)<br>Mark Foster<br>5 Upland Road<br>Baltimore, MD 21210 | Subject: |
|---|---|
| | Submitted to: |
| | Dates of Previous Requests: |

**Description of Documents Requested:**

Provide the following information for the period January 1, 2009 to the present.

The following request for information applies to Mark Foster and Second Chance Inc.  It also includes any employees, agents or staff of any of the above.

- Power of attorney, if you wish to have a representative work with me during the examination.

- List of all clients from 2009 to present in which you sold or advertised Second Chance's tax shelter / promotion including (for each client):

  Names
  Addresses
  Donor acknowledgement letters
  Pledge letters/ Pledge commitments
  Program Overview – Funded Deconstruction Options
  Non-cash contribution value received by Second Chance
  Annual service payment for deconstruction services rendered

  (all applications, contracts, agreements and invoices with respect to purchasers; and all receipts for payment with respect to purchasers)

- All records of payments received from clients (including non-cash contributions & service payments), including but not limited to, general ledgers and cash receipts journals, bank statements and deposit slips.

- All records of any statements made with respect to the allowability of credits or deductions or other tax benefits obtainable through the participation in Second Chance's tax shelter plan promoted.  (records including, but not limited to documents, emails, brochures, videotapes, audiotapes, compact discs, etc.)

| Information Due By | __March 5, 2015__ | At Next Appointment | [x] | Mail In | [ ] |
|---|---|---|---|---|---|

| | Name and Title of Requestor | Date:<br>2/10/2015 |
|---|---|---|
| FROM | Marco Volpe     (ID# ▮▮▮▮▮▮    ) | |
| | Office Location:<br>IRS / TEGE, 450 Golden Gate Ave, MS 7401, San Francisco, CA 94102<br>Phone: Voice (415) 837-6673<br>FAX  (855)-770-7067 | Page 1 |

Form 4564

02/19/2015  07:50    4103850435    SECOND_CHANCE    PAGE  04

| Form 4564 | Department of the Treasury<br>Internal Revenue Service<br>Department Information Document Request | Request Number<br>01 |
|---|---|---|

| To: (Name of Taxpayer and Company, Division or Branch)<br><br>Mark Foster<br>5 Upland Road<br>Baltimore, MD 21210 | Subject: |
|---|---|
| | Submitted to: |
| | Dates of Previous Requests: |

Description of Documents Requested:

4  - All forms, including company formation documents, provided to clients of Second Chance

5  - Promotional material: all manuals, operations handbooks, prospectus, brochures, seminar material, schedule of seminars offered, or other documents which describe the tax shelter plan or arrangement offered to purchasers.

6  - All documents describing the marketing activities and strategies of any tax shelter plan offered. This includes (1) any training manuals provided to salespeople (2) any media, including but not limited to, videotapes, audiotapes, compact discs, used to train salespeople, and (3) any media, including but not limited to video tapes, audiotapes, or CD's, used in marketing any tax shelter plan or arrangement.

7  - All legal, accounting or other opinions sought and utilized in the promotion of the tax shelter plan or arrangement offered.

8  - Documents which identify the names and addresses of all persons involved in the organization (or assisting in the organization) or sale of any tax shelter plan or arrangement promoted or offered by Mark Foster / Second Chance. These persons include, but are not limited to (1) attorneys, (2) Certified Public Accountants, (3) salespersons, and (4) other persons to whom commissions or finders fees were paid.

9  - All minutes of any promotion entity from inception to the present, including records regarding the appointment and/or resignations/terminations of any entity official, records of all assets transferred into any entity, and all records regarding the ownership of all shares of beneficial interest in any entity.

10  - Identification of all former and current entity officials from inception of the promotion to the present. Identification to include name, address and telephone number, both business and personal.

11  - Copies of any related entities returns (Form 1120, 1120S, 1065, 1040, 940, 941, 945)

| Information Due By | March 5, 2015 | At Next Appointment | ☒ | Mail In | ☐ |
|---|---|---|---|---|---|

| | Name and Title of Requestor<br><br>Marco Volpe    (ID# █████████    ) | Date:<br>2/10/2015 |
|---|---|---|
| FROM | Office Location:<br>  IRS / TEGE, 450 Golden Gate Ave, MS 7401, San Francisco, CA 94102<br>Phone: Voice (415) 837-6673<br>FAX  (855)-770-7067 | Page 1 |

Form 4564

*Exh. D. J#4*

Thomas J. O'Rourke
301-517-4821
torourke@milesstockbridge.com

March 5, 2015

Mr. Marco Volpe, Revenue Agent
IRS TE/GE
450 Golden Gate Avenue
MS 7401
San Francisco, CA 94102

*Ex 4*

Re:    Second Chance

Dear Mr. Volpe:

This letter is written in response to your letter dated February 10, 2015 to my clients, Mark Foster and Second Chance, Inc. ("Second Chance").    It will be given to you at our meeting scheduled for March 5, 2015 at the IRS offices in Baltimore, Maryland.

We would like to take this opportunity to do the following:

1.    To provide a brief overview of how Second Chance operates to carry out its tax exempt purposes and a brief summary of its interactions with IRS since its inception.
2.    To ascertain from you precisely why the IRS believes that Second Chance and Mark Foster are involved in abusive tax avoidance transactions.
3.    To make you aware that there is an ongoing need to provide further guidance as to how donations of property such as those made to Second Chance should be valued for federal income tax purposes.
4.    To provide as much of the information as we have been able to gather to this point in response to the information documents request that was included with your letter of February 10, 2015.
5.    To clarify certain questions we have regarding your documents request so we can provide this information as soon as possible.

**An Overview of Second Chance and its Activities**

Second Chance was organized in 2001 as a nonprofit organization that provides people, materials, and the environment with a "second chance." We have attached a description of how it carries out its exempt purposes taken from the organization's web site as **Exhibit A**. The Second Chance mission is to <u>retrain</u> and create employment for displaced and unemployed workers in deconstruction methods; <u>reclaim</u> building material to reduce demolition debris overloading landfills; and <u>renew</u> materials to preserve the region's rich architectural heritage.

Page 2

Second Chance provides jobs and a green collar workforce, protects the natural environment, and preserves our architectural heritage.

We have attached materials from the websites from the US Environmental Protection Agency (**Exhibit B**) and from the US Department of Housing and Urban Development (**Exhibit C**) that encourage the use of programs such as those adapted by Second Chance. We have also attached materials from a variety of organizations and publications that use methods similar to those employed by Second Chance or that describe the benefits the benefits of deconstruction programs (**Exhibit D**).

Second Chance was founded in 2001 and developed an employment and training program in 2003 to address the pressing needs of Baltimore City residents facing multiple challenges in finding employment.

As a testament to the effectiveness of the Second Chance mission, the organization has been the subject of numerous press reports and has received awards and recognition on multiple levels. These include, among others: the "*Baltimore Regional Workforce Innovations Award*" awarded by the Baltimore Workforce Investment Board and the Baltimore County Workforce Development Council; the "*Enoch Pratt Community Award*" presented by The First Unitarian Church of Baltimore; the "*City of Baltimore Certificate of Recognition*" in recognition of Second Chance's outstanding service to the Operation Safe Kids Program and Baltimore City youth; an "*Official Citation*" from Senator Verna L. Jones of the 44th Legislative District, Baltimore City, and from Delegate Salima Siler Marriott, Chair of the Baltimore City Delegation, in recognition of enhancing the region's economic and workforce development; a "*Mayor's Letter of Appreciation*" from Mayor Martin O'Malley; and the "*Mayor's Business Recognition Award*" from the Greater Baltimore Committee and the Baltimore Development Corporation.

Second Chance is able to carry out its mission because of the support of its donors who have contributed buildings, materials, and money to support its exempt purposes. Because the IRS has granted an exemption to Second Chance under section 501(c) (3) of the Code, donors are entitled to claim a tax deduction for the value of any property contributed to Second Chance.

**RS Examination for Tax Years Prior to 2011**

For the periods prior to 2011 a number of Second Chance donors were examined by the IRS and the valuation of the property contributed by these donors to Second Chance was questioned. A number of cases resulted in the taxpayers' receipt of a "no change" letter, meaning the IRS accepted the donation to Second Chance as perfectly permissible under the tax code. While Second Chance has not been a party to any of these actions, it has been advised that all IRS examinations initiated prior to 2013 were resolved amicably between the donors and the IRS.

An issue in any IRS examination of a Second Chance donor typically involves the value of any materials or structure that has been donated and the proper methodology to be used in

Page 3

determining the value of the donated property. Most individuals who donated buildings prior to 2012 valued their donations by determining the value of the property before and after the donation and claiming the diminution in value of the property as the charitable contribution, or utilized a qualified real estate appraiser to determine the contributory value of the structure being donated. See the attached **Exhibit E**.

In the middle of 2012, the IRS changed the standard it would apply to Second Chance donations, and by inference donations made to similar organizations. On July 12, 2012, Mark Foster was summoned to appear for a meeting with IRS Managers in which Second Chance was directed to inform its potential donors that IRS was now prescribing and setting the standard on what it called a "deconstructed appraisal" to support any charitable contribution. Second Chance found several appraisal firms to refer donors to that could produce the type of appraisal delineated by IRS managers. Accordingly, by late 2012 /early 2013, almost all Second Chance donors began to value their donation by valuing the specific items donated from the structure, rather than the value of the entire structure as determined by a real estate appraisal. A sample of the "deconstructed appraisal" which the taxpayer believes to be in full compliance with the examination methodology described at the July 12, 2012 meeting with the IRS managers is attached as **Exhibit F**.

To the best of the taxpayer's knowledge, the IRS has not issued any written guidance describing the revised method of valuing buildings donated to charitable organizations. Rather, the only guidance provided to Second Chance was the oral guidance provided to Mr. Foster in July of 2012 by the IRS managers who expressed that authority. Any information that Second Chance has gained about the IRS position since 2012 has been derived on an ad hoc basis from donors who have been examined.

It is of utmost importance that it is understood that Second Chance does not and cannot provide tax advice to any donor. That is repeated verbally and in almost every document presented to any potential donor. Notwithstanding that, it is incumbent on Second Chance to share with potential donors and their advisers any pertinent information that it is aware of to consider in determining whether to make a donation to Second Chance, and if so, how to properly value the donation. Ultimately the amount of any deduction claimed, the type of appraisal utilized, and the selection of any appraiser are all decision made by the donor, independent of Second Chance.

**The IRS Examination of Donations to Second Chance in 2011**

In August, 2012 Revenue Agent Charles Walker of the IRS office in Baltimore, MD initiated an audit of Second Chance and issued a number of information documents requests in which he asked Second Chance to supply much of the same information that is included in your documents request. Over a period exceeding six months, Second Chance supplied all of the information that it had that was responsive to Mr. Walker's request.

Page 4

Second Chance and its representatives met with Mr. Walker on many of occasions during the period from August, 2012 through September, 2013 and have communicated with him on an intermittent basis since that time. In one of the very first meeting with Mr. Foster, Agent Walker indicated his belief that Second Chance was "one of the worst tax shelters he had seen in his career" and that "no deduction should be allowed for a structure that was going to be demolished anyway." During the course of the investigation, the agent Walker interviewed the auditor for Second Chance and stated to him that he was "going to put a stake through the heart of Second Chance." As a result of this comment and what Second Chance believed approximately a half dozen violations of federal disclosure statues, it filed a complaint with the Treasury Department Inspector General (TIGTA). TIGTA has opened an investigation of this matter and to the best of our knowledge this investigation is ongoing.

Second Chance believes that Agent Walker has a single minded agenda to follow in pursuit of his ambition to "put a stake in the heart of Second Chance" as evidenced by:

1. Auditing Second Chance in pursuit of alleged transgressions to support that outcome.
2. Auditing the personal returns of Mr. Foster for 2008 to 2012.
3. Auditing the personal returns of Mrs. Foster for 2008 to 2012.
4. Auditing 35+ donors of Second Chance to create an atmosphere of fear on the part of any future donors (fully explained below).
5. Interceding to prevent the Global Settlement from being fully implemented to cause more fear for potential donors (see explanation below).
6. Acting in a manner to precipitate a TIGTA investigation.
7. Attempting to initiate a Criminal Investigation of Mr. Foster that was opened and then quickly closed.
8. Possibly involved in lobbying for this current investigation to be opened with the same stated goal of destroying Second Chance.
9. Diminishing the ability of Second Chance to survive under the weight of the cost to defend all of the actions being taken by Agent Walker.

As part of the IRS examination of Second Chance, IRS requested that it produce records showing the names or persons who had made donations to Second Chance over the course of several years in 2011. Second Chance complied with this request and provided the information. Second Chance has not been provided a copy of any examination report that may have been prepared as a result of Mr. Walker's investigation.

IRS initiated a project to examine the tax returns of approximately 30 to 45 Second Chance donors from 2011. It should be noted that donors from 2011 would not have had the benefit of the guidance provided by IRS Managers to Mr. Foster in July of 2012 and it was clearly too late for a contemporaneous appraisal as the donated structure was gone.

The facts seem to indicate that there was a pre-determined outcome for each examination as evidenced by the following:

Page 5

1. In at least one case the audit was completed, and the taxpayer was advised that there would be no change to his return. After several weeks, the agent contacted the taxpayer and advised him that the agent's group manager had advised him that the no change report would have to be revised because it involved a donation to Second Chance.

2. A most cursory audit that had a predetermined outcome that both surprised and angered the taxpayers and their representatives. There was typically one meeting with the taxpayer and/or his/her representative. An examination report was issued almost immediately. In one case, the taxpayer was given the examination report at the initial meeting. This suggests there is no consideration of the facts of any given case.

3. All monetary and property donations to Second Chance were immediately and summarily disallowed and penalties were asserted.

4. The legal basis for disallowing the deductions was always one or a combination of the following:

   A. There was a "quid pro quo." The taxpayers received demolition services in exchange for their donation to Second Chance. The decisions in *Rolfs v. Commissioner,* 135 TIC. 471, aff'd at 668 F. 3d 888(7th Cir. 2012) and *Patel v. Commissioner,* 138 T.C. 395(2012) were routinely cited as support the examining agent's position. These cases had very different fact sets that concerned donations to fire departments.

   B. The taxpayer did not contribute his/her entire interest in the donated property.

   C. Any appraisal that the taxpayer may have submitted was not a "qualified appraisal" prepared by a "qualified appraiser" without specifying any defects in either the appraisal or the appraiser's qualifications. In many of the examinations, the valuation methodology was not mentioned as a basis for the disallowance.

5. A perfunctory meeting with the agent and a group manager in which the taxpayer's representative was advised that all deductions will be disallowed.

Many, if not all, donors appealed the examination determinations to the IRS Appeals Division. All Second Chance cases were handled by the IRS Appeals Division on a coordinated basis. All cases were assigned to the same Appeals Officer. Detailed legal arguments were submitted in support of the position that the examination reports in virtually every case were based on both an erroneous factual premise (that the taxpayers received demolition services in exchange for their donation) and an improper application of applicable law. Thus, Appeals agreed that the conclusions reached in the examination reports were wrong, but there was still a difference of opinion on the proper valuation of any property contributed to Second Chance.

The taxpayers requested that Appeals Officer provide copies of any guidance that had been issued that addressed how donations such as those made to Second Chance should be valued.

Page 6

The Appeals Officer indicated that to the best of her knowledge no such guidance had ever been issued.

After a series of meetings, the parties reached a basis of settlement in May, 2014. They agreed that all affected taxpayers were entitled to deduct the full amount of their cash contributions to Second Chance, 50% of the value of the contributed property, and that no penalties would be asserted. This was intended to be a global settlement to resolve all Second Chance cases. This settlement was reviewed and approved by the Appeals officer and by at least one senior reviewer in the Appeals Division. We believe the settlement was offered and accepted by approximately 20-35 individual taxpayers who were audited for their 2011 tax year. As part of the project described above. The IRS immediately provided written agreements to some of the taxpayers, all of them signed the agreements and paid any additional tax due under the settlement. (Note IRS should have precise number of persons accepting the global settlement.) The other donors (approximately 10-15 individuals) were treated differently with some receiving written settlement agreements which they signed and returned before the deadline, and others who verbally accepted the offer but did not receive a written offer.

In September/October, 2014 these remaining donors were told that a hold had been placed on all Second Chance cases. None of the persons that we have dealt with in the IRS will provide any information about why the processing of Second Chance cases was placed on hold. We believe, but cannot confirm, that the hold resulted from ex parte communications between representatives of the IRS Examination and Appeals Divisions. Such ex parte communications are expressly prohibited by the Internal Revenue Service Restructuring and Reform Act of 1998, Rev. Proc. 2012-18, §2.03, and by the manuals of both the IRS and Appeals and Examinations. Internal Revenue Manual Part 4.2.7(Examination Division) and Part 8.1.10 (Appeals).

In late November, 2014 the remaining donors were advised that the IRS was revoking the "global settlement" offer and that it would provide a new offer. Under the revised offer, a taxpayer could settle by accepting a 50% disallowance of any cash contributed to Second Chance and $10,000 for the value of any property that had been contributed. No penalties would be asserted. The legal position to support the logic of this offer has not been provided to any of the taxpayers.

When donors or their representatives contacted the Appeals Officer assigned to coordinate the Second Chance project, they were told that she would be happy to meet with them to discuss their cases, but that she had no authority to deviate from the settlement offer. The matter had been taken out of her hands. When asked if she could arrange a meeting with higher level officials who had made the decisions, she said that she did not think that this was possible. When she was requested to provide a written explanation of the IRS position which led to modification of the prior position, she said there was no written explanation, or if there was it had never been provided to her. When asked if it did not seem fundamentally unfair of the IRS to treat similarly situated taxpayers differently, she said she had no authority to comment on this.

Page 7

The individual taxpayers who were given the revised settlement offers have either signed Forms 870 and intend to file a suit for refund in federal district court after all procedural requirements have been satisfied, or have asked for notice of deficiency so they may challenge the IRS position in U.S. Tax Court..

**Basis for IRS Position that Second Chance is Engaged in an Impermissible Tax Avoidance Activity and Could be Subject to an Injunction and Penalties**

Your letter of February 10, 2015 indicates that you have reviewed materials "regarding your participation in tax avoidance transactions." We respectfully request that you provide us with copies of these materials and tell us what these tax avoidance activities are. We would also like to make a number of comments with respect to this statement.

Tax avoidance strategies are entirely permissible. This principle was perhaps best summarized by Judge Learned Hand when he stated: "Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right for nobody owes any public duty to pay more tax than the law demands, taxes are enforced exactions, not voluntary contributions." Newman v. Commissioner, 159 F.2d 848(2d Cir. 1947).

Tax avoidance strategies are specifically embraced in the tax code. Home mortgage interest, contributions to tax deferred plans, and contributions to a recognized charity are all strategies that allow the avoidance of tax. Second Chance is a section 501(c) (3) organization and contributions to it are expressly permitted by code section 170.

While the IRS has examined Second Chance donors since its inception, some examiners have found these deductions to be entirely consistent with the tax code. Moreover, even in those cases settled on some intermediate basis, no penalties have ever been upheld. **Why are Second Chance activities now being characterized as a possible abusive tax shelter?**

The underlying argument that the Service has used in all cases described above in regards to the cash contribution is that it promotes a quid pro quo. In the Service's view, donors are paying Second Chance for demolition of their property in exchange for a tax benefit and for demolition services. This assertion is wrong as a matter of fact and has been rejected. During the appeals process, a number of taxpayers provided evidence from demolition companies that established that anything removed by Second Chance had no impact on the cost of demolition. In other words, any donations to Second Chance saved the taxpayers nothing in demolition costs.

We are particularly perplexed because Second Chance believes it is acting in a manner encouraged by EPA and HUD ( see Exhibits B and C), used by any number of companies ( see exhibit D), and praised by respected financial periodicals (see exhibit D), but condemned by IRS as an "abusive tax shelter" for reasons that have yet to be disclosed.

Page 8

While Second Chance has questioned the method used by some donors to value their donations it has issued no guideline as to how this should be done. As early as 2010, the undersigned implored the IRS to tell donors how to value their donations (see Exhibit E and in particular the highlighted paragraphs), but this request has been repeatedly ignored.

**Information Documents Request**

The underlying basis for the documents request is that the IRS believes that Second Chance is promoting an impermissible tax avoidance program. While we will, to the best of our ability in the very short lead time provided, provide a response to your requests, we dispute any implication that Second Chance is engaged in any impermissible activity.

We have compiled some of the information in response to your documents request and wish to clarify certain other requests. We specifically request your guidance and clarification on the following:

1. Your have requested information for the period from 2009 through the present. Much of the information that you have requested was provided to Agent Walker in 2012 at significant time and expense to Second Chance. Do you want us to provide this same information to you? Is it satisfactory if we supply information for the periods subsequent to those periods already provided?
2. The undersigned has previously provided a power of attorney from both Second Chance and Mr. Foster. If this power needs to be updated I will discuss this with you when Mr. Foster and I meet with you on March 5, 2014.
3. We have provided as **Exhibit G** the general information provided to prospective donors who inquire about donating properties to Second Chance.
4. We have provided copies of sample follow-up information provided to persons who make donations to Second Chance as **Exhibit H.**
5. We have attached a copy of the Form 4564 that you sent to Second Chance and have provided responses to these inquires to the extent we could within the limited time frame allowed **(Exhibit I)**. We will review this with you when we meet on March 5, 2015.

**Conclusion**

We believe that since its inception Second Chance has operated in a manner that is entirely consistent with the tax code. For the most part, when the IRS has questioned donations, it has agreed with this position. The only substantive issue we have been unable to resolve is the proper methodology for valuing contributions of structures. While IRS has disagreed with the approach used in some cases, it has agreed with it in others. What has been acknowledged is that IRS has not published any specific guidance on this matter.

Page 9

Second Chance firmly believes it conducts its activities in a manner acceptable to the IRS. Donors to Second Chance and the many other organizations like it cannot always do so consistently unless the IRS publishes definitive guidance with respect to how it believes these donations should be valued.

Second Chance represents what can be accomplished in service to the community when donors are generous enough to provide materials and training opportunities rather than send those materials to the landfill. The role of government is to encourage good and responsible behavior and one way that is done is by providing tax incentives. This is precisely what both EPA and HUD are suggesting in the materials attached to this letter.

The outcomes that are the result of the operation of Second Chance are recognized by the community as well as by City and State Government by the many awards and recognitions that have been bestowed and jobs that are being created.

This is clearly not an abusive tax shelter and it is our hope that this investigation is closed quickly so resources can be applied to cases where actual harm is being done.

Second Chance firmly believes that this investigation is, hopefully, the last vestige of an ongoing attempt by Agent Walker to "put a stake in the heart" of Second Chance. If you agree, you should bring this Second Chance investigation to a close in the same expedited manner in which the criminal investigation was closed when facts did not align with his allegations.

If you believe there is merit to the assertions, then Second Chance believes you must address the issue as well in a broader context than a singular action against only one of hundreds of organizations that mimic the behaviors that you are investigating. Additionally, if you believe these activities are abusive promotions as alleged, then it should be expected you will endeavor to unwind the promotion of these types of activities by the governmental agencies who now openly advocate for this behavior.

We look forward to discussing this matter with you.

Sincerely,


Thomas J. O'Rourke

Enclosures

cc:     Mark Foster

Thomas J. O'Rourke
301-517-4821
torourke@milesstockbridge.com

March 16, 2015

Mr. Marco Volpe, Revenue Agent
IRS TE/GE
450 Golden Gate Avenue
MS 7401
San Francisco, CA 94102

Re:    Second Chance

Dear Mr. Volpe:

This letter is written in follow-up to our meeting on Monday, March 9, 2015 in Baltimore.

At the very outset I wish to emphasize that since its inception, one of Second Chance's primary goals has been to operate in a manner consistent with all IRS guidelines in accomplishing its tax exempt purposes. It thought it had been doing so because, prior to 2013, most donors who had been audited by the IRS received no change letters. To Second Chance this meant that the methodologies it used were consistent with IRS policies. In those cases where the amount of the donation was questioned, the basis of the disagreement involved the valuation used by the taxpayer. Such cases were typically settled either between the taxpayer and the agent, or the taxpayer and the Appeals division. When Mr. Foster was advised in July, 2012 that IRS wanted a specific personal property appraisal that it called a "deconstructed appraisal" he advised donors of this. Thus, since late 2012 donors have been using a valuation method that they believed to consistent with IRS policy. If you disagree with this, please advise us and tell us the proper method to use.

A consistent basis for the position taken in the examination of 2011 Second Chance donors was that the taxpayers received a quid pro quo (demolition services) in exchange for any cash donation and that they did not donate their entire interest in the property. Both of these arguments are addressed in the protest that is attached as Exhibit A to this letter filed by the undersigned on behalf of one donor. The IRS Appeals office agreed with the position taken in the attached letter and this case was settled. The Appeals settlement was approved by senior level Appeals reviewers.

Since Second Chance has now advised its donors that any contribution must be supported by a personal property appraisal that values the individual component items that are donated in the manner specified to Mr. Foster by IRS, we believe the partial interest issue is now moot with respect to cases arising after late 2012. Please advise us if you disagree.

Page 2

The issue of whether there is a quid pro quo for any cash donation needs to be addressed. We have supplemented the argument set forth in the attached protest in the succeeding section of this letter.

**There was no quid pro quo for the cash contributions donors made to Second Chance.**

When we met you explained in that in your view cash contributions to Second Chance are not deductible because the taxpayers received a quid pro quo – they received demolition services in exchange for the cash. We believe that this position is wrong both as a matter of fact and as a matter of law.

When Second Chance receives a donation it advises the donor that the structure they donate will be used in support of its mission to train disadvantaged individuals in deconstruction techniques. The goal is to help these individuals develop skills they can use to find full time employment. The individuals who work on the deconstruction project are paid for their services. A Second Chance donor is requested to make a contribution to help fund the training program. While Second Chance receives a structure and is free to remove all or any part of the structure, it also advises donors that a structure may remain on their property after Second Chance removes all items of value. Donors are it advised that Second Chance will not provide demolition services and that the structure which, in most cases has been stripped of all usable items, will remain. If the donor wishes to remove the remains of the structure he/she must do so at his/her expense.

During the course of the ongoing investigation of Second Chance donors, these donors have provided evidence from demolition companies that cost of demolition would be the same whether or not Second Chance had stripped the structure of usable items. In other words, any work done by Second Chance resulted in no savings in demolition costs to the donor - there was no quid pro quo.

This conclusion is supported by a number of court cases, most of which involve the donation of a conservation easement. In these cases, when a charitable entity accepts the easement, it requires a cash donation by the donor to allow the entity to achieve its exempt purposes. For example, in Scheidelman v. Commissioner, 682 F. 3rd 189 (2d Cir. 2012), the Court specifically stated:

> While Scheidelman's $9,275 donation was described as a prerequisite of the Trust's acceptance of the easement donation the Trust gave the Taxpayer no "goods or services" or "benefit" or anything of value in return for making her money gift.

The court further concluded that such cash payments are commonly required by charitable entities as a condition for accepting a gift of property to allow the charity to defray the costs associated with the expense of receiving the donated property. The courts in Kaufman v. Commissioner, 134 T.C. 182 (2010), 136 T.C. 294(2011), vacated on another issue at 687 F. 3d 21 (1st Cir. 2012), and in Dunlap V. Commissioner, T.C. Memo 2012-126 reached similar conclusions.

Page 3

Similar to the contributions in <u>Scheidelman</u>, <u>Kaufman</u>, and <u>Dunlap</u>, the donors received no goods or services from Second Chance for the cash they contributed. This cash contribution did not result in a reduction in their demolition costs. There was no quid pro quo.

In summary, we believe donors did not receive a quid pro quo for any cash contributions they made to Second Chance because:

1. They received no goods or services in return for any payments they made.
2. The court cases that have considered the issue have concluded that any cash payments made in conjunction with a contribution of property are fully deductible as long as the donor did not receive goods or services in return.
3. IRS Appeals has determined that cash payments made in conjunction with a contribution of property are fully deductible and are not a quid pro quo for demolition services.

Please direct any comments or questions you may have regarding this letter to the undersigned.

Thank you.

 Sincerely,


Thomas J. O'Rourke

Enclosures

cc:     Elizabeth Henn, IRS Counsel
        Mark Foster, Second Chance



**XH TRMA**

TRK# 0201

8812 4985 5824

THU – 15 MAY 10:30A
PRIORITY OVERNIGHT

CA-US FAT

93721

ORIGIN ID:GAIA  (301) 762-1600
PATRICK TOOHEY ESQUIRE
MILES & STOCKBRIDGE P.C.
11 N. WASHINGTON STREET
SUITE 700
ROCKVILLE, MD 20850
UNITED STATES US

TO CHARLES R. MATTHEWS
DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
2525 CAPITOL STREET
FRESNO CA 93721

REF: 101889-48

DEPT:
PO:
INV:
(301) 762-1600

SHIP DATE: 14MAY25
ACTWGT: 0.50 LB
CAD: 102185958/INET4535

BILL SENDER

58GJ4/EA36/59F2

FedEx
Express

J252025040801uv

After printing this label:

**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

Dear Customer,

The following is the proof-of-delivery for tracking number: 881249855824

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Shipping/Receiving |
| **Signed for by:** | P.Ramero | **Delivery Location:** | Internal Revenue Service |
| **Service type:** | FedEx Priority Overnight | | 2525 Capitol Street |
| **Special Handling:** | Deliver Weekday | | FRESNO, CA, 93721 |
| | | **Delivery date:** | May 15, 2025 09:56 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 881249855824 | **Ship Date:** | May 14, 2025 |
| | | **Weight:** | 1.0 LB/0.45 KG |

**Recipient:**
Charles R. Matthews, Department of the Treasury
Internal Revenue Service
2525 Capitol Street
FRESNO, CA, US, 93721

**Shipper:**
Patrick Toohey Esquire, Miles & Stockbridge P.C.
11 N. Washington Street
Suite 700
Rockville, MD, US, 20850

**Reference**                101898-48



**P. RAMERO**
**#7, 09:57, 1 Del, 0 NonDel**

Thank you for choosing FedEx