UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SECOND CHANCE, INC., et al., ) | |
| ) | |
| Plaintiffs and counter-defendants, ) | |
| ) | |
| v. ) | No. 1:25-cv-01665-MJM |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant and counter-plaintiff. ) | |

## ANSWER AND COUNTERCLAIM

The United States answers the complaint and counterclaims as follows.

## NATURE OF THE CASE

1.  Admits that plaintiffs seek, pursuant to 26 U.S.C. §§ 6703(c)(2) and 7422, a refund of certain payments made toward civil penalties and interest assessed against them pursuant to 26 U.S.C. § 6701. Denies the remainder.

## PARTIES

2.  Admits.

3.  Admits.

4.  Admits that the Internal Revenue Service is an agency of the United States of America whose main office is located at 1111 Constitution Avenue. N.W., Washington, District of Columbia 20224. Denies the remainder.

## JURISDICTION AND VENUE

5.  Admits.

6.  Admits that venue is proper in this judicial district under 28 U.S.C. § 1402(a)(1). Denies the remainder.

1

## FACTS COMMON TO ALL COUNTS

7.      Denies.

8.      The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 8.

9.      Denies.

10.     Denies.

11.     Denies.

12.     Admits that the Internal Revenue Code allows tax deductions for certain charitable contributions. Denies the remainder.

13.     Admits that paragraph 13 sets for some of the criteria taxpayers must meet in order to claim a charitable contribution deduction. Denies the remainder.

14.     Admits that, to substantiate a donation of property that results in a claimed deduction of more than $5,000, the taxpayer must, among other things, obtain a "qualified appraisal" of that property as set forth in 26 U.S.C. § 170(f)(11)(C) and (E). Denies the remainder.

15.     Admits that Second Chance makes and furnishes IRS Forms 8283 to customers. Denies the remainder.

16.     Denies.

17.     Denies.

18.     Denies.

19.     Denies.

20.     Denies.

21.     The United States lacks knowledge or information sufficient to form a belief about the truth of the allegations set forth in the first sentence of paragraph 21. Denies the remainder.

22.     Admits the IRS investigated Second Chance's tax avoidance transactions and admits that it audited 22 of Second Chance's customers. Denies the remainder.

23.     Admits that the IRS denied the charitable donation deductions that Second Chance's customers claimed. Denies the remainder.

24.     Admits that the IRS assessed penalties against Second Chance and Foster pursuant to 26 U.S.C. § 6701. Denies the remainder.

25.     Admits that, on or about July 8, 2024, the IRS sent a letter to Second Chance stating that it had determined Second Chance was liable for penalties under 26 U.S.C. § 6701 in the total amount of $22,000 (or, $1,000 per customer), and further admits that the IRS provided a lengthy explanation of the basis for its determination. Denies the remainder.

26.     Admits that, on or about July 8, 2024, the IRS sent a letter to Foster stating that it had determined Foster was liable for penalties under 26 U.S.C. § 6701 in the total amount of $22,000 (or, $1,000 per customer), and further admits that the IRS provided a lengthy explanation of the basis for its determination. Denies the remainder.

27.     Admits that, on or about August 12, 2024, Second Chance and Foster, through counsel, sent a letter to the IRS stating they disputed the IRS's penalty determination. Denies the remainder.

28.     Admits that, on or about August 15, 2024, Second Chance and Foster, through counsel, sent an email to the IRS providing some information regarding why they disputed the IRS's penalty determination. Denies the remainder.

29.     Admits.

30.     Admits.

31.     Admits.

32.     Admits.

33.     Admits that on or about May 15, 2025, Foster provided some additional information to the IRS regarding why he disputed the IRS's penalty determination. Denies the remainder.

34.     Admits that on or about May 15, 2025, Second Chance provided some additional information to the IRS regarding why it disputed the IRS's penalty determination. Denies the remainder.

35.     Admits that more than six months elapsed between Foster and Second Chance's claims for refund and their complaint in this case. Denies the remainder.

36.     Denies.

37.     Denies.

38.     Admits that the customers the IRS audited in connection with Foster and Second Chance's tax avoidance transactions provided documents to the IRS. Denies the remainder.

39.     Denies.

40.     Admits the IRS denied the claimed charitable contribution deductions that some customers claimed in connection with Foster and Second Chance's tax avoidance transactions. Denies the remainder.

41.     Denies.

42.     Admits that the IRS denied claimed charitable contribution deductions for items that were never actually donated to Second Chance. Denies the remainder.

43.     Admits that the IRS denied claimed charitable contribution deductions because the appraisals were not qualified appraisals and because the appraisals employed bogus methodologies. Denies the remainder.

44.     Admits that the IRS denied claimed charitable contribution deductions because the appraisals contained insufficient information regarding the donated property. Denies the remainder.

45.     Admits that the IRS denied claimed charitable contribution deductions made by customers of Second Chance. Denies the remainder.

46.     Admits that the IRS denied claimed charitable contribution deductions based on failure to comply with the contemporaneous written acknowledgement requirements of 26 U.S.C. § 170(f)(8). Denies the remainder.

47.     Denies.

48.     Denies.

49.     Denies.

50.     Denies.

51.     Admits.

52.     Denies.

53.     Denies.

54.     Denies.

55.     Denies.

56.     Denies.

## COUNT I – CLAIM FOR REFUND
### (Second Chance, Inc.)

57.    The United States repeats and reiterates each response set forth above as if fully set forth herein.

58.    Admits.

59.    Denies.

60.    Denies.

The paragraph following paragraph 60 is a prayer for relief with respect to Count I that does not require a response. To the extent the prayer for relief for Count I requires a response, the United States admits that plaintiffs are seeking certain relief but denies plaintiffs are entitled to any such relief, and specifically denies that Second Chance is entitled to litigation costs and attorneys' fees.

## COUNT II – CLAIM FOR REFUND
### (Mark Foster)

61.    The United States repeats and reiterates each response set forth above as if fully set forth herein.

62.    Admits.

63.    Denies.

64.    Denies.

The paragraph following paragraph 64 is a prayer for relief with respect to Count II that does not require a response. To the extent the prayer for relief for Count II requires a response, the United States admits that plaintiffs are seeking certain relief but denies plaintiffs are entitled to any such relief, and specifically denies that Foster is entitled to litigation costs and attorneys' fees.

## COUNTERCLAIM

The United States of America, for its counterclaim against Mark Foster and Second Chance, Inc. (collectively, "counterclaim defendants"), alleges the following:

1.    Counterclaim defendants Mark Foster and Second Chance, Inc. organize, promote, and sell (or assist in the organization, promotion, or sale of) abusive charitable donation transactions that result in inflated and unsupported charitable contribution deductions claimed on the federal income tax returns of their customers.

2.    Foster and Second Chance target owners of real property who are planning a demolition of an existing structure, typically a single-family home, for purposes of building a larger, more modern structure.

3.    Using false promises of legitimate tax savings, Foster and Second Chance encourage property owners to "deconstruct" their homes prior to demolition. Foster and Second Chance then arrange for some components salvaged prior to demolition to be brought to Second Chance's warehouse in Baltimore. Yet counterclaim defendants promise customers they can claim charitable contribution tax deductions based upon the value of their homes, not just the pieces salvaged during the "deconstruction" process.

4.    Foster and Second Chance know or have reason to know that they made false or fraudulent statements about tax benefits to their customers. Foster and Second Chance have promoted their home deconstruction activity to potential customers as a means of generating large income tax deductions. In support of those deductions, Foster and Second Chance created lists of donated materials including materials that Second Chance never received. Foster signed IRS Forms 8283 acknowledging the receipt of goods and the value of those goods, with knowledge, or with reason to know, that Second Chance never received those goods.

5.      The purported value of the donations to Second Chance was determined by using a replacement value methodology, rather than the fair market value of the items required by the Internal Revenue Code and applicable Treasury Regulations. Replacement value is the amount of money it would cost to replace an asset with a new or similar one of like kind and quality in the current market.

6.      Because the donations to Second Chance consisted mostly of materials salvaged from homes being readied for demolition, the replacement value significantly overstated the value of the salvaged items. For example, donated kitchen flooring that had been attached to the house and removed by Second Chance is valued based on the cost to replace the flooring with identical, new-in-the-box flooring.

7.      Foster and Second Chance assisted their customers in claiming: (1) overstated deductions for salvaged material donated to Second Chance; and (2) fictitious deductions for goods and services that were never received by Second Chance.

8.      A decision of the U.S. Court of Appeals for the Fourth Circuit has confirmed the abusive nature of similar charitable donation transactions engaged in by Second Chance. That ruling – of which counterclaim defendants are aware – determined that these transactions rely on an inappropriate valuation methodology and the customers in these transactions improperly claimed charitable contribution deductions for items that were never donated to Second Chance.

9.      In other words, Foster and Second Chance are fully aware that their activities assisted their customers in claiming false or fraudulent deductions and that the IRS Forms 8283 and supporting documents signed by Foster would be used to understate the tax liabilities of their customers.

10.     Because of these abusive charitable donation transactions, the IRS has expended significant resources auditing some of the Second Chance customers who have claimed large and unwarranted charitable contribution deductions on their income tax returns.

11.     Since 2005, Foster and Second Chance have organized and promoted abusive charitable donation transactions. IRS audits of 22 of these transactions show that, on average for each tax return examined, Foster and Second Chance assisted their customers in claiming $201,500 in bogus charitable contribution deductions. If that figure is multiplied across their known customer base from tax years 2019 to 2021 alone, the total dollar amount of bogus deductions could be as much as $100 million.

12.     Accordingly, the United States brings this counterclaim pursuant to 26 U.S.C. §§ 7402 and 7408 to enjoin the counterclaim defendants from organizing, promoting, or selling abusive charitable donation transactions, and assisting in those activities, from aiding or abetting the understatement of tax liability resulting from abusive charitable donation transactions, and other relief as detailed below.

## AUTHORIZATION

13.     This counterclaim is brought pursuant to 26 U.S.C. §§ 7401, 7408(a), and Fed. R. Civ. P. 13.

14.      This counterclaim is commenced at the request and with the authorization of a delegate of the Secretary of the Treasury and at the direction of a delegate of the Attorney General of the United States, under 26 U.S.C. §§ 7401 and 7408(a).

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1340, and 1345, as well as 26 U.S.C. §§ 7402 and 7408.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as well 28 U.S.C. § 7408(a), because the counterclaim defendants reside in this judicial district and a substantial part of the conduct giving rise to this counterclaim took place in this judicial district.

## THE PARTIES

17.    The counterclaimant is the United States of America.

18.    Counterclaim defendant Mark Foster resides in Towson, Maryland. Foster graduated from Cornell University in 1980 with a bachelor's degree in hotel administration. Foster worked in the hospitality industry for 20 years. Among other things, he developed, managed and sold hotels and restaurants. In 2000, Foster started, and began to devote his time to, an organization that would become known as Second Chance.

19.    Counterclaim defendant Second Chance, Inc. holds itself out as a nonprofit organization exempt from taxation under 26 U.S.C. § 501(c)(3). Second Chance has its principal place of business in Baltimore, Maryland. Foster formed Second Chance in Maryland in 2000.

20.    Foster is the president, CEO, and founder of Second Chance. He controls Second Chance's operations, speaks with customers, has worked to expand Second Chance's activities, and hires and trains employees.

## OVERVIEW OF THE COUNTERCLAIM DEFENDANTS' ABUSIVE CHARITABLE DONATION TRANSACTIONS

21.    The Internal Revenue Code provides that a taxpayer may deduct from her taxable income the value of a charitable contribution or gift to a recognized tax-exempt entity.

22.    The amount of a charitable deduction generally is based on the fair market value of the property at the time of the donation. The Internal Revenue Code defines fair market value as "the price at which the property would change hands between a willing buyer and a willing

seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

23.    For claimed charitable contribution deductions of property with a value of over $5,000, a taxpayer must obtain a "qualified appraisal" of that property.

24.    Information related to noncash charitable contributions is typically reported on IRS Form 8283 (Noncash Charitable Contribution), and should be included with the tax return containing the claimed deduction. By signing IRS Form 8283, the charitable organization (donee) certifies that it received the donated property as described in the form, including a "summary of the overall physical condition of the property at the time of the gift."

25.    Foster promised significant tax savings (with donation values often in the hundreds of thousands of dollars) to property owners who used the "deconstruction" services provided by Second Chance.

26.    Foster and Second Chance market these abusive charitable donation transactions to wealthy individuals who plan to tear down an existing home to build a larger, more modern residence.

27.    Second Chance's abusive charitable donation transactions are promoted through a website located at www.secondchanceinc.org. This site explains how its abusive charitable donation transactions work, and advertises the "generous tax savings" available to Second Chance's customers.

28.    The site also provides estimates of the amount of taxes customers can expect to save by allowing Second Chance to deconstruct their property. The site provides an example of the estimated tax savings using Second Chance's "deconstruction" services using $200,000 as the fair market value of the materials to be donated.

29.     Foster and Second Chance tell their customers that a qualified appraisal of the property is required to claim the noncash charitable contribution deduction. Foster and Second Chance send an email to the customer summarizing the details of the deconstruction process.

30.     According to Second Chance, "deconstruction" is the taking apart of a house or building to salvage materials that can be repurposed.

31.     Second Chance disassembles portions of their customer's home, salvages useful components, and leaves the remainder for demolition by a contractor hired by the customer.

32.     Although Second Chance performs deconstruction, it does not perform demolition and advises their potential customers to that effect.

33.     Foster and Second Chance require that their customers make a cash donation, typically $10,000 to $30,000, to Second Chance to obtain the tax benefits purportedly associated with the charitable donation scheme. These "pledges" are made by Second Chance's customers either upfront or in installments.

34.     But these "pledges" are not traditional donations; they function as a fee the customer is required to pay to engage the services of Second Chance and thereby secure the ability to obtain a tax benefit.

35.     Nevertheless, Foster and Second Chance falsely state that their customers may deduct the full amount of their "pledge" from their federal income taxes as well – on the false basis that the customers "will receive no goods or services in exchange" for the donation.

36.     Foster and Second Chance have described this cash "pledge" payment to them as a "sharing" of the tax benefits they generate for their customers.

37.     When customers fail or refuse to pay the "pledge," Foster and Second Chance typically refer the matter to their attorneys for collection.

38.    Second Chance provides customers, or potential customers, with a Tax Strategy

Planning Worksheet, which outlines the estimated tax benefits from the deconstruction:

## Tax Strategy Planning Worksheet

### Contribution Options for $200K House*

Value of Contributed Structure:    $200,000
Median value from appraiser estimate range

Tax Rate (Federal and State):    40%
Assumed tax rate; yours may differ

Estimated Tax Savings:    $80,000
Donation value times tax rate

### Program Cash Contribution Options
Choose the option that best suits your tax strategy

|  | Option #1 | Option #2 | Option #3 |
|---|---|---|---|
| Donation Options: | 30 days after completion | Next year after tax season | The following year after tax season |
| Pledge Amount: | $27,500 | $30,000 | $32,500 |
| Tax Savings: (On contributions at 40%) | -$11,000 | -$12,000 | -$13,000 |
| Net Cost of Donations: | $16,500 | $18,000 | $19,500 |

### Summary

|  | | | |
|---|---|---|---|
| Tax Savings or Refund: | $80,000 | $80,000 | $80,000 |
| Cost of Donation: (After 40% tax savings) | -$16,500 | -$18,000 | -$19,500 |
| Net Benefit to Donor: | $63,500 | $62,000 | $60,500 |

It is important to understand that you will still have the same demolition costs before and after our involvement in the project. We utilize your structures for training and workforce development.

* All information provided is an example of how the program could possibly work. It is not tax advice and you should consult with your tax specialist to verify your personal benefit analysis.

39.    The Tax Strategy Planning Worksheet is furnished to aid the customer in deciding

whether to participate in the transaction. Invariably, the final valuation of the salvaged and

donated materials falls within the range provided by the appraiser prior to deconstruction and reported on the Tax Strategy Planning Worksheet.

40.     Interested customers are first provided an estimate or range of value of the property to be donated.

41.     The appraiser enters the structure's measurements and components into R.S. Means, a construction cost estimating software program used to project and control the cost of both new building and renovation projects. R.S. Means provides a list of all the materials, fixtures, and other components in a typical home of similar size in that market and their current cost. R.S. Means does not provide a list of items salvaged from the home and the condition of any such salvaged items. Yet, the appraiser uses the R.S. Means software to produce an estimated donation value. This estimate does not reflect the actual materials, fixtures, and other components in the home, does not consider which of those materials, fixtures, and other components will be salvaged successfully or brought to Second Chance's warehouse; nor does it consider the condition of each of these individual items in their salvaged state.

42.     The list created from R.S. Means represents all the materials, fixtures, and other components in the customer's home prior to deconstruction, less drywall, masonry, tile and mirror. The final appraisal is not revised to reflect the items that actually were salvaged and donated and does not describe the items in their "as-deconstructed" condition.

43.     The appraiser's estimate is then provided to Second Chance, which uses the information to prepare the Tax Strategy Planning Worksheet. The Tax Strategy Planning Worksheet estimates the prospective customer's expected tax savings. The Tax Strategy Planning Worksheet is prepared and furnished to the customer before Foster or Second Chance commence "deconstruction" services – thus, it is not known at this time what (if any) materials,

fixtures, and other components will be salvaged successfully; nor is the condition of any such salvaged materials known.

44.     Next, a prospective Second Chance customer is asked to sign a contract, titled "Agreement for Charitable Contribution and Pledge Agreement," which then allows Second Chance to begin "deconstructing" the customer's property by removing any material of value to resell or recycle.

45.      If, before deconstruction, the customer seeks to keep some of the items previously reflected in the appraisal, the R.S. Means list of materials, fixtures, and other components is not adjusted.

46.     Any items salvaged from these projects are taken to the Second Chance warehouse in Baltimore where they are sold to the public.

47.     Items not salvaged by Second Chance are thrown into dumpsters or relocated to the basement for removal by a demolition company hired by the customer. After Second Chance completes the deconstruction, the customer is responsible for hiring and paying a demolition company to remove whatever was not salvaged and to demolish the remainder of the structure.

48.     Second Chance typically creates a manifest, or list, of everything its workers removed from a given site.

49.     When the deconstruction process is over, Foster and Second Chance provide the client with a signed letter thanking them for the donation of the property. After the pledge is paid, Foster sends another signed letter thanking the customer for the payment.

50.     Foster copies the pre-deconstruction list initially created from R.S. Means software and signs it with the notation "All Materials Received." The R.S. Means list is attached to the appraisal as Addendum A and the list signed by Foster is attached as Addendum AA.

51.     The list created from R.S. Means software is not an accurate list of the items salvaged from the deconstructed residences and, thus, is not an accurate list of the items donated to Second Chance.

52.     The list created from R.S. Means software is materially different from the manifests, or lists, of everything Second Chance workers removed from the deconstruction site.

53.     The manifests, or lists, of everything Second Chance workers removed from the deconstruction site are not provided to the appraiser.

54.     Customers in these transactions claim charitable contribution deductions based on the value of all the items on the list created from R.S. Means software, not the items that are brought to Second Chance's warehouse.

55.     Despite Foster's written acknowledgment that all the items on the list created from R.S. Means software were received by Second Chance ("All Materials Received"), the manifests created by the Second Chance deconstruction crew tell a different story.

56.      Customers to Second Chance are led to believe the pre-deconstruction list created from R.S. Means software, which is included in the appraisal, and the post-deconstruction materials list signed by Foster ("All Materials Received") are the items actually salvaged from the customer's property and donated to Second Chance.

57.     Foster and Second Chance use the same appraiser to prepare almost all of the appraisals for all of their customers.

58.     Foster signs IRS Form 8283 as President of Second Chance and furnishes the IRS Form 8283 to the customer.

59.     By signing the IRS Form 8283, Foster, on behalf of Second Chance, assists in the preparation and presentation of a portion of the tax return of the customers in these transactions.

Foster knows, or has reason to believe, that the customers in the transactions cannot substantiate their charitable contribution deductions without a fully executed IRS Form 8283. That is, the portion will be used in connection with a material matter arising under the internal revenue laws.

60.     Foster also knows that the appraisal created from R.S. Means software – which includes essentially all the materials, fixtures, and other components in the home prior to deconstruction – does not represent the items actually donated to Second Chance and therefore will result in an understatement of the liability for tax of another person.

## EXAMPLES

61.     The following examples illustrate the counterclaim defendants' abusive charitable donation transactions. These are simply examples of the conduct at issue, and they are not intended to exemplify each false statement that the counterclaim defendants made or furnished or each instance in which the counterclaim defendants aided or abetted the understatement of tax liability.

### *Property 1 – Bethesda, Maryland single-family home*

62.     Property 1 is a single-family home located in Bethesda, Maryland. On or about October 7, 2020, the owners of Property 1 exchanged emails with a representative of Second Chance regarding the possible "deconstruction" of their home. Second Chance informed the owners of Property 1 that the organization asks its customers to share "a portion of the tax benefit with us in the form of a cash donation made at a time that is in keeping with their tax strategy." According to Second Chance, "[m]ost folks capture the deduction for the deconstruction first and then make their cash donation to us the next tax year. Some even split it up over multiple years."

63.     Second Chance further explained the potential tax benefits of home deconstruction, providing the owners of Property 1 with a Tax Strategy Planning Worksheet with an example of a tax benefit of $80,000 through donating materials worth $200,000.

64.     On or about October 19, 2020, Property 1 was inspected for deconstruction.

65.     On or about October 27, 2020, the appraiser provided the owners of Property 1, via email, an estimated donation value of "$135,000 to $165,000." Second Chance also e-mailed the owners of Property 1, on or about October 28, 2020, noting the estimate provided by the appraiser and stating "the Net tax benefit is $42,000-$45,000. The donation to Second Chance is $25,000-$30,000. (Net donation of $15,000-$18,000)[.]"

66.     On or about November 17, 2020, Second Chance provided the owners of Property 1 with the "Pledge Letter" and "Agreement for Charitable Contribution." The Pledge Letter acknowledges a commitment to pay $25,000 to Second Chance and states the owners of Property 1 "will receive no goods or services in exchange for your donation."

67.     On or about February 8, 2021, Second Chance e-mailed the owners of Property 1 notifying them that "Second Chance Inc. has completed the deconstruction project at [] in Bethesda, Md." Manifests prepared by Second Chance indicate that salvaged materials were removed from Property 1 on January 28, 2021 and February 5, 2021.

68.     The appraisal is dated February 24, 2021 and was provided to the owners of Property 1 on or about that date. According to the appraisal, the valuation date is November 17, 2020.

69.     The appraisal purports to value all of the "identified assets" from the RS Means report ("objective is to determine the Fair Market Value of the property listed in Addendum A"), and does not value the salvaged materials that actually were removed from Property 1, nor does

it value the materials that actually were donated to Second Chance, as reflected in the manifests created by Second Chance and dated January 28, 2021 and February 5, 2021. Only the manifests recorded by Second Chance described the items actually salvaged and donated to Second Chance.

70.     According to the appraisal, the value of the "identified assets" was $148,500.

71.     Foster, on behalf of Second Chance, signed IRS Form 8283, acknowledging receipt of "personal property" with the condition described as "good – see attached appraisal." The IRS Form 8283 falsely states that the value of the goods donated to Second Chance was $148,500. Foster signed and dated the IRS Form 8283 on February 24, 2021.

72.     On or about March 21, 2021, Second Chance furnished a copy of the IRS Form 8283 to the owners of Property 1.

73.     The owners of Property 1 used the IRS Form 8283 signed by Foster to substantiate a charitable contribution deduction of $148,500.

74.     The owners of Property 1 were not entitled to the $148,500 tax deduction they claimed. By claiming that unwarranted tax deduction, they understated their tax liability.

### *Property 2 – Vienna, Virginia single-family home*

75.     Property 2 is a single-family home located in Vienna, Virginia. On or about July 2, 2020, the owners of Property 2 exchanged emails with a representative of Second Chance regarding the possible "deconstruction" of their home. Second Chance informed the owners of Property 2 that the deconstruction program "creates a tax benefit for the homeowner" and the "first step would be to have a materials appraiser take a look at the home and provide an estimate of the value of the materials donation."

76.     Second Chance further explained the potential tax benefits of home deconstruction, providing the owners of Property 2 with a Tax Strategy Planning Worksheet with an example of a tax benefit of $80,000 through donating materials worth $200,000.

77.     On or about July 10, 2020, Property 2 was inspected for deconstruction.

78.     On or about July 22, 2020, the appraiser provided the owners of Property 2, via email, an estimated donation value of "$145,000 to $165,000."

79.     Second Chance e-mailed the owners of Property 2, on or about July 28, 2020, regarding the pledge amount the owners of Property 2 would be required to make. Second Chance stated that "the pledge is based primarily on the scope of work" and reflects the cost "for [Second Chance] to run our program at this site."

80.     On or about August 3, 2020, Second Chance provided the owners of Property 2 with the "Pledge Letter" and "Agreement for Charitable Contribution." The Pledge Letter acknowledges a commitment to pay $25,000 to Second Chance and states the owners of Property 2 "will receive no goods or services in exchange for your donation."

81.     On or about October 5, 2020, Second Chance e-mailed the owners of Property 2 notifying them that "Second Chance Inc. has completed the deconstruction project at [] in Vienna, Va." Manifests prepared by Second Chance indicate that salvaged materials were removed from Property 2 on September 22, 2020, September 23, 2020, and October 5, 2020.

82.     The appraisal is dated December 10, 2020 and was provided to the owners of Property 2 on or about that date. According to the appraisal, the valuation date is August 3, 2020.

83.     The appraisal purports to value all of the "identified assets" in the RS Means report ("to evaluate and appraise the following: personal property detailed in Addendum A"), and does not value the salvaged materials that actually were removed from Property 2, nor does

it value the materials that actually were donated to Second Chance, as reflected in the manifests created by Second Chance and dated September 22, 2020, September 23, 2020, and October 5, 2020. Only the manifests recorded by Second Chance described the items actually salvaged and donated to Second Chance.

84.    According to the appraisal, the value of the "identified assets" was $161,000.

85.    Foster, on behalf of Second Chance, signed IRS Form 8283, acknowledging receipt of "personal property" with the condition described as "good – see attached appraisal." The IRS Form 8283 falsely states that the value of the goods donated to Second Chance was $161,000. Foster signed and dated the IRS Form 8283 on December 14, 2020.

86.    On or about December 14, 2020, Second Chance furnished a copy of the IRS Form 8283 to the owners of Property 2.

87.    The owners of Property 2 used the IRS Form 8283 signed by Foster to substantiate a charitable contribution deduction of $161,000.

88.    The owners of Property 2 were not entitled to the $161,000 tax deduction they claimed. By claiming that unwarranted tax deduction, they understated their tax liability.

**COUNTERCLAIM DEFENDANTS ORGANIZED AND PROMOTED ABUSIVE CHARITABLE DONATION TRANSACTIONS**

89.    In 2000, Foster formed Second Chance with the Secretary of State of Maryland. Foster sought and received tax-exempt status for Second Chance with the IRS.

90.    From 2005 to the present, Foster has used Second Chance to organize and promote abusive charitable donation transactions.

91.    Foster and Second Chance developed marketing materials, hired employees, and sought out real property owners to participate in abusive charitable donation transactions.

92. Foster developed the Tax Strategy Worksheet to advertise the purported tax benefits of the abusive charitable donation transactions to potential customers and customers of Second Chance.

93. Foster and Second Chance created tax strategy worksheets that included calculations of unwarranted tax benefits for customers of the abusive charitable donation transactions.

94. Foster and Second Chance marketed participation in the abusive charitable donation transactions through the Second Chance website, advertisements in the Baltimore Sun newspaper, and have even hired a marketing company to spread word of their abusive tax practices.

95. Foster created the deconstruction agreement, pledge agreement, and recognition of donation letter.

## COUNTERCLAIM DEFENDANTS MADE AND FURNISHED FALSE STATEMENTS ABOUT TAX BENEFITS

96. Foster and Second Chance made and furnished (or caused others to make and furnish) materially false statements regarding the tax benefits available to customers in the abusive charitable donation transactions.

97. To substantiate a donation of property that results in a claimed deduction of more than $5,000 the taxpayer must, among other things, obtain a "qualified appraisal" of that property as set forth in 26 U.S.C. § 170(f)(11)(C) and (E).

98. The Treasury regulations set forth the requirements for preparing a "qualified appraisal." 26 C.F.R. § 1.170A-13(c)(3).

99.    A "qualified appraisal" must include the "fair market value, within the meaning of § 1.170A-1(c)(2), of the contributed property on the valuation effective date." 26 C.F.R. § 1.170A-17(a)(3)(i)(D).

100.    Fair market value is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 1.170A–1(c)(2).

101.    A "qualified appraisal" is prepared "in accordance with generally accepted appraisal standards" – defined as "the substance and principles of the Uniform Standards of Professional Appraisal Practice, as developed by the Appraisal Standards Board of the Appraisal Foundation." 26 C.F.R. § 1.170A-17(a)(2).

102.    Foster and Second Chance made and furnished (or caused employees and representatives to make and furnish) false statements regarding the allowability of large charitable contribution tax deductions to customers who participated in their abusive charitable donation transactions.

103.    Foster and Second Chance made and furnished (or caused employees and representatives to make or furnish) false statements in the form of inflated appraisals, tax worksheets, and IRS Forms 8283 that overstated the fair market value of property and falsely represented that goods and materials were donated to Second Chance when, in fact, such goods and materials were not so donated.

104.    Foster and Second Chance made and furnished (or caused employees and representatives to make or furnish) the inflated appraisals, tax worksheets, and IRS Forms 8283 to customers in the abusive charitable donation transactions.

105.    Foster and Second Chance made and furnished (or caused employees and representatives to make or furnish) false statements that the appraisals they arranged for their customers were "qualified appraisals."

106.    Foster and Second Chance made and furnished, or caused others to make and furnish, gross valuation overstatements – *i.e.*, that the values of the donated property exceeded 200% of the actual fair market value of the property – in violation of 26 U.S.C. § 6700(a)(2)(B).

107.    Foster and Second Chance made and furnished, or caused others to make and furnish, these gross value overstatements in connection with the abusive charitable donation transactions in the form of inflated appraisals, tax worksheets, and the executed IRS Forms 8283.

### COUNTERCLAIM DEFENDANTS KNEW OR HAD REASON TO KNOW THEIR STATEMENTS WERE FALSE

108.    Foster and Second Chance knew or had reason to know of the falsity of their statements. Foster controlled and organized Second Chance; managed and directed employees and representatives; created marketing materials and tax strategy worksheets; and had knowledge of the internal operations and financial records of Second Chance.

109.    Foster and Second Chance promoted the abusive charitable donation transactions as a tax strategy.

110.    Foster is a sophisticated entrepreneur, holds a bachelor's degree, and has many years of experience orchestrating the abusive charitable donation transactions.

111.    Foster holds himself out as having thoroughly researched the tax laws governing the abusive charitable donation transactions.

112.    Foster holds himself out as an authority on the tax laws governing the abusive charitable donation transactions.

113.    Foster and Second Chance continued organizing, selling, and making false statements about the abusive charitable donation transactions despite IRS scrutiny and adverse proceedings in federal court. Foster is aware of the decision of the U.S. Court of Appeals for the Fourth Circuit affirming the disallowance of a charitable deduction for a Second Chance customer's donation of their "deconstructed" home in which the Court succinctly held, "[i]n providing a value for every component of the house, the appraisal failed to provide the value of the contributed property."

114.    Given Foster's professional qualifications, role in the conduct, and years of experience, he and Second Chance knew or had reason to know that the customers in the abusive charitable donation transactions were not entitled to the tax benefits they stated were available.

### COUNTERCLAIM DEFENDANTS KNOWINGLY AIDED OR ASSISTED IN THE UNDERSTATEMENT OF TAX LIABILITY

115.    Foster and Second Chance aided or assisted in the preparation of inflated appraisals, tax worksheets, and IRS Forms 8283 that overstated the fair market value of donated property and falsely represented that goods and materials were donated to Second Chance when, in fact, such goods and materials were not so donated.

116.    Foster and Second Chance knew (or had reason to believe) the inflated appraisals, tax worksheets, and IRS Forms 8283 would be used in connection with a material matter arising under the internal revenue laws – charitable deductions reported on the federal income taxes of their customers.

117.    Foster and Second Chance knew the inflated appraisals, tax worksheets and IRS Forms 8283, if used in connection with abusive charitable donation transactions, would result in an understatement of the tax liability for the customers in those transactions.

## HARM TO THE GOVERNMENT AND THE PUBLIC

118.    Counterclaim Defendants' abusive charitable donation transactions have harmed and continue to harm the United States Treasury and the public.

119.    Because of these transactions, the IRS has expended significant resources auditing the customers who have claimed large and unwarranted charitable deductions.

120.    Since 2005, Foster and Second Chance have organized and promoted abusive charitable donation transactions. IRS audits of 22 of these transactions show that, on average for each tax return examined, Foster and Second Chance assisted their customers in claiming $201,500 in bogus charitable contribution deductions. If that figure is multiplied across their known customer base from tax years 2019 to 2021 alone, the total dollar amount of bogus deductions could be as much as $100 million.

121.    Customers in these abusive charitable donation transactions are harmed because they are liable for any unpaid tax, plus interest and penalties, after having participated in a tax-motivated transaction that failed to deliver the tax benefits promised by Foster and Second Chance.

122.    Counterclaim defendants' activities undermine public confidence in the fairness of the federal tax system and incite non-compliance with the internal revenue laws.

123.    Counterclaim defendants' activities inspire contempt for the system of honest, voluntary income tax reporting.

124.    Without an injunction, the United States will suffer irreparable harm from the underpayment of tax liabilities and the exhaustion of resources to enforce the internal revenue laws.

125.    Without an injunction, the United States will suffer irreparable harm with no adequate legal remedy.

126.    An injunction prohibiting counterclaim defendants from organizing, selling, promoting, and making statements about abusive charitable donation transactions is necessary and appropriate to stop their unlawful practices. The resulting harm to counterclaim defendants from being enjoined pales in comparison to the harm they have caused to the United States. Prohibiting counterclaim defendants from further promoting their abusive charitable donation transactions is appropriate and commensurate with their consistent practice of flouting the internal revenue laws and regulations.

### COUNT I: PERMANENT INJUNCTION AGAINST MARK FOSTER AND SECOND CHANCE, INC. UNDER 26 U.S.C. § 7408 FOR PROMOTING ABUSIVE TAX SHELTERS

127.    The abusive charitable donation transactions described in this counterclaim constitute a plan or arrangement within the meaning of 26 U.S.C. § 6700.

128.    Since 2005, counterclaim defendants have organized and sold the abusive charitable donation transactions described in this counterclaim.

129.    Counterclaim defendants made and furnished (or caused others to make and furnish) false statements regarding the allowability of a deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of participating in abusive charitable donation transactions.

130.    Counterclaim defendants knew or had reason to know that their statements were false within the meaning of 26 U.S.C. § 6700(a)(2)(A).

131.    Counterclaim defendants made and furnished (or caused others to make and furnish) gross valuation overstatements within the meaning of 26 U.S.C. § 6700(a)(2)(B).

132.    Counterclaim defendants have engaged in conduct – including but not limited to the conduct described in this counterclaim – that is subject to penalty under 26 U.S.C. § 6700, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

133.    If counterclaim defendants are not enjoined, they are likely to continue to promote abusive charitable donation transactions.

134.    Counterclaim defendants' conduct has caused irreparable harm to the United States.

135.    Counterclaim defendants' conduct has caused and is causing substantial revenue loss to the United States' Treasury, much of which may be unrecoverable.

**COUNT II: PERMANENT INJUNCTION AGAINST MARK FOSTER AND SECOND CHANCE, INC. UNDER 26 U.S.C. § 7408 FOR AIDING AND ABETTING THE UNDERSTATEMENT OF TAX LIABILITY**

136.    Counterclaim defendants aid or assist in, procure, or advise with respect to, the preparation or presentation of portions of a return, affidavit, claim, or other document (including, but not limited to, IRS Forms 8283, appraisals, and tax strategy worksheets).

137.    Counterclaim defendants, know (or have reason to believe) that such portion will be used in connection with their customers' reporting of charitable deductions to the IRS, which constitutes a material matter arising under the internal revenue laws.

138.    Counterclaim defendants know that the portion, if so used, will result in the understatement of the tax liability of the customers in the abusive charitable donation transaction, within the meaning of 26 U.S.C. § 6701(a).

139.    Counterclaim defendants have engaged in conduct – including but not limited to the conduct described in this counterclaim – that is subject to penalty under 26 U.S.C. § 6701, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

140.    If counterclaim defendants are not enjoined, they are likely to continue to promote abusive charitable donation transactions.

141.    Counterclaim defendants' conduct has caused irreparable harm to the United States.

142.    Counterclaim defendants' conduct has caused and is causing substantial revenue loss to the United States' Treasury, much of which may be unrecoverable.

**COUNT III: PERMANENT INJUNCTION AGAINST MARK FOSTER AND SECOND CHANCE, INC. UNDER 26 U.S.C. § 7402 FOR INTERFERING WITH THE ENFORCEMENT OF THE INTERNAL REVENUE LAWS**

143.    Counterclaim defendants made and continue to make false or fraudulent statements regarding facts applicable to material matters under the internal revenue laws, and facilitate and continue to facilitate taxpayer claims for false and inflated charitable deductions. These actions constitute conduct that has substantially interfered, and continues to substantially interfere, with the enforcement of the internal revenue laws.

144.    Unless enjoined, counterclaim defendants are in a position to, and likely will, continue to engage in such unlawful conduct and to interfere in the enforcement of the internal revenue laws.

145.    The United States will suffer irreparable injury if counterclaim defendants are not enjoined.

146.    Enjoining counterclaim defendants is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop their abusive conduct and the harm it causes the United States.

147.    The requested injunction against counterclaim defendants is necessary or appropriate to stop their unlawful conduct, and this Court should impose such relief under 26 U.S.C. § 7402(a).

## RELIEF SOUGHT

WHEREFORE, on Counts I through III of this counterclaim, against counterclaim defendants Mark Foster and Second Chance, Inc., the United States of America respectfully requests the following relief:

A.    That this Court find that Mark Foster and Second Chance, Inc. have engaged in conduct subject to penalty under 26 U.S.C. §§ 6700 & 6701 and that injunctive relief under 26 U.S.C. § 7408 is appropriate to prevent recurrence of that conduct.

B.    That this Court find that Mark Foster and Second Chance, Inc. have engaged in conduct interfering with the administration and enforcement of the internal revenue laws and that injunctive relief under 26 U.S.C. § 7402(a) is necessary and appropriate to prevent recurrence of that conduct.

C.    That this Court, pursuant to 26 U.S.C. §§ 7402 and 7408, enter a permanent injunction prohibiting Mark Foster and Second Chance, Inc. from, directly or indirectly:

1.    Organizing, promoting, or selling (or assisting in the organization, promotion, or sale of) any plan or arrangement regarding charitable contribution tax deductions;

2.    Participating (directly or indirectly) in the sale of any plan or arrangement regarding charitable contribution tax deductions;

3.    Making or furnishing (or causing another to make or furnish) a statement about the allowability of any charitable contribution tax deduction, in exchange for compensation; and

4.      Aiding, assisting, procuring, or advising with respect to the preparation of any portion of a return, affidavit, claim, or other document regarding charitable contribution tax deductions, in exchange for compensation.

D.      That this Court, pursuant to 26 U.S.C. § 7402(a), order the immediate revocation of the tax-exempt status, under 26 U.S.C. § 501(c)(3), of Second Chance, Inc. (EIN: 52-2276640).

E.      That this Court, pursuant to 26 U.S.C. § 7402, order Mark Foster and Second Chance, Inc., by February 28th each year for each of the next five years, to sign a declaration under penalty of perjury affirming that they have not engaged in any of the conduct identified above in paragraph C during the prior calendar year. Mark Foster and Second Chance, Inc. shall send that declaration to the following two recipients at the following addresses (unless directed otherwise by counsel for the United States):

Internal Revenue Service
Lead Development Center
25520 Commercentre Drive
Mail Stop 5040
Lake Forest, CA 92630

Department of Justice
Civil Division, Tax Litigation Branch
P.O. Box 7238
Ben Franklin Station
Washington, D.C. 20044

F.      That this Court, pursuant to 26 U.S.C. § 7402, order Mark Foster and Second Chance, Inc., to, within 30 days of entry of judgment in this case:

1.      Produce to counsel for the United States a complete list of customers who signed a donation agreement with Second Chance, Inc., from January 1, 2010, to present. The list shall be in the form of an Excel spreadsheet, and include each

customer's name, address, email address, telephone number, and social security

number or other tax identification number, and date of donation.

2.      Send, by email or mail and at the expense of Mark Foster and Second

Chance, Inc., a copy of the judgment in this case to each individual identified in

paragraph F(1) above. The mailings may include a cover letter, but such letter

must be in a form either agreed to by counsel for the United States or approved by

this Court, and shall not include any other documents or enclosures, unless agreed

to by counsel for the United States or approved by this Court.

3.      Provide a copy of the judgment in this case to all employees, independent

contractors, directors, and officers of Mark Foster and Second Chance, Inc., and

provide to counsel for the United States a signed and dated acknowledgment of

receipt for each person who was provided such a copy. Except for the judgment in

this case, no additional materials may be included in the notification unless

approved by counsel for the United States or approved by this Court.

4.      Prominently display the judgment in this case on the front page of all

websites Mark Foster and Second Chance, Inc. control or maintain that reference

federal taxes, and continue to display it for the next five years.

G.      That this Court, pursuant to 26 U.S.C. § 7402, order Mark Foster and Second

Chance, Inc., to file with the Court, within 45 days of entry of judgment in this case, a

certification signed under penalty of perjury that he has complied with paragraph F

above.

H.      That this Court prohibit Mark Foster and Second Chance, Inc. from making any statements, written or oral, or cause or encourage others to make any statements, written or oral, that misrepresent any of the terms of the judgment in this case.

I.      That this Court permit the United States to engage in post-judgment discovery to ensure and monitor compliance with the judgment in this case.

J.      That this Court retain jurisdiction over this action for the purpose of implementing and enforcing the judgment in this case.

K.      That this Court, pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure, order that entry of the judgment in this case binds the following who receive actual notice of it by personal service or otherwise: (i) Mark Foster and Second Chance, Inc.; (ii) the officers, agents, servants, employees, and attorneys of Mark Foster and Second Chance, Inc.; and (iii) other persons who are in active concert or participation with anyone described in (i) or (ii) above.

L.      That this Court grant the United States such other and further relief as the Court deems appropriate

//

//

//

//

//

//

//

//

//

Dated: December 19, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

s/ *Richard G. Rose*
RICHARD G. ROSE
District of Columbia Bar No. 493454
Trial Attorney

HARRIS J. PHILLIPS
Massachusetts Bar No. 675603
Senior Litigation Counsel

Tax Litigation Branch
Civil Division
U.S. Department of Justice

P.O. Box 7238
Ben Franklin Station
Washington, D.C.  20044
(202) 616-2032
richard.g.rose@usdoj.gov